# EXHIBIT A

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

**12-Person Jury**

FILED
12/15/2020 4:11 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

11493534

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**IN THE CIRCUIT COURT OF COOK COUNTY**
**DISTRICT 2, SKOKIE, ILLLINOIS**

HOWARD LEVENTHAL,

Plaintiff,

vs.

MARY HANDELAND,
NOAH EERNISSE,
MICHELLE ESPINOSA,
REPUBLICAN PARTY OF OZAUKEE COUNTY,
WINSTON M. PAES,
STEVE ZISSOU,
SALLY BUTLER,
JOE HORNING,
THOMAS W. VINSON,
ANDREA R. VINSON,
KATHY BROGHAMMER,
DAN EASTMAN,
RICK STERNHAGEN,
CARI ANNE MIHALKO,
EMMETT GRISSOM,
ADAM GEROL,
JEFFREY SISLEY,
LORRAINE MARX,
CHRISTINE KLOTZ,
ROBERT OLMR,
PAUL MALLOY,
STEVEN CAIN,
MARY LOU MUELLER,
ROBIN KELLER,
MIGUEL A. ZALDIVAR, JR.
BARRY BOLINE,
JOHN R. STORCK,
MICHELLE ESPINOSA,
MARCUS HOLMES,
RONALD JACOBS,
PETER GOLDSMITH, and
UNNAMED CO-CONSPIRATORS

Defendants

Case No.: 2020L062057

COMPLAINT

Amount Claimed: $500 Million

Jury Demand

**Civil RICO Act Claim**

## COMPLAINT UNDER RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT, 18 U.S. CODE § 1961 ET SEQ., FOR CIVIL REMEDIES AND OTHER RELIEF

**NOW COMES PLAINTIFF** Howard E. Leventhal, a non-attorney acting *pro se*, hereby respectfully submitting this Complaint against Defendants Mary Handeland, Noah Eernisse,

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

**12-Person Jury**

FILED
12/15/2020 4:11 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

11493534

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**IN THE CIRCUIT COURT OF COOK COUNTY
DISTRICT 2, SKOKIE, ILLINOIS**

HOWARD LEVENTHAL,

Plaintiff,

vs.

MARY HANDELAND,
NOAH EERNISSE,
MICHELLE ESPINOSA,
REPUBLICAN PARTY OF OZAUKEE COUNTY,
WINSTON M. PAES,
STEVE ZISSOU,
SALLY BUTLER,
JOE HORNING,
THOMAS W. VINSON,
ANDREA R. VINSON,
KATHY BROGHAMMER,
DAN EASTMAN,
RICK STERNHAGEN,
CARI ANNE MIHALKO,
EMMETT GRISSOM,
ADAM GEROL,
JEFFREY SISLEY,
LORRAINE MARX,
CHRISTINE KLOTZ,
ROBERT OLMR,
PAUL MALLOY,
STEVEN CAIN,
MARY LOU MUELLER,
ROBIN KELLER,
MIGUEL A. ZALDIVAR, JR.
BARRY BOLINE,
JOHN R. STORCK,
MICHELLE ESPINOSA,
MARCUS HOLMES,
RONALD JACOBS,
PETER GOLDSMITH, and
UNNAMED CO-CONSPIRATORS

Defendants

Case No.: 2020L062057

COMPLAINT

Amount Claimed: $500 Million

Jury Demand

**Civil RICO Act Claim**

**COMPLAINT UNDER RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT, 18 U.S. CODE § 1961 ET SEQ., FOR CIVIL REMEDIES AND OTHER RELIEF**

**NOW COMES PLAINTIFF** Howard E. Leventhal, a non-attorney acting *pro se*, hereby respectfully submitting this Complaint against Defendants Mary Handeland, Noah Eernisse,



FILED DATE: 12/15/2020 4:11 AM 2020L062057

Michelle Espinosa, Republican Party Of Ozaukee County, Winston M. Paes, Steve Zissou, Sally Butler, Joe Horning, Thomas W. Vinson, Andrea R. Vinson, Kathy Broghammer, Dan Eastman, Rick Sternhagen, Cari Anne Mihalko, Emmett Grissom, Adam Gerol, Jeffrey Sisley, Lorraine Marx, Christine Klotz, Robert Olmr, Paul Malloy, Steven Cain, Mary Lou Mueller, Robin Keller, Miguel A. Zaldivar, Jr., Barry Boline, John R. Storck, Michelle Espinosa, Marcus Holmes, Ronald Jacobs, Peter Goldsmith, and Unnamed Co-Conspirators; in nineteen counts as follows:

1. Criminal Conspiracy to Murder Judith Leventhal
2. Criminal Conspiracy to Kidnap Howard Leventhal
3. Criminal Conspiracy to Kidnap Amelia Leventhal
4. Criminal Conspiracy to Oppress
5. Criminal Conspiracy to Commit Theft by Deception
6. Criminal Conspiracy to Publish Anti-Semitic Hate Speech ("Sneaky Jew Leventhal")
7. Criminal Conspiracy to Intentionally Inflict Emotional Distress
8. Criminal Conspiracy to Maliciously Cause Physical Bodily Injury
9. Criminal Conspiracy to Defame
10. Criminal Conspiracy to Defraud Individuals
11. Criminal Conspiracy to Defraud the State of Illinois
12. Criminal Conspiracy to Defraud the State of Wisconsin
13. Criminal Conspiracy to Breach Contracts
14. Criminal Conspiracy to Defraud the United States
15. Criminal Conspiracy to Deprive Constitutional Rights
16. Criminal Conspiracy to Obstruct Justice
17. Criminal Conspiracy to Unjustly Enrich
18. Criminal Conspiracy to Commit Perjury
19. Tortious Interference with Familial Relations

This action is brought pursuant to state court jurisdiction under U.S. Code Title 18. Crimes and Criminal Procedure, Part I., Crimes Chapter 96, **Racketeer Influenced and Corrupt Organizations**, Section 1964. Civil remedies; Illinois Tort law (Illinois Statutes Chapter 735. Civil Procedure §-1116) and other applicable federal law and law of the State of Illinois.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

# TABLE OF CONTENTS


| § | Title | Page |
|---|---|---|
| 1 | **CONCURRENT FEDERAL RICO ACT JURISDICTION IN THIS STATE COURT** | 4 |
| 2 | **PARTIES** | 7 |
| 3 | **ALLEGATIONS** | 12 |
| | 1. Criminal Conspiracy to Murder Judith Leventhal | 12 |
| | 2. Criminal Conspiracy to Kidnap Howard Leventhal | 13 |
| | 3. Criminal Conspiracy to Kidnap Amelia Leventhal | 15 |
| | 4. Criminal Conspiracy to Oppress | 16 |
| | 5. Criminal Conspiracy to Commit Theft by Deception | 18 |
| | 6. Criminal Conspiracy to Publish Anti-Semitic Hate Speech ("Sneaky Jew Leventhal") | 21 |
| | 7. Criminal Conspiracy to Intentionally Inflict Emotional Distress | 23 |
| | 8. Criminal Conspiracy to Maliciously Cause Physical Bodily Injury | 29 |
| | 9. Criminal Conspiracy to Defame | 30 |
| | 10. Criminal Conspiracy to Defraud Individuals | 33 |
| | 11. Criminal Conspiracy to Defraud the State of Illinois | 36 |
| | 12. Criminal Conspiracy to Defraud the State of Wisconsin | 36 |
| | 13. Criminal Conspiracy to Breach Contracts | 40 |
| | 14. Criminal Conspiracy to Defraud the United States | 45 |
| | 15. Criminal Conspiracy to Deprive Constitutional Rights | 48 |
| | 16. Criminal Conspiracy to Obstruct Justice | 51 |
| | 17. Criminal Conspiracy to Unjustly Enrich | 51 |
| | 18. Criminal Conspiracy to Commit Perjury | 52 |
| | 19. Tortious Interference with Familial Relations | 54 |
| 4 | **CONTINUING VIOLATIONS DOCTRINE TOLLING STATUTES OF LIMITATION** | 56 |
| 5 | **DAMAGES CLAIMED** | 58 |
| 6 | **CONCLUSION AND PRAYER** | 62 |
| | **Appendices** | |
| | 1. Table of Authorities (in order of appearance) | 64 |
| | 2. Index to Exhibits | 68 |




FILED DATE: 12/15/2020 4:11 AM 2020L062057

## SECTION 1
## CONCURRENT FEDERAL RICO ACT JURISDICTION OF THIS STATE COURT

1. The U.S. Supreme Court noted in *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473 (1981) that its analysis of state-court jurisdiction over a federal cause of action "begins with the presumption that state courts enjoy concurrent jurisdiction. Recognizing that Congress has the power to limit a federal claim to federal courts, "the presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests."

2. Applying the *Gulf Offshore* analysis, this note argues that state courts share jurisdiction with federal courts over civil RICO claims. see also *Claflin v. Houseman*, 93 U.S. 130 (1876); *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502 (1962). First, the language of civil RICO's jurisdictional grant does not constitute an explicit statutory directive of exclusive jurisdiction; the Supreme Court has interpreted similar language in another federal statute as consistent with the presumption of concurrent jurisdiction. Second, the legislative history of RICO does not contain an unmistakable implication that Congress intended to limit civil RICO actions to federal courts.

3. In fact, Congress never even considered the issue of state court jurisdiction in RICO suits. Finally, state court adjudication of civil RICO claims advances rather than obstructs federal interests. State court adjudication presents injured parties with additional fora for redress and relieves federal court dockets.

4. Courts presume that state and federal courts share concurrent jurisdiction over a federal cause of action. Only three factors can rebut this presumption: (1) an explicit statutory grant of exclusive jurisdiction; (2) an unmistakable implication in the statute's legislative history that Congress intended exclusive jurisdiction; or (3) a clear incompatibility between state-court

FILED DATE: 12/15/2020 4:11 AM 2020L062057

jurisdiction and the federal interests underlying the statute. Any one of these prongs alone rebuts the presumption of concurrent jurisdiction.

5. The Supreme Court has held that jurisdiction over all federal causes of action shall be presumed to be concurrent between state and federal courts. This presumption emerges from the Constitutional grant to Congress of the power to create lower federal courts and the discretion to define the role of such lower courts. Congress could have opted not to form lower federal courts, leaving only state courts to adjudicate federal causes of action, subject to review by the Supreme Court. The drafters, therefore, apparently intended concurrent jurisdiction to be "the rule, rather than the exception. ' Additionally, the presumption of concurrent jurisdiction is based upon the principle of dual state and national sovereignty in our federal system. In *Claflin v. Houseman*, the Supreme Court explained; the laws of the United States are laws in the several States, and just as much binding on the citizens and courts thereof as the State laws are. The United States is not a foreign sovereignty as regards the several States, but is a concurrent, and, within its jurisdiction, paramount sovereignty.

6. The fact that a State court derives its existence and functions from the State laws is no reason why it should not afford relief [over federal claims]; because it is subject also to the laws of the United States and is just as much bound to recognize these as operative within the State as it is to recognize the State laws. The two together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are not foreign to each other, nor to be treated by each other as such, but as courts of the same country, having jurisdiction partly different and partly concurrent.

7. Numerous cases in Illinois courts have been brought to include RICO Act claims, see for example *Cont'l Grp., LLC v. All Access Int'l, Inc.*, 2017 Ill. App. 160389 (Ill. App. Ct. 2017). 18



FILED DATE: 12/15/2020 4:11 AM 2020L062057

U.S.C. § 1964(c) provides the private cause of action: Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor, see *Haroco v. American Nat. B. T. Co. of Chicago*, 747 F.2d 384 (7th Cir. 1984). *Tafflin v. Levitt*, 493 U.S. 455 (1990), was a United States Supreme Court case in which the Court held that state courts have concurrent jurisdiction to decide civil claims brought under the Racketeer Influenced and Corrupt Organizations Act (RICO).

8. Under 45 U.S.C. § 56 (1982) ("The jurisdiction of the courts of the United States...shall be concurrent with that of the courts of the several States."). The Supreme Court held that state courts have jurisdiction over claims under this provision. See *Burnett v. New York Cent. R.R.*, 380 U.S. 424 (1965) (confirming state court jurisdiction over FELA claims). Under 15 U.S.C. § 77v(a) (1982) ("The district courts of the United States... shall have jurisdiction... concurrent with State and Territorial courts, of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter."). See, e.g., *Weiner v. Shearson, Hammill & Co.*, 521 F.2d 817 (9th Cir. 1975) (state courts share concurrent jurisdiction with federal courts over claims under the Securities Act). See also Labor Management Relations Act, § 301(a), 29 U.S.C. § 185(a) (1982). Well settled federal law provides that RICO Act claims can be brought in state court.

9. The Plaintiff in this matter Howard Leventhal is a current citizen and resident of Cook County, Illinois. He has the deepest of ties with the community closely surrounding this court branch, having attended Niles Township North High School, walking distance from this court. Every single member of his nuclear, secondary and tertiary family has lived in Skokie for ten years or more at one time or another. His closest circle of lifelong friends either lives in Skokie now or has lived in Skokie, Morton Grove or the surrounding area for many years. Ongoing

FILED DATE: 12/15/2020 4:11 AM 2020L062057

injuries to Mr. Leventhal committed by the Defendants have continued to the same month this complaint is filed, producing further horrendous injury inflicted upon Mr. Leventhal within Cook County.

10. Leventhal provides 24/7 in-home care to his 95-year-old mother who lives approximately 30 minutes driving time each way from this court, within Cook County. Removing this case to federal court, if that is what the Defendants predictably attempt, would inflict undue and deliberately abusive hardships upon both Leventhal and his mother. There is no authentically grounded cause not to adjudicate this matter in this court.

11. Jurisdiction of this matter in this court is proper and correct as is the provision for treble damages set forth in the RICO Act[1].

## SECTION 2
### PARTIES

12. Plaintiff Howard Leventhal is in his mid-60s, an FAA-licensed pilot, an inventor, author of four books[2] and two widely-read aviation technology blogs, tech business developer, United States patent holder, an internationally certified black belt instructor in Taekwon-do, currently an undergrad college student pursuing an architecture degree and father of a (formerly) abandoned foundling girl he adopted in the People's Republic of China during 2002. The child's name as assigned by the China Center for Adoption Affairs was Chang Wen Ying. Upon entry into the United States during March 2002 under the Intercountry Adoption Act of 2000 P. L. 106-279;

[1] See: Judith A. Morse, *Treble Damages under RICO: Characterization and Computation*, 61 Notre Dame L. Rev. 526 (1986). Available at: http://scholarship.law.nd.edu/ndlr/vol61/iss3/9

[2] https://www.amazon.com/Howard-Leventhal/e/B07RR9J1G7



FILED DATE: 12/15/2020 4:11 AM 2020L062057

114 Stat. 825; 42 U.S.C. 14901 et seq. (a federal proceeding), Wen Ying was renamed Amelia Wenying Handeland-Leventhal and was brought into residence with the Plaintiff in Lindenhurst, Illinois. Subsequent to events described below, the Defendants caused Amelia's name to be changed to Amelia Jade Handeland to conceal her from the Plaintiff after kidnapping her.

13. Defendant Mary Handeland is a Wisconsin resident, proficient grifter, kidnapper and world class professional emasculation machine. She is employed by Co-Defendant Joe Horning who provides material support for the offenses enumerated in this complaint. Handeland is a lifelong chronic abuser of antipsychotic drugs and serial frivolous lawsuit filer. She once deliberately threw grapes on the floor of a Wisconsin Roundy's grocery store, pretended to fall on the grapes and then sued Roundy's for a "slip and fall" injury, while appearing in court sporting a cervical collar purchased at Walgreens. She sued ten parties in Milwaukee County Case Number 2014CV003888 *Mary Handeland vs. Marquette University School of Dentistry et al* after setting up the dentist for this lawsuit before first ever entering the dental suite; a frivolous, extortionate litigation style orchestrated and taught by her mother, Co-Defendant in this matter Lorraine Marx, another professional grifter. Mary sued ex-employer, Wisconsin-based Ralph Marlin for "sexual harassment" after hearing an off-color joke at work.

14. Handeland was arrested after coercing her first husband James Handeland into a narcotics trafficking conspiracy in Wisconsin. During this particular misadventure, she stole money from her own parents and a bank to fund purchases of "inventory." After being caught, she attempted suicide several times - sadly, unsuccessfully. Subsequently she deceived Plaintiff Howard Leventhal into marriage during 1999 for the purpose of stealing assets and cash and committing the other harms and injuries set forth in this complaint. By failing to disclose her history of psychiatric treatment, decades-long antipsychotic drug intake, prescription and street drug abuse

FILED DATE: 12/15/2020 4:11 AM 2020L062057

history, arrest history and suicide attempts during the process of adopting Amelia, Handeland defrauded Plaintiff Leventhal, the United States Government (State Dept.), the State of Illinois, the state-licensed Home Study provider upon which all the adoption parties and the government of the People's Republic of China relied – among many other things, a criminal violation of 18 USC § 1001, false statements in the federally sanctioned adoption proceeding – to say nothing of the concomitant horrendous financial fraud and horrific perversions of moral duty upon Howard and Amelia Leventhal.

13. Defendant Noah Eernisse is a resident of the state of Wisconsin and a knuckle-dragging[3] police officer under the command of Co-Defendant Emmett Grissom. Co-Defendant, the Republican Party of Ozaukee County (RPOC), which claims to be a legitimate political organization domiciled in the state of Wisconsin, is the racketeer influenced corrupt organization at the nexus of the RICO-act offenses enumerated in this complaint. RPOC is a front, cover operation/arm of the Neo-Nazi Movement in Wisconsin[4]. Among its many charming initiatives have been tireless work to disenfranchise voters not fitting into its most-favored template for the racial makeup of its neighbors; and to maliciously, covertly harass and harangue families of mixed race to move out of Ozaukee County[5] - a close-in north suburban municipality bundle of

[3] Noah Eernisse is closely related to another knuckle-dragging racist cop – Matthew Eernisse of St Louis, who was indicted for shooting an unarmed black man in the back, see: https://www.stltoday.com/news/local/crime-and-courts/st-louis-officer-indicted-in-case-involving-shooting-of-unarmed-man/article_65ff00cf-20df-552a-ae41-9fcaf398791f.html

[4] See news media article: "*Multiple hate groups located in Wisconsin, one headquartered in Milwaukee.*": https://www.wisn.com/article/retired-lieutenant-shot-at-sikh-temple-reflects-on-nationalists-after-pittsburgh-synagogue-shooting/24458066

[5] See: *'Infecting the area:' Biracial Cedarburg family 'stunned' by hate mail telling them to 'get out'*, https://www.fox6now.com/news/infecting-the-area-biracial-cedarburg-family-stunned-by-hate-mail-telling-them-to-get-out



FILED DATE: 12/15/2020 4:11 AM 2020L062057

Milwaukee; a throwback, insular enclave of Third Reich war criminal descendants[6] and modern-day, self-appointed guardians of Hitler's "*Herrenvolk*" theory[7].

14. Winston M. Paes, Robin Keller, Michelle Espinosa, Steve Zissou and Sally Butler are residents of the state of New York, operating a business which employs bribery and extortion to covertly influence and coerce New York, New Jersey and Connecticut state and federal judges in civil and criminal litigation. Keller also provides planning services to individuals and businesses acting to obtain possession of high value goods and services without payment. Co-Defendant Miguel A. Zaldivar, Jr. resides in Washington DC and provides material support to Keller. Paes, Keller, Espinosa, Zissou and Butler also operate as paid professional confidential witnesses, a scheme under which they obtain paid court appointments as legal or paralegal service providers to criminal defendants and then feed ostensibly "privileged" information about their "clients" back to prosecutors (their actual clients), double-dipping into state and federal funds, using oppressed and defenseless criminal defendants as chattel property, violating the 5th and 6th Amendment rights of citizens as a revenue-production strategy and *modus operandi*.

15. Sally Butler is infamous for needlessly churning a mentally disabled man endless times through the New York legal system and then selling the client's story as a movie script, in such a way that only she (Butler) and her husband, Co-Defendant Steve Zissou gained financially[8].

[6] See: https://www.wuwm.com/post/remembering-wisconsins-world-war-ii-prison-camps#stream/0

[7] *Herrenvolk* translation: "Master Race," Hitler's "Aryan Supremacy" theory: See https://en.wikipedia.org/wiki/Master_race

[8] See "*Lawyer defending serial bus thief accused of angling to cash in on movie deal about the case.*": https://www.nydailynews.com/new-york/serial-bus-thief-lawyer-accused-cash-movie-article-1.3735589

FILED DATE: 12/15/2020 4:11 AM 2020L062057

Butler and Zissou are so skillful at blindly generating "collateral" damage in legal matters for their own gain without regard to the welfare of others, that even famed actress Julia Roberts (who they grandiosely recruited to portray Butler in their ego exercise movie), was harmed simply by allowing herself to communicate with them[9].

15. Joe Horning is a Wisconsin resident and operator of various Neo-Nazi front businesses operating throughout Wisconsin. Co-Defendants Thomas W. Vinson and Andrea R. Vinson are residents of Lindenhurst, Illinois and currently in fraudulent possession of and title to real estate property located at 2885 Farmington Dr, Lindenhurst, Illinois and rightfully belonging to the Plaintiff.

16. Also supplying material support for the injurious acts set forth herein are Co-Conspirators and domestic terrorists[10] Kathy Broghammer, Dan Eastman, Rick Sternhagen, Cari Anne Mihalko, Emmett Grissom, Adam Gerol, Jeffrey Sisley, Lorraine Marx, Christine Klotz, Robert Olmr, Paul Malloy, Barry Boline, Steven Cain and John R. Storck; all citizens of the state of Wisconsin, operatives of the Republican Party of Wisconsin, Republican Party of Ozaukee County and their covert Neo-Nazi operations.

16. Co-Conspirators Marcus Holmes and Ronald Jacobs are residents of the state of Illinois, known to frequently associate with felons and who were used to provid material support for the Wisconsin and New York defendants. Co-Conspirator Peter Goldsmith is a resident and citizen of the United Kingdom and employer of Co-Defendant Winston Paes, having supplied material

[9] See: "NYC Seeks to Recover Money Made Off Upcoming Julia Roberts Film About Transit Impostor": https://www.hollywoodreporter.com/news/nyc-wants-money-julia-roberts-877455

[10] Domestic terrorism is a form of terrorism in which victims "within a country are targeted by a perpetrator with the same citizenship" as the victims.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

support to Paes before, during and after the offenses complained-of herein. Unnamed Co-Conspirators are various individuals remaining in power or position to cause further harm and injury to the Plaintiff or his daughter and therefore are unnamed. For the moment.

## SECTION 3
## ALLEGATIONS

### 1. Criminal Conspiracy to Murder Judith Leventhal

1. Defendant Mary Handeland was the Plaintiff's second wife. Leventhal's first wife, Judith Leventhal (1953-2015) died five days after the Defendants collectively and knowingly conspired to kidnap Howard Leventhal (see 3.2. below), did so and then literally, emotionally inflamed Judith, a multiple sclerosis sufferer who relied upon Howard for large amounts of financial[11] and emotional support, so much that Judith's autonomic nervous system failed and she died – a direct and proximate result of Defendants' premeditated, malicious and knowing acts and conspiracy principally designed by co-Defs Winston Paes, Mary Handeland, Steve Zissou, Sally Butler and Michelle Espinosa.

2. Multiple sclerosis sufferers become severely physically harmed from emotional upset and the Defendants knew this on September 12, 2015, the date they kidnapped Leventhal. For personal and collective financial gain, to terminate Howard's payment of monies to Judith and

[11] Judith required 24/7/365 in-home care and various treatments which were not covered by payors. She received monthly amounts from Leventhal ranging from $7,000 to $10,000 per month, the vast majority of which was paid voluntarily by Leventhal and exceeded court-ordered sums by large percentages. The Defendants conspired and attempted to redirect these monies to themselves by in-fact, murdering Judith.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

divert such monies to themselves, Defendants acted to end and then ended Judith's life through shock and emotional torture. See obituary, Exhibit A.

**2. Criminal Conspiracy to Kidnap Howard Leventhal**

15. Mary Handeland solicited money and was paid monies by other Defendants to provide a series of false statements and representations to the federal court in *U.S. v. Leventhal*, Case No. 13-cr-695(BMC) in the United States Court for the Eastern District of New York, again a multiplicity of violations of the federal criminal false statements statute, 18 USC Sec 1001, as well as federal obstruction of justice (18 U.S.C. § 1503), perjury (18 U.S. Code § 1621) and subornation of perjury (18 U.S. Code § 1622) criminal statutes.

16. To state a cause of action in a civil RICO action a plaintiff must allege: (1) that a person (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate commerce. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). A "pattern" under RICO "requires at least two acts of racketeering activity" within a ten-year period, 18 U.S.C. § 1961(5), or multiple predicates within a single scheme that amounted to criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 236, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989). A civil RICO claimant must prove conduct which took place over the prior ten years that is indictable, and offenses that are punishable under various criminal statutes. *Sedima*, 473 U.S. at 488. All of the predicates for RICO adjudication are present in this matter.

17. These false statements made by Handeland during a fallacious bail revocation hearing in Brooklyn, NY on September 11-12, 2015 were co-designed by the Defendants and caused



FILED DATE: 12/15/2020 4:11 AM 2020L062057

Leventhal, a senior citizen with chronic, serious medical problems, to be summarily imprisoned on September 12, 2015 in the notorious Metropolitan Detention Center (MDC), characterized by federal magistrate judge Cheryl Pollak as being indistinguishable from a "third world prison"[12] for its inhumanly low standard of medical care. Handeland lied to the court by falsely characterizing Leventhal's personal history in a negative way, falsely minimizing his medical conditions (after not living in the same household with him for the prior 8 years and while having no current knowledge of his medical state) and concocting fictional, ludicrously false, utterly baseless accusations that Leventhal posed some sort of threat to Amelia. These specific allegations and all or nearly all of the other fact allegations in this Complaint have been admitted by the United States Government in proceedings during 2020 in Case No. 13-cr-844, *U.S. v. Leventhal*, in the U.S. District Court, Northern District of Illinois, the case into which Leventhal's release from federal custody was transferred during 2020[13].

18. After being kidnapped by the Defendants, Leventhal was held at MDC without needed medical care until sentenced in December 2016. During this period he was cut off by the Defendants from contact with his daughter while hundreds of thousands of dollars-worth of property were converted by Defendants into cash for the Defendants' consumption, while Leventhal was 1,000 miles away, stripped of all resources, unable to obtain counsel, unable to persuade the Illinois court to hear his causes telephonically and unable to protect himself or his relationship with his daughter in any way – precisely as strategized, designed and implemented

[12] Newspaper story: https://www.nydailynews.com/new-york/brooklyn/judge-refuses-send-women-horrifying-brooklyn-jail-article-1.2820551

[13] See 2002 Docket entries, 13-cr-844, *US v Leventhal*, USDC NDIL.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

by Co-Defendants Handeland, Michelle Espinosa and Co-Conspirator Winston Paes. Paes, a subhuman, unrepentant monster improvidently inflicted upon the United States directly from Hell, is a naturalized U.S. citizen purportedly born in Goa, India. What Paes most surely is beyond that, is an indelible black stain upon the American legal profession which can never be eradicated without deporting him back whereunder whatever rock he slithered out from.

### 3. Criminal Conspiracy to Kidnap Amelia Leventhal

1. The Defendants used the opportunity presented by Leventhal's forced isolation 1,000 miles away from home, to violate every in-force contact and visitation order entered in *Handeland v. Leventhal*, Case No. 05 D 808 in the Circuit Court of Lake County, Illinois, a divorce proceeding (Exhibit F). Then the Defendants kidnapped Amelia from Illinois to Wisconsin, and illegally transferred jurisdiction over Amelia from Illinois to Wisconsin court, to evade contempt proceedings in Illinois court, see *Handeland v. Leventhal* in the Circuit Court of the State of Wisconsin, Ozaukee County. All of the Wisconsin-residing defendants named in this matter had direct hands in the kidnapping. Flight from one state to another to evade rightful court process is a federal crime also, see: 18 U.S. Code § 1073, yet another crime the perpetration of which all the defendants conspired to effect.

2. This kidnapping was a *prima facie* violation of the federal Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A[14]. Co-Defendant Noah Eernisse, a Grafton, Wisconsin

[14] See "*INTERSTATE CHILD CUSTODY, A Practitioner's Guide to the Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A*" at: https://www.bwjp.org/assets/documents/pdfs/a_practitioner%E2%80%99s_guide_to_the_parental_kidnapping_prevention_act_pkpa.pdf



FILED DATE: 12/15/2020 4:11 AM 2020L062057

police officer, when informed of the relevant facts and apprised of his complicity in criminal activity, transmitted the Exhibit B email message to the Plaintiff, acknowledging that he (Eernisse) understood the criminal implications of his actions to groundlessly and falsely project a shield of law enforcement around Handeland while simultaneously forwarding and perfecting Amelia's kidnapping.

3. Despite every conceivable manner of begging and pleading by Plaintiff Howard Leventhal[15], since Amelia's kidnapping took place, father and daughter have neither seen nor spoken to each other under a legal barrier designed and erected by the Defendants and orchestrated by Co-Defendant Robert Olmr, also a Neo-Nazi who claims to be a Wisconsin criminal lawyer. Now Amelia is 20 years old, an adult and nearly the entire value to both Howard and Amelia of the holy and sacred father/daughter relationship has been extinguished and destroyed through self-serving conspiracy by the Defendants, for undeserved self-enrichment and craven avarice of the defendants in panoply ways and no other authentic motivation or causation.

### 4. Criminal Conspiracy to Oppress

1. It has long been established in Illinois courts that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton

[15] Which have been cruelly responded-to by the Defendants with no-contact orders and arrest warrants, bought and paid-for in bribery payments to certain of the Defendants who masquerade as legitimate public officials, by other Defendants. See Exhibit P.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

disregard of the rights of others." See *Kelsay v. Motorola, Inc.* (1978), 74 Ill.2d 172, 186, 384 N.E.2d 353, 359 and *Cornell v. Langland*, 109 Ill. App. 3d 472, 475 (Ill. App. Ct. 1982).

2. Defendants in this matter, fully aware of all the outlandish injuries they have caused to Howard and Amelia Leventhal, conspired to oppress and succeeded at oppressing and preventing Howard Leventhal from acting to defend himself and his daughter from their actions. Defendant Robin Keller coerced her husband, US District Judge the spineless, odious and honorless Brian M. Cogan of the Eastern District of New York, a corpulent, flatulent Republican Jackass gasbag appointed by bloviating Republican Jackass President George W. Bush - to enter language in the Judgment of Conviction (Exhibit C) oppressing, depressing, priorly restraining[16] and limiting Leventhal's First Amendment right to seek redress of the issues presented in this matter until Leventhal's period of supervised release was ended. The federal court in Chicago, recognizing the egregious cruelty of the harms set forth in this complaint, ended Leventhal's period of supervised release two years early on December 3, 2020, see order, Exhibit D hereto.

3. Keller collaborated with Co-Defendants Michelle Espinosa and Winston Paes (with whom Keller now, five years later, shares fee income by some strange non-coincidence) along with other defendants, to enter this language so that Leventhal would be handcuffed, oppressed and prevented from re-establishing any sort of relationship with his daughter, long after Leventhal's actual handcuffs were removed. Winston Paes and Co-Defendant Peter Goldsmith

[16] In *New York Times Co. v. United States*, 403 U.S. 713 (1971), the US Supreme Court outlawed "prior restraint," precisely the technique employed by the bloviating gasbag defendants in this matter to erect defenses around themselves for the harms they inflicted upon Leventhal and his daughter, as set forth herein. Thusly, the time for filing this matter was tolled on December 3, 2020 when said Constitution-defying erected defenses expired, see NDIL Order, Ex D.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

have paid monies to Keller over and over again during the interceding years to indirectly compensate Keller's husband, the detestable, incurably arrogant and self-important "Judge" Cogan - for entering the Exhibit C order.

4. Cogan is well known for sycophantically kowtowing to any and every demand by government lawyers as Co-Defendant Paes formerly was; which explains why he (Judge Cogan) was handpicked by the Department of Justice to oversee the trial of drug lord Joaquin "El Chapo" Guzman. El Chapo's case was one in which DOJ lawyers could not afford to be seen as anything other than the crusading champions of truth, justice, the American Way and their personal bonus checks, expense accounts, resumes and statistics as such miscreants are. Cogan's *de facto* job, the business which he and his wife Co-Defendant Keller gain the most financially from - is highly compensated fellation, ego-stroking, pimping and career promotion for hyper-ambitious government lawyers and CJA-appointed "defense" attorneys doubling as confidential informants, the Constitution be damned.

**5. Criminal Conspiracy to Commit Theft by Deception**

1. In panoply ways, Defendants committed theft against Leventhal; theft of everything valuable to him dear and pedestrian; vaporizing the sacred and amplifying the profane. In 2008, Handeland invited and allowed her then-current boyfriend Richard Rea to live in the marital residence at 2885 Farmington Dr., Lindenhurst, Illinois, thereby voiding Howard's obligation to pay maintenance to Handeland[17]. However of course, Handeland kept this cohabitation secret

[17] See Exhibit E, public record document of Richard Rea's occupancy in the Lindenhurst residence.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

and enlisted Amelia to do the same – one of the first series of actions by Handeland to alienate Amelia from her father for no reason other than to defraud Leventhal of money. Among many other wrongs committed by this one of many instances of Handeland's deliberate destruction of the holy and sacred relationship between father and daughter, was utterly unjustified parental alienation as defined under Illinois law and prohibited by an in-force Illinois state court order between Handeland and Leventhal, see excerpt, Exhibit F.

2. Of course, Handeland kept demanding and receiving abundant monies from Howard, who had no knowledge of the covert, prohibited living arrangements. Mr. Rea passed away in October 2011 while he was inhabiting the residence, probably harangued to death over money by Mary in her emasculating, screaming banshee[18] black widow mode, one of her innumerable, charming, diametrically opposite schizophrenic[19] personalities. It is noteworthy here and should be stated that the Plaintiff met Mr. Rea in person several times during Handeland's choreographed hostage swaps. It was obvious from the circumstances that Rea was in a relationship with Handeland (although not obvious that Rea was living in the home). Leventhal's first impression (as a decades-experienced martial arts instructor with heightened sensitivities on this topic) was that Mr. Rea was not a threat to Amelia and that she was safe with him. It is remarkable to reflect that Handeland is so constitutionally incapable of departing from

[18] *Banshee* in Irish legend: a female spirit whose loud screaming and wailing warns of an impending death in a house.

[19] Schizophrenia is a serious mental disorder in which people interpret reality abnormally. Schizophrenia may result in some combination of hallucinations, delusions, and extremely disordered thinking and behavior that impairs daily functioning, and can be disabling, see https://www.mayoclinic.org/diseases-conditions/schizophrenia/symptoms-causes/syc-20354443#:~:text=Schizophrenia%20is%20a%20serious%20mental,functioning%2C%20and%20can%20be%20disabling.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

the devious, two-faced and underhanded approach, that she could not have found some way to have an adult conversation and seek the required permission from Leventhal. Instead, she chose, as she has chosen throughout her life - and as her own mother (Co-Defendant Lorraine Marx) and sister (Co-Defendant Christine Klotz) taught, to proceed in as a deceptive, oppressive, cheating, disingenuous and toxic a fashion as was possible under the circumstances.

3. For nearly 100% of the time, from the date of purchase of the Lindenhurst home in 1999 until Mary sold it in 2016, Leventhal paid the mortgage and associated housing costs. From the 2009 date Rea moved into the home forward, all such monies were obtained by the Defendants through theft by deception.

4. Under Illinois law, (720 ILCS 5/16-1) (from Ch. 38, par. 16-1), Sec. 16-1. Theft. (a) A person commits theft when he or she knowingly: (1) Obtains or exerts unauthorized control over property of the owner; or (2) Obtains by deception control over property of the owner. Every payment from Leventhal to Handeland after the first date of Rea's occupancy forward, was an act of Theft by Deception by Handeland, materially supported before, during and after the fact by all of the Defendants.

5. Likewise, title to the Lindenhurst marital residence was dislodged from Leventhal by Handeland's deception and that of her co-conspirators, the other defendants. The house's current titleholders, Co-Defendants Thomas and Andrea Vinson, purchased the house for substantially less than its market value, in conspiracy with the other Defendants to obtain the house at below market rates and supply the Defendants with additional cash advanced by the Vinsons' mortgage lender.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

### 6. Criminal Conspiracy to Publish Anti-Semitic Hate Speech

1. On Sep 26, 2019, Jan 10, 2020 and Feb 17, 2020, Plaintiff Leventhal entered the Skokie Public Library located at 5215 Oakton St., Skokie, Illinois (see Google Maps history, Exhibit G) and searched his name on the Internet. All three times, among the first search returns was the "story" attached here as Exhibit H, which begins "***Sneaky Jew Leventhal*** ..." This article was written and planted by the co-defendants, principally Winston Paes with assistance of a co-conspirator[20] and has remained viewable on the Internet through indispensable efforts by all the Defendants, through to and including the filing date of this complaint. Leventhal was born of Jewish parents, circumcised in the traditional ritual and consecrated to his family's faith in the *bar mitzvah* ceremony at a synagogue walking distance from this court.

2. The *Daily Stormer*, which provided publishing space for this Defendant-written article, is a Neo-Nazi publication. Andrew Anglin is the founder of the Daily Stormer website, which aptly takes its name from the gutter Nazi propaganda sheet known as *Der Stürmer*. True to that vintage, Anglin is infamous for the crudity of his language and his thinking, a contrast to his sophistication as a prolific Internet troll and serial harasser[21].

3. Conspiracy Against Rights, 18 U.S.C. § 241 makes it unlawful for two or more persons to conspire to injure, threaten, or intimidate a person in any state, territory, or district in the free exercise or enjoyment of any right or privilege secured to the individual by the U.S. Constitution or the laws of the U.S. The Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act

[20] Plaintiff personally observed an individual he now believes to be Andrew Anglin, giggling in a corner of a men's restroom on the 8th floor in the Brooklyn federal courthouse with Co-Defendant Winston Paes, while discussing their efforts to publish the Exhibit H article.
[21] https://www.splcenter.org/fighting-hate/extremist-files/individual/andrew-anglin



FILED DATE: 12/15/2020 4:11 AM 2020L062057

of 2009, 18 U.S.C. § 249 makes it a federal crime to willfully cause bodily injury, or attempt to do so using a dangerous weapon, because of the victim's actual or perceived race, color, religion, or national origin. The Act also covers crimes committed because of the actual or perceived religion, national origin, sexual orientation, gender, gender identity, or disability of any person, if the crime affected interstate or foreign commerce or occurred within federal special maritime or territorial jurisdiction.

4. Defendants in this matter caused bodily injury to Leventhal through withheld medical care (see Physician report Exhibit J) while conspiring to use the intimidating threat of lethal force present in the powers improvidently lent to them in their government employment, to deprive Leventhal's civil liberties, pursuit of happiness, 14th Amendment right to parent his daughter, 5th and 6th Amendment rights, 8th Amendment right to be free of cruel and unusual punishment among other Constitutional rights – by publishing the "*Sneaky Jew*" article and using it as a weapon in their arsenal employed to destroy the relationship between Howard and Amelia Leventhal as well as to directly physically harm Leventhal, medically and emotionally[22] – to say nothing of the unknown harm yet to be discovered, caused to Amelia by depriving her of a father during her teens and early twenties, for no rightful cause.

5. Violent Interference with Federally Protected Rights, 18 U.S.C. § 245 makes it a crime to use or threaten to use force to willfully interfere with a person's participation in a federally protected activity because of race, color, religion, or national origin. Federally protected activities include public education, employment, jury service, travel, or the enjoyment of public

[22] See Physician expert report Exhibit J and Psychologist's expert report Exhibit K, admitted as true by the Government in federal court, *US v Leventhal*, 13-cr-844, 2020 proceedings.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

accommodations. Under this statute, it is also a crime to use or threaten to use force against those who are assisting and supporting others in participating in these federally protected activities. Defendants, in their ludicrously presumptuous undertakings set forth here, used the threat of violence against Leventhal intrinsic to his grossly overblown criminal prosecution[23] to deprive Leventhal, based upon Leventhal's religion, federally protected rights to receive proper medical and mental health care while imprisoned for the equally ludicrous period of time he was in fact imprisoned by the Defendants through their frauds and crimes inflicted upon the United States – purely income-producing endeavors on defendants' parts[24].

**7. Criminal Conspiracy to Intentionally Inflict Emotional Distress**

1. Under forum law in Illinois, to state a cause of action for intentional infliction of emotional distress, a plaintiff must adequately allege that: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or

[23] For one example of many: Leventhal – a senior citizen with serious, life-threatening digestive medical issues – was dragged during February 2017 in shackles *in his underwear* at the point of multiple shotguns, across the tarmac at Upstate New York's Stewart International Airport (SWF), by armed jackasses operating under "authority" of these defendants, during a transfer, just prior to being transported over a 24-hour period in a series of conveyances without functioning toilets. During this hellish experience, Leventhal soiled his clothing and was not provided fresh clothes until the next day. Average temperature at Stewart Airport in February: High 39° / Low 23°.

[24] See Exhibit L, Leventhal's filings the federal court (admitted by the Government) describing and defining the gross and outrageously excessive sentence in *US. v. Leventhal* – designed by Defendants to destroy Leventhal's parent-child relationship. This destruction was not a "collateral effect," it *was the sentence*. Such punishment is neither prescribed nor allowed by the governing statutes. Leventhal's sentence was illegal and *de facto* extra-judicial, for among other reasons, it was entered for no actual cause other than to enrich the defendants in this matter and to use the federal court to unconstitutionally restrain Leventhal from obtaining any meaningful or timely relief and to protect the defendants' financial gains arising therefrom.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

knew that there was a high probability that its conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress." *Welsh*, 306 Ill. App.3d at 154, 713 N.E.2d at 683; *McGrath v. Fahey*, 126 Ill.2d 78, 86, 533 N.E.2d 806, 809 (1988). Whether conduct is extreme and outrageous is evaluated on an objective standard based on all of the facts and circumstances. *Fahey*, 126 Ill.2d at 90, 533 N.E.2d at 811. Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions or trivialities." *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 89-90, 360 N.E.2d 765, 767 (1976). Liability only attaches in circumstances where the defendant's conduct is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'" *Public Finance Corp.*, 66 Ill.2d at 90, 360 N.E.2d at 767, quoting Restatement (Second) of Torts § 46, Comment d (1965). The distress inflicted must be so severe that no reasonable person could be expected to endure it. *Fahey*, 126 Ill.2d at 86, 533 N.E.2d at 809. See *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 745 (Ill. App. Ct. 2001).

2. The distress inflicted by the Defendants working in the conspiracy described here is so severe that no reasonable person could be expected to endure it – and – has almost nothing to do with the fact that Leventhal was confined by the Defendants in prison *per se*. Leventhal engaged in admitted criminal activity and admitted so under oath on numerous occasions. He deserved a certain amount of time in prison, which leaves what he did not deserve:

3. Leventhal over the time he was incarcerated, observed innumerable visits between children and incarcerated inmates. Some of these visit-receiving inmates were notorious drug dealers and hyper-violent criminals. Several were contract killers with death sentences. Some were seriously and obviously mentally ill. Yet all of these fathers and mothers were allowed contact and maintained contact with their beloved children. Leventhal was not allowed any of

FILED DATE: 12/15/2020 4:11 AM 2020L062057

this, by premeditated design of the defendants and as a *quid pro quo* for Handeland's perjury and obstruction of justice, paid-for additionally with federal funds remitted to Handeland for lying.

4. Rather, the Defendants in this matter conspired together to produce Mary Handeland's numerous injections of fabricated testimony in federal court by exchanging with Handeland, among other things valuable to her, extinguishment of the relationship between Howard and Amelia. Why would Handeland even want this? Because parental alienation is an intergenerational pattern and pathology in her own family. Her father, the late Stephen Budiac, was an authentic hero of WWII and the only person of admirable character in Handeland's nuclear family.

5. Steve Budiac hand-delivered bundled sticks of lit dynamite into Japanese gun emplacements during his Marine military service in the Pacific during World War II. When he came home, he married Co-Defendant Lorraine Marx who, in short order demanded monetary bonuses for bearing children. Around the time Mary was 13 years old, Marx demanded that Steve purchase a new Cadillac on payments, because neighbors had done the same. Steve was a financially conservative man and refused to buy a car he could not pay for with cash. Lorraine filed divorce against Steve and wrecked her childrens' lives and psyches, including Mary's, because she could not browbeat Steve into buying a *new* Cadillac.

6. Mary Handeland could not browbeat Howard Leventhal into terminating his support for Judith Leventhal, his deathly ill first wife, so that the Defendants could have the money Judi received and Judi could live out her terrifying life as an M.S. sufferer in a state institution. Mary's divorce filing in April 2005 was the triggering event leading to the conspiracy to emasculate, humiliate, physically and emotionally torture Howard Leventhal, using his beloved daughter as a bludgeon, through to and including this very day.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

7. Howard, as a freshly-minted Taekwon-do black belt following his senior year in high school, was assigned by his instructor (now known as) Grandmaster Dr. Greggory A. Youstra, 9th degree, a former longtime teacher at Niles North High School (located walking distance from this court). Youstra is a direct disciple of the late Great Grandmaster, South Korean Army General Choi Hong Hi, founder of modern Taekwon-do[25]. Dr. Youstra assigned Leventhal to teach young children at the Morton Grove, Illinois Park District, see Youstra affidavit Exhibit M. One of Leventhal's students of the time was (is now known as) Grandmaster Earl Weiss, 9th degree, presently a current Skokie resident, business owner and presently the highest ranking Jewish martial artist on Planet Earth, in any authentic Asia-descended system. A reference letter from Grandmaster Weiss is included in Exhibit M.

8. Training children to fend for themselves as adults is a fundamental imperative of both Jewish *mitzvot*[26] and all major, authentic Asia-descended martial arts systems – a foundational precept of the Buddhist "dharma" or "way" and solemn duty[27] which may not be avoided or ignored. This precept was drilled and cemented into Leventhal's consciousness during Hebrew school from age 8 -13 and then again throughout his teenage years in martial arts training. Being

[25] See Wikipedia: https://en.wikipedia.org/wiki/List_of_taekwondo_grandmasters. Choi, Youstra and Weiss are listed as Grandmasters.
[26] *Mizvot*: The 613 Secondary Commandments. Code of Jewish Law, ibid. 618; *Shulchan Aruch HaRav. Orach Chaim* 619:13.
[27] See "*Children and Dharma: An Introduction*," https://tricycle.org/magazine/children-and-dharma-introduction/. Leventhal views himself as a "Jew-ddhist," a practitioner and believer of both his legacy Jewish traditions and those of the Shaolin Buddhist masters from whom the Asian martial arts have descended. See https://www.grin.com/document/374134. About 250,000 individuals are thought to share such a composite belief system in the United States.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

a parent is as fundamental to Leventhal's existence and self-image as humanity itself – a duty which Leventhal has treated as sacred and inviolable for every moment of his adult life.

9. Upon first stepping onto the gym floor at age nineteen to enable those young souls to fend for themselves throughout their lives, Leventhal was transformed instantly, into a spiritually committed expectant parent. Having a child is *more* important to Leventhal than average parents. Average "normal" people engage in a pleasurable experience and a child pops out nine months later. Leventhal endured years of hell getting to the point in his second marriage (to Handeland) until the arduous process of adopting a child became possible, solely through[28] Howard Leventhal's efforts, skillset and contact network. He has seen nothing in his life as more important than having and nurturing a child or children since that moment at a park district fieldhouse in 1975. Amelia Leventhal is Howard's only child and she is more important to Leventhal even than his own life. The harm caused to this sacred relationship by these defendants solely to pusillanimously engorge their bank accounts, is infinite and irreparable.

10. To characterize the Defendants' actions to perfect the above-described barrier between father and child as "emotional torture," far understates the intolerable impact upon Leventhal which began on September 12, 2015 through Defendants' abusive acts and continues every waking minute of every day of Leventhal's existence. "Having your child forcibly separated from parents can induce anguish, despair, guilt, blame and depression in the parents" states a

[28] Handeland is and was utterly incapable of accomplishing this feat on her own. Steve Budiac, her own father, upon learning of the adoption plan, said to Leventhal: "This is a mistake. Mary can't handle the responsibility."



FILED DATE: 12/15/2020 4:11 AM 2020L062057

Stanford University scholarly publication[29]. Leventhal has been afflicted by these complained-of acts with intolerable despair and other emotional injuries from which he may never recover, see Psychologist's report, Ex. K.

11. These actions have been completely undue in these instances and have no authentic, legally grounded place in criminal punishment of any kind – except punishment under the theory of child abuse. Even actual child abusers (which Leventhal is not) are commonly allowed to see their own children, see "*Children and family law: 'How can you share parenting with an abusive parent?'*"[30]. Yet the long series of abominations inflicted upon Howard and Amelia by the defendants in this matter have formed a preconceived, predesigned and conspired upon impenetrable barrier. Howard, who is a model father and diametrically the opposite of any abusive parent[31], has been prevented by these Defendants from seeing his daughter once in the last five years. This set of circumstances has caused Leventhal to reflect on the benefits of suicide yet somehow he has (as of yet) avoided actually killing himself through some combination of spirituality excavated from the past and his training in mental focus.

12. Defendants actions to intentionally inflict emotional distress upon the Plaintiff meet the prerequisites for recovery on this count for Intentional Infliction of Emotional Distress.

[29] See: *"Separation from parents removes children's most important protection and generates a new trauma, Stanford scholar says"* https://news.stanford.edu/2018/06/26/psychological-impact-early-life-stress-parental-separation/#:~:text=Having%20your%20child%20forcibly%20separated,not%20experiencing%20depression%20or%20anxiety.

[30] https://www.theguardian.com/society/2020/mar/15/children-and-family-law-how-can-you-share-parenting-with-an-abusive-parent

[31] Exhibit M reference letters.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**8. Criminal Conspiracy to Maliciously Cause Physical Bodily Injury**

1. As set forth above, Leventhal has been seriously physically injured directly and proximately because of the falsities concocted by the Defendants through Mary Handeland's statements to the federal court during Leventhal's sentencing. It had been Leventhal's stated intention upon release from prison, to upgrade his federally-licensed status as a pilot and become a flight instructor. However, due to Defendants' acts, this is no longer possible, see Exhibit J, which describes defendant-caused deterioration in Leventhal's medical condition rendering impossible - flight instruction in small aircraft without lavatories.

2. In Illinois as a general rule, a cause of action for personal injuries accrues when the plaintiff suffers injury. (See *West American Insurance Co. v. Sal E. Lobianco Son Co.* (1977), 69 Ill.2d 126, 130; *Hermitage Corp. v. Contractors Adjustment Co.* (1995), 166 Ill.2d 72.) Traditionally, the limitations period was not tolled simply because the plaintiff was unaware of the existence of an injury. (See *Bates v. Little Company of Mary Hospital* (1982), 108 Ill. App.3d 137, 139.). Thus, mechanical application of the statute of limitations could, in some situations, bar plaintiffs from bringing suit before the plaintiff was even aware that he was injured. To alleviate the harsh consequences that would flow from literal application of the limitations period, the judiciary created the "discovery rule." The effect of the discovery rule, which this court first adopted in *Rozny v. Marnul* (1969), 43 Ill.2d 54, 72-73, is to postpone the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused. *Jackson Jordan, Inc. v. Leydig, Voit Mayer* (1994), 158 Ill.2d 240, 249. From *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 360-61 (Ill. 1995).



FILED DATE: 12/15/2020 4:11 AM 2020L062057

3. Leventhal discovered that he could no longer pursue a career as a flight instructor after a colonoscopy was performed on him during 2020, see physician's report, Exhibit J. This procedure revealed for the first time, the true extent of harm inflicted upon Leventhal by the Defendants when they conspired together to deceive the federal court into *de facto* denying proper medical care to Leventhal while he was in prison. It was not possible for Leventhal to make this discovery until he was free to seek medical care on his own on December 11, 2019, became able to secure medical coverage independently from control and neglect by the defendants, and then began doing so pursuant to his first gastroenterologist visit during 2020.

4. Defendants actions set forth above to intentionally injure the Plaintiff meet the prerequisites for recovery on this count for personal injury.

**9. Criminal Conspiracy to Defame**

1. A cause of action for defamation *per quod* may be brought in two circumstances. First, a *per quod* claim is appropriate where the defamatory character of the statement is not apparent on its face, and resort to extrinsic circumstances is necessary to demonstrate its injurious meaning. To pursue a per quod action in such circumstances, a plaintiff must plead and prove extrinsic facts to explain the defamatory meaning of the statement. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1 (1992); *Mittleman v. Witous*, 135 Ill.2d 220, 233 (1989).

2. A per quod action is also appropriate, however, where a statement is defamatory on its face, but does not fall within one of the limited categories of statements that are actionable per se. See *Mitchell v. Peoria Journal-Star, Inc.*, 76 Ill. App.2d 154, 158-60 (1966). In such per quod actions, the plaintiff need not plead extrinsic facts, because the defamatory character of the statement is apparent on its face and resort to additional facts to discern its defamatory meaning

FILED DATE: 12/15/2020 4:11 AM 2020L062057

is unnecessary. The action is one for defamation per quod simply because the statement does not fall into one of the actionable *per se* categories. In other words, the statement is defamatory on its face, but damage to the plaintiff's reputation will not be presumed. See *Mitchell v. Peoria Journal-Star, Inc.*, 76 Ill. App.2d 154, 158-60 (1966). As with any defamation per quod action, the plaintiff must plead and prove special damages to recover. *Bryson v. News America Publications*, 174 Ill. 2d 77, 103 (Ill. 1996).

3. That the "*Sneaky Jew*" article (Ex H, published by the Defendants) is defamatory on its face goes without saying. It was published on computers at the Skokie Public Library for any and all patrons to see no less than three times, less than two years prior to the filing of this complaint. The special damages inflicted upon Leventhal and his daughter by the defendants encompass destruction of the father/daughter relationship as well as nearly every relationship Leventhal has valued since he was a child.

4. To make certain of the definition of "special damages" the court must consider, as shown in Prosser, Torts § 93, at 593 (2d ed. 1955), that all slanderous words, except for the four categories of slander per se are actionable only upon proof of 'special' damage — special in the sense that it must be supported by specific proof, as distinct from the damage assumed to follow in the case of libel or the kinds of slander already considered. Additional definitions are found in 53 C.J.S. Libel and Slander § 240 (1948) as follows:

5. "General damages are those which the law presumes must actually, proximately, and necessarily result from the publication of the defamatory matter. If the words are not actionable per se, there can be no recovery of general damages. Special damages are such as have actually occurred, computable in money, which are the natural, but not the necessary, result of the alleged wrong, and do not follow by implication of law on proof of the defamatory words."



FILED DATE: 12/15/2020 4:11 AM 2020L062057

6. The need for proof of special damages as an indispensable prerequisite for recovery by plaintiff herein is also expressed in *Valentine v. North American Co.* (1974), 60 Ill.2d 168, 170, 328 N.E.2d 265, *Richardson v. Dunbar* (1981), 95 Ill. App.3d 254, 259, 419 N.E.2d 1205, and cases there cited; *Kirk v. Village of Hillcrest* (1975), 31 Ill. App.3d 1063, 1065, 335 N.E.2d 535, and *Whitby v. Associates Discount Corp.* (1965), 59 Ill. App.2d 337, 340-41, 207 N.E.2d 482. See also *PSL Realty Co. v. Granite Investment Co.* (1981), 86 Ill.2d 291, 312, 427 N.E.2d 563 and *Moricoli v. P S Management Co.*, 104 Ill. App. 3d 234, 237-38 (Ill. App. Ct. 1982).

7. Although Leventhal has sustained the most extreme economic harm as a product of Defendants' defamation, at this point he could not care less about money in any way, shape or form - except as an instrument with which to punish these defendants, all of whom obviously hold their bank accounts more sacred and inviolable than people. The harm caused by these defendants is the worst and most egregious of all possible harms – worse in Leventhal's view than if he had been murdered by the Defendants.

8. If Leventhal had been murdered by the defendants, he would not have to endure seeing photographs of his daughter every day and then well up in tears. If Leventhal had been murdered by the defendants, he would not break down sobbing every time he witnesses people being nice to each other in daily life and on television. Loss of society with his daughter is the most severe harm that could possibly be inflicted upon Howard Leventhal – and – all of the Defendants knew this before the above set forth injuries were inflicted; see Exhibits N in the personal reference bundle, some of which date back to 2005, eight years before Leventhal was ingested into the claws and gullets of these animal defendants and then spat out like so much detritus and flotsam.

9. Defendants, for no reason except to magnify their income and assets, defamed Howard Leventhal to the most intolerable ends and must be held responsible for doing so. Failing to hold

FILED DATE: 12/15/2020 4:11 AM 2020L062057

them responsible provides a license for more herds of toxic, money-grubbing jackasses like these Defendants to keep doing the same thing over and over gain in the future.

**10. Criminal Conspiracy to Defraud Individuals**

1. Defendants defrauded Howard and Amelia, before, during and after the fact, through Mary's entry into marriage with Howard solely for the purpose of dislodging property, cash and a child from Howard.

2. Defendants defrauded Howard Leventhal, officials of Family Resource Center (the adoption agency) and the adoption home study provider, by deliberately concealing Handeland's history of suicide attempts, psychosis, drug abuse, frivolous lawsuits and criminal acts. This fraud resulted in Mary being identified in Amelia's naturalization and adoption proceeding as Amelia's adoptive mother – a specious outcome that never would have taken place absent the concealments described here.

3. By entering into the Marital Settlement Agreement (MSA) in *Handeland v Leventhal*[32], without any intention to honor Handeland's obligations, defendants defrauded Leventhal out of cherished parenthood (the upper-most purpose of obtaining a divorce from Judi Leventhal and marrying Handeland at the outset), the costs of adoption, all of the support monies provided to Handeland from Leventhal approximating $2 million, automobiles, clothing, food, jewelry and title to the marital residence at 2885 Farmington Dr, Lindenhurst, Illinois.

[32] Case No. 05 D 808 in the 19th Judicial Circuit Court Lake County Illinois.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

4. To establish a claim for common law fraud in Illinois, a plaintiff must allege and prove: (1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury. See *Redarowicz v. Ohlendorf* (1982), 92 Ill.2d 171, 185-86 and *Siegel v. Levy Org. Development Co.*, 153 Ill. 2d 534, 542-43 (Ill. 1992).

5. A series of false statements and representations were made by Defendants to induce Howard into marrying Mary. In fact, the real reason that Mary married Howard was to dislodge assets, monies and a child from Leventhal. Mary did not disclose this. Mary induced Leventhal to marry her by causing Leventhal to believe, among other things, that even if they were ever to divorce, they would irrevocably and forever be parents jointly of the child they intended to adopt. Leventhal relied upon this representation, in agreeing to adopt Amelia, in agreeing to marry Handeland, in agreeing to provide Handeland with enormous sums of money and in agreeing to enter into the MSA.

6. To state that Leventhal (and Amelia) have been harmed by this fraud is to vastly understate the effects of defendants' fraud. Children need fathers. A young woman in particular needs to deeply absorb and understand that her father "has her back" and that she need not jump into one of the first spousal relationships proposed to her, to get the kind of security that fathers provide. Amelia, while she may not recognize this harm today, will be severely debilitated by this harm caused by the Defendants for her entire life. These defendants have assisted Handeland to emotionally cripple Amelia in the very same way that Mary was emotionally crippled by her own mother, co-Defendant Lorraine Marx, another bane upon humanity issued from Hell.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

7. Howard has been harmed as much as any human being could be harmed without actually killing him – which might have been preferable. The one and only thing of any real meaning to him since he was 19 years old has been taken away – the daughter he visualized and dreamed of for 25 years before meeting her. There is no greater level of harm or torture that could have been inflicted upon Howard by these defendants – and they knew so before they acted.

8. Fraud may be common law civil or criminal in nature. For example, in contempt proceedings the principal specific societal norms vindicated are the following: (1) judges and other court officials are entitled to respect when performing their judicial duties; (2) judicial proceedings should be conducted in an orderly manner; (3) court orders should be obeyed; and (4) individuals should not commit fraud upon the courts. See *United States v. United Mine Workers of America* (1947), 330 U.S. 258, 302-03, 91 L.Ed. 884, 917-18, 67 S.Ct. 677, 700-01. See *In re Marriage of Betts*, 200 Ill. App. 3d 26, 45 (Ill. App. Ct. 1990). The fundamental difference between criminal and civil fraud is how each case is handled. With criminal fraud, the person committing a criminal act of fraud is prosecuted by the government and a guilty verdict or plea could result in probation, jail time, and/or restitution. Whereas in civil fraud, a victim of some sort of misrepresentation (fraud) brings a civil lawsuit against the bad actor to recover damages due to the fraud. In civil fraud lawsuits, the recovery may be for economic or non-economic losses.

9. Criminal fraud charges may be brought for Mail fraud, Wire fraud, Racketeering (under RICO), Securities fraud, Identity theft, Tax evasion and other crimes. The frauds set forth in this section aggregate together, when viewed in light of all the defendants' other criminal conspiracies, as racketeering predicates under the RICO Act.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

**11. Criminal Conspiracy to Defraud the State of Illinois**

1. Handeland, while masquerading as Amelia's rightful mother, received innumerable apportionments of Illinois state-paid financial assistance, insurance coverage, services provided by courts of the State of Illinois, compensation and reimbursement for education expenses for Amelia and no cost tuition while attending the College of Lake County, Grayslake, Illinois.

2. Each and every dollar of financial benefit and services of any and every kind that Handeland received from the State of Illinois after Amelia's adoption and before Handeland kidnapped Amelia to Wisconsin, was obtained by fraud. This aggregates to an additional set of RICO-predicate acts in the defendants' RICO conspiracy.

**12. Criminal Conspiracy to Defraud the State of Wisconsin**

1. At times relevant hereto, first-named Defendant Mary Handeland has been Treasurer and/or Secretary of Co-Defendant entity Republican Party of the State of Wisconsin (the Neo-Nazi front group and RICO Act nexus hereof), see Exhibit N copy of official correspondence. Starting predictably on Valentine's Day 2016, through several entries during 2020, co-defendants have conspired together to enter certain orders in Wisconsin's electronic court docketing system (https://www.wicourts.gov/casesearch.htm) harming, restraining and injuring Leventhal without authentic legal grounds. Prior to fraudulent "entry" of each and every one of these "orders," Handeland directed publicly solicited and contributed Republican donor monies to these co-defendants' election campaigns and personal accounts as *quid pro quo* for entry of the subject "judicial orders," see Bought-and-Paid-For Wisconsin Judicial Order(s), Exhibit P. Every one of these acts has been a grossly corrupt and improper exercise of government authority causing outrageous harms to both Howard and Amelia which continue to this day.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

2. Direct recipients of these fraudulently directed funds include but are not limited to Defendants hereunder Wisconsin Court Commissioner Barry Boline; Wisconsin Judges John R. Storck, Paul Malloy and Steven Cain; Ozaukee County District Attorneys Adam Y. Gerol and Jeffrey Sisley; and include Ozaukee Court Clerks Defendants Mary Lou Mueller and Cary Ann Mihalko. These corrupt individuals along with former Ozaukee County judge Joseph Voiland, form a veritable circular firing squad of Keystone Kops, reminiscent of pathetic slapstick performers in a *Three Stooges* episode.

3. Voiland, an elected Wisconsin "judicial officer," during a time period relevant to this complaint, separately charged all of the individuals listed in paragraph 2 directly above with criminal conduct in a 357-page complaint filed with the Wisconsin Department of Justice[33]. Voiland alleged acts of misconduct similar to those acts complained-of here. see "*Ozaukee County Courthouse dysfunction: Judge's claims spawn two investigations.*"[34] See also "*Disorder In The Court: Charges Of Misconduct, Dysfunction in Ozaukee County Court*"[35] and a summary online posting: "*The DOJ's investigation fully exposed a breathtaking level of dysfunction in the Ozaukee County court system.*"[36]

---

[33] https://s17596.pcdn.co/wp-content/uploads/2018/01/2017-11-03-Records-re-DCIs-File-Reduced-Size.pdf
[34] https://www.postcrescent.com/story/news/investigations/2018/02/27/ozaukee-county-courthouse-dysfunction-judges-claims-spawn-two-investigations/376031002/
[35] https://www.maciverinstitute.com/2018/01/disorder-in-the-court-charges-of-misconduct-dysfunction-in-ozaukee-county-court/
[36] https://twitter.com/intent/tweet?url=https%3A%2F%2Fwww.maciverinstitute.com%2F%3Fp%3D37790&text=The%20DOJ%27s%20investigation%20fully%20exposed%20a%20breathtaking%20level%20of%20dysfunction%20in%20the%20Ozaukee%20County%20court%20system.%20%23wiright%20%23wipolitics&via=MacIverWisc&related=MacIverWisc



FILED DATE: 12/15/2020 4:11 AM 2020L062057

4. Voiland abandoned these claims against his colleagues after publicly contributed RPOC funds were delivered to him in cash in a paper bag by Defendant Handeland, RPOC Treasurer, see: "*Ozaukee County judge who was locked in conflict with court colleagues won't seek re-election.*"[37] Later published reports indicate that RPOC leaders wanted to have defendant herein Steven Cain installed as an Ozaukee County judge to replace Voiland. Voiland spent most of his time on the Ozaukee County bench in perpetual outrage at the misconduct he observed within this state-supported apparatus. Cain, by no surprise, was then elected, see: "*Steve Cain defeats Angela Foy for Circuit Court seat in Ozaukee County.*"[38] Voiland was so emotionally damaged by the indigestibly corrupt acts of these very same defendants that he required a period of psychiatric treatment in a veteran's mental hospital.

5. Defendant Ozaukee County "judge" Paul Malloy stands alone however as an unrepentant bloviating jackass extraordinaire and disenfranchiser of non-WASPs[39], see: "*Judge finds Wisconsin elections commissioners in contempt of court, orders them to quickly remove people from the rolls.*"[40] In January 2020 Malloy attempted to vaporize Democratic votes by disenfranchising hundreds of thousands of Wisconsin Democrats through yet another judicial order bought and paid for by Co-Defendant RPOC. Again Defendant Mary Handeland delivered

---

[37] https://www.jsonline.com/story/news/politics/2018/12/27/ozaukee-count-judge-wont-seek-re-election-get-treatment-va/2420502002/
[38] https://www.jsonline.com/story/news/politics/elections/2019/04/02/wisconsin-election-ozaukee-circuit-court-steve-cain-vs-angela-foy/3334191002/
[39] White Anglo-Saxon Protestants.
[40] https://www.jsonline.com/story/news/politics/2020/01/13/judge-contempt-court-order-wisconsin-voter-rolls-case/2804070001/

FILED DATE: 12/15/2020 4:11 AM 2020L062057

publicly contributed funds under her control to Malloy to coerce Malloy's disenfranchisement order.

6. The breadth and depth of chronically infected public corruption among the above defendants - elected Wisconsin judicial and legal system officials - is not merely breathtaking, it is also criminally chargeable and threads through and through the matters complained-of hereunder. A report by Columbia Law School titled "*U.S. Anti-Corruption Oversight: A State-by-State Survey*"[41] states: "*Wisconsin's public integrity system has been in a state of turmoil since the turn of the century, with several major corruption cases, ethics controversies, and legal changes. In 2015, Wisconsin faced criticisms for loosening campaign finance regulations and splitting its unique Government Accountability Board into two separate (and arguably less independent) commissions for ethics and elections, respectively.*" Bribery of public officials is a Class H felony in the State of Wisconsin (WI Stat § 946.10 (2013 through Act 380) and also a felony under federal law, see 18 U.S. Code § 201. Bribery of public officials and witnesses. It goes without saying that theft of money from political donors is an additional common law criminal offense.

7. In producing the Exhibit P orders the defendants acted in conspiracy to corruptly commit bribery by misdirecting publicly-contributed campaign funds to defraud the State of Wisconsin into placing bindings and boundaries (backed by the gravity and police powers of their armed enforcers and knuckle-dragging Co-Defendants Ernisse and Grissom) around Plaintiff Howard Leventhal; to prevent Leventhal from pursuing and vindicating Constitutionally valid and

[41] https://web.law.columbia.edu/sites/default/files/capi-data/reports/wisconsin_2018.pdf



FILED DATE: 12/15/2020 4:11 AM 2020L062057

existing parental rights, property rights, rights to due process and 8th Amendment right to be free of the cruelty piled upon Leventhal and his daughter by these Defendants.

8. To state a cause of action in a civil RICO action a plaintiff must allege: (1) that a person (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate commerce. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). A "pattern" under RICO "requires at least two acts of racketeering activity" within a ten-year period, 18 U.S.C. § 1961(5), or multiple predicates within a single scheme that amounted to criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 236, 109 S. Ct. 2893, 2899, 106 L.Ed.2d 195 (1989). A civil RICO claimant must prove conduct that is indictable, and offenses that are punishable under various criminal statutes. *Sedima*, 473 U.S. at 488. All the predicates for a RICO Act conspiracy are present in this count and this matter.

**13. Criminal Conspiracy to Breach Contracts**

1. There are four separate and distinct contracts which have been breached through the instant Defendants' RICO conspiracy: 1) The contract between Mary Handeland and Howard Leventhal under which consideration was exchanged so that both Howard and Mary would actively participate in parenting Amelia, as a lifelong occupation – not as an activity which could ever be terminated by Mary or her equally toxic mother or sister, by any eunuch lawyer or KKK Grand Vizier judge, by the act of any person or authority - except death; 2) The many various specific requirements of the Marital Settlement Agreement (MSA) between Mary and Howard, under which Mary received a seven figure sum of money and property over time (including title

FILED DATE: 12/15/2020 4:11 AM 2020L062057

to the Lindenhurst residence), specifying visitation and other matters between Amelia and Howard, all of which have been ignored and violated in total abandonment over the 5 years since Amelia was 15 years old, by these defendants acting in conspiracy; 3) The Plea Agreement in *U.S. v Leventhal*, entered into with malicious intent to deceive Leventhal by Winston Paes for his personal commercial benefit, conveying rights to Leventhal all of which have vaporized through this conspiracy undertaken by all of the Defendants to this matter; and 4) The contract Paes entered into with the government and People of the United States upon his naturalization, binding Paes to behave within the United States like a civilized human being rather than the subhuman miscreated Frankenstein miniature Hitler he is, in exchange for being granted citizenship.

2. Paes and Co-Defendant Peter Goldsmith, prior to Paes' hiring at the New York-based law firm of Debevoise and Plimpton, devised a scheme to abuse Plaintiff Leventhal in the plethora ways described here, so as to generate a paper trail of "news" coverage with which to decorate Debevoise and Plimpton offices in order to generate additional revenues. The "Sneaky Jew" story (Exhibit H) is one of many.

3. Paes had spent a number of years working at the five-figure income level in government and coveted the seven-figure job he has now. So he targeted Howard Leventhal's case, that of a resoundingly weakened suburban father who had been crushed by the 2008 stock market crash and lost his moral compass while seeking methods of supporting multiple households including that of his elderly parents, a separate household for first wife Judi dying slowly and horrifically through the minute-by-minute tortures of multiple sclerosis, the home containing Amelia and Leventhal's own separate home. It is inconceivable that Paes could have picked on any



FILED DATE: 12/15/2020 4:11 AM 2020L062057

individual in a more weakened state – a practice described by former FBI Director James Comey as "Chickenshit Prosecution."

4. In his book "*The Chickenshit Club: Why the Justice Department Fails to Prosecute Executives*,"[42] author Jesse Eisinger quotes Comey and describes miscreant weasels like Winston Paes, who have collectively caused what Eisinger refers to as "deterioration of the Justice Department and the Securities and Exchange Commission." The book recounts a Southern District of New York federal prosecutor staff meeting where Comey was to preside. He said: *""Before we read off the box score, I have something to say:" Comey said. "We have a saying around here: We do the right things for the right reasons in the right ways." All the assembled prosecutors had heard that exhortation in some variation, from Comey in the hallways or in smaller meetings, and from other chiefs. Then Comey asked the seated prosecutors a question: "Who here has never had an acquittal or a hung jury? Please raise your hand?" The go-getters and resume builders in the office were ready. This group thought themselves the best trial lawyers in the country. Hands shot up. "I and my friends have a name for you guys:" Comey said, looking around the room. Backs straightened in preparation for praise. Comey looked at his flock with approbation. "You are members of what we like to call the Chickenshit Club?" Hands went down faster than they had gone up. Some emitted sheepish laughter."*

5. What Winston Paes did to crush Howard and Amelia Leventhal was nothing other than the cowardly resume-building Comey admonished his troops for during the meeting described above. Every single meaningful thing that happened in Leventhal's criminal case after

[42] https://www.amazon.com/Chickenshit-Club-Department-Prosecute-Executives/dp/1501121367

FILED DATE: 12/15/2020 4:11 AM 2020L062057

Leventhal's guilty plea in December 2013 was an outgrowth of abusive, corruptly criminal acts of obstruction of justice by Winston Paes, aided by co-defendants Zissou, Butler, Espinosa and all of the other co-defendants – to falsely bloat Paes' resume with Orwellian levels of disinformation[43] so that the seven figure salary he is now paid by defendant Goldsmith would be manifested; and so that Goldsmith's personal income derived from Paes' fee production would thereby be further amplified. "Justice," whatever justice is supposed to mean, was not done here. Repositioning decimal points in the personal bank accounts of Paes, Goldsmith, Handeland, Zissou, Butler, Espinosa and all the other co-defendants is what was done here.

6. In pursuit of cash for the personal benefits of himself and defendant Goldsmith, Winston Paes breached Leventhal's Plea Agreement and withheld "Acceptance of Responsibility Points" from Leventhal, which worked to produce the ludicrous sentence[44] handed down by defendant Robin Keller's husband. In order to generate sensational tabloid "newspaper" stories and no other authentic motive or cause, Keller has received cash compensation and shared it with her husband, whose household has benefitted from Keller's client-sharing with Paes' and Goldsmith's law firm over the intervening years, in payment for this egregious scheme to obstruct justice.

7. Obstruction of justice is a federal crime under 18 U.S.C. § 1503. The above described corrupt, purely cash-motivated acts by these defendants in conspiracy to breach contracts amount

[43] What was the name of the protagonist of George Orwell's famous and ironically prescient novel "1984"? Winston. Thematically, 1984 centers on the consequences of totalitarianism, mass surveillance, and repressive regimentation of persons and behaviors within society – precisely the Constitution-defying behaviors these defendants engaged-in to magnify the asset sides of their balance sheets - afflicting permanent irreparable harm upon Howard and Amelia.

[44] See Exhibit L admissions by the Government



FILED DATE: 12/15/2020 4:11 AM 2020L062057

also to obstruction of justice and aggregate further to actionable prerequisites for recovery under RICO in this matter.

8. In order to plead a cause of action for breach of contract, a plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages. *Gonzales v. American Express Credit Corp.*, 315 Ill. App. 3d 199, 206, 733 N.E.2d 345 (2000). Only a duty imposed by the terms of a contract can give rise to a breach. *Gallagher Corp. v. Russ*, 309 Ill. App. 3d 192, 199, 721 N.E.2d 605 (1999). See *W.W. Vincent Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759 (Ill. App. Ct. 2004). Upon receiving the generous grant of United States citizenship, Winston Paes accepted the obligation to behave like a civilized human being and not to burn the Constitution as he did in *US v Leventhal*. Paes had a duty not to use Leventhal's Plea Agreement as a personal tool and instrument of deception to shortcut through a trial and just get right to news stories about the insane prison sentence coerced into existence by defendant Keller.

9. Mary Handeland had a duty not to defecate all over the two contracts she made with Leventhal for joint parenting of Amelia – after Handeland had destroyed her own reproductive system through indiscriminate acts involving various electrical appliances and dozens upon dozens of partners. She received enormous financial benefits including equity in real estate; for these two contracts. She was relieved from having to work in any sort of productive job for more than a decade. And she has usurped for herself all of the love and companionship that any normal parent expects in a normal parent/child relationship uncorrupted by "people" like these monstrous, money-grubbing, poisonous defendants.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

10. A civilized society cannot stand for these sorts of abuses. These defendants must be held to account, for if they are not, an endless parade of human beings will continue being crushed for money in the way Howard and Amelia Leventhal have been crushed for nothing except money.

### 14. Criminal Conspiracy to Defraud the United States

1. Plaintiff restates the fact allegations above, Criminal Conspiracy to Breach Contracts and states further as follows:

2. Acts of criminal fraud upon the United States related to this matter are legion and cumbersome to state or restate coherently in entirety. Among these, Co-Defendants Steve Zissou and Sally Butler (husband and wife) were Leventhal's court-appointed "defense" lawyers in *US v. Leventhal*. In this pursuit they received approximately $100,000 in payments from the Criminal Justice Act (CJA) Panel budget of the Eastern District of New York (federal funding) to "defend" Leventhal. What this amounted to was a duty to minimize Leventhal's sentence, because Zissou and Butler were not engaged until after Leventhal pled guilty. Instead, they fed back information to prosecutor Paes and maximized Leventhal's sentence. "Maximized" however is far too weak a term, given that the Government has admitted that Leventhal's sentence was somewhere between 10 times and 1,825 times the closest comparable cases.[45]

3. During a series of 2014-2015 meetings in Chicago when Zissou and Butler travelled to the Midwest from their East Coast home, the couple met with Leventhal at the Sofitel Magnificent Mile Hotel, a $350 per night lodging, paid for by federal CJA funds and

[45] See Exhibit L excerpts from the record in *US v Leventhal*, 13-cr-844, Northern District of Illinois.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

supplemented by funds provided to Zissou from Paes' DOJ slush fund, also federal funds. During these meetings, Zissou placed his newly acquired Windows Surface laptop computer 2-3 feet from Leventhal. At one point, Zissou went to use the restroom and Leventhal, curious about the new model computer, examined it.

4. Leventhal, who is a self-taught computer expert and designer of electronics devices hundreds of thousands of units of which were sold globally at RadioShack, noticed that the wi-fi connection to the laptop seemed slow, like Zissou was downloading a movie. No such downloading was going on. So Leventhal executed several command line prompts to determine what outside devices, if any, were connected to Zissou's laptop and what functions were being executed in the background.

5. Leventhal discovered four IP addresses which were continuously connected to the laptop. Two of the IP addresses were transferring webcam audio to a company in Virginia. The Virginia company was/is a cover operation for the National Security Agency (NSA), a US government agency closely allied with the Department of Justice. Zissou and Butler were knowingly enabling DOJ prosecutor Paes to monitor supposedly "privileged" attorney/client conversations with Leventhal, among many other things, in outrageous violation of Leventhal's 5th and 6th Amendment rights.

6. Subsequent to this discovery Leventhal emailed Zissou numerous times with queries on the topic. Zissou never responded. Zissou's new laptop was supplied to him by Paes to enable Paes to have an advantage in Leventhal's case, to "win" the ridiculously lengthy sentence and then his current 7 figure job. Forgetting for a moment about the egregious malpractice and attorney misconduct involved with this on Paes', Zissou's and Butler's parts – all three in this process were defrauding the United States out of monies paid to "defend" Howard Leventhal, not

FILED DATE: 12/15/2020 4:11 AM 2020L062057

to insanely magnify Leventhal's sentence. Defendants Mary Handeland, Michelle Espinosa and other co-conspirators in this matter were all informed and involved in this additional fraud upon the United States.

7. Fraud upon the United States is a felony under 18 U.S.C. § 371. Stealing $100,000 from the United States under false pretenses is no minor offense and opens the perpetrators to prison terms of up to 20 years along with substantial fines and restitution. All the acts particularized in this count by the Defendants are criminally chargeable acts satisfying the predicate for RICO Act adjudication.

8. Each and every one of Handeland's representations to the State Department, with the possible exception of her name and birthdate, pursuant to Amelia's adoption was a distinct act of fraud. As a general rule, when the United States authorizes individuals to perfect an international adoption, it does not expect that such adoptions will be used as leveraging instruments to dislodge cash in panoply forms from a parent under false pretenses.

9. The Hague Convention on the Protection of Children and Co-operation in Respect of Intercountry Adoption (Convention) is an international agreement to safeguard intercountry adoptions. Concluded on May 29, 1993 in The Hague, the Netherlands, the Convention establishes international standards of practices for intercountry adoptions. The United States signed the Convention in 1994, and the Convention entered into force for the United States on April 1, 2008. The United Nations states: "The Hague Convention on the Protection of Children and Co-operation in Respect of Intercountry Adoption (Convention) is an international agreement to safeguard intercountry adoptions. Concluded on May 29. 1993 in The Hague, the Netherlands, the Convention establishes international standards of practices for intercountry



FILED DATE: 12/15/2020 4:11 AM 2020L062057

adoptions. The United States signed the Convention in 1994, and the Convention entered into force for the United States on April 1, 2008."

10. Nowhere in the published purposes and premises for intercountry adoptions does any policy statement indicate that adoptions may be pursued as a means solely to enrich a parent, her friends and relatives – which has taken place here. Handeland and her co-defendants defiled Amelia and the prospects for Amelia's wholesome development into a functioning adult - along with defiling the legal process of adopting Amelia while defrauding the United States before, during and after the process, up to and including today.

11. The vulgar acts described in this count and complaint aggregate to additional predicate acts under RICO.

### 15. Criminal Conspiracy to Deprive Constitutional Rights

16. Defendant restates all of the fact allegations above and states further as follows:

17. Certain of the defendants may attempt to claim immunity from penalty for the allegations in this case by asserting immunity or qualified immunity. Immunity principles however are grounded in acts performed while the accused is or was performing his or her duty as an employee or agent of a government. None of the defendants were acting in this matter as an employee or agent of government – they were acting to fill their own pockets with cash pursuant to a RICO Act predicate criminal conspiracy. There is no legitimate government process which ordains the execution of a RICO Act predicate criminal conspiracy. None of the defendants are immune on any level.

18. Plaintiffs have the burden of showing the constitutional right was clearly established. *Gonzalez*, 578 F.3d at 540. " '[C]learly established' for purposes of qualified immunity means

FILED DATE: 12/15/2020 4:11 AM 2020L062057

that '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.' "*Wilson v. Layne*,526 U.S. 603, 614–15, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ). Earlier cases need not involve "fundamentally similar" or "materially similar" facts for officials to be on notice that their conduct violates clearly established law. (Internal quotation marks omitted.) *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

19. Since *Soldal v. Cook County, Illinois*, 506 U.S. 56, 71–72, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992), police officers have known they may act to preserve the peace but cross a constitutional line when they become actively involved in (for example) a private repossession. Courts addressing this same issue of police involvement in a private repossession consistently conclude "[s]tate law limiting self-help to those situations where a breach of the peace is avoided, and federal law recognizing that an unlawful repossession can amount to state action and a deprivation of property under § 1983," are clearly established. *Marcus*, 394 F.3d at 824; see also *Cochran v. Gilliam*, 656 F.3d 300, 309–11 (6th Cir.2011) (police officers' " active involvement" in assisting seizure of property violated clearly established law); *Hensley*, 693 F.3d at 694 (following *Cochran*); *Menchaca*, 613 F.2d at 513 (see discussion above). See *Murray v. Poani*, 980 N.E.2d 1275, 1283-84 (Ill. App. Ct. 2012).

20. It would be ludicrous (but not unexpected) for the defendants to suggest that they had no understanding or duty to understand that perjury, subornation of perjury, obstruction of justice and all of the other criminal acts and rights deprivations by the defendants set forth herein – are



FILED DATE: 12/15/2020 4:11 AM 2020L062057

criminal acts. They simply could not care less about who or what they were harming in these instant acts, proceeded, and then hoped to get away with all of it after temporarily crippling Leventhal's ability to counterattack.

21. Leventhal's First Amendment, Fifth, Sixth, Eighth and Fourteenth Amendment rights have been violated through the defendant's RICO Act criminal conspiracy. None of the defendants are immune.

22. As to the principle of "absolute immunity," which doubtlessly will be claimed by some of the defendants, Illinois law does not provide a license to those in government employ to just execute any illegal act and perpetrate any egregious harm, just because of the "sovereign" name on a paycheck. Leventhal deserved some time in prison. Yet even though the time he got was of ludicrous length, the duration itself is not really the fundamental issue in this civil complaint. Destruction of Leventhal's parenthood is the fundamental issue.

23. A prosecutor or judge is absolutely-immune only for those activities "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430, 47 L. Ed. 2d 128, 143, 96 S. Ct. 984, 995 (1976). Publishing the "Sneaky Jew" article is not "intimately associated with the judicial phase of the criminal process," nor is bribing Mary Handeland or giving her the quid pro quo of destroying Leventhal's parenthood in exchange for perjury.

24. The Supreme Court has adopted a "functional approach," which analyzes the nature of the function performed, not the identity of the actor who performed it. *Buckley*, 509 U.S. at 269, 125 L. Ed. 2d at 226, 113 S. Ct. at 2613. However, when a prosecutor performs the investigative functions normally performed by a police officer, absolute immunity does not apply. *Buckley*, 509 U.S. at 273, 125 L. Ed. 2d at 226, 113 S. Ct. at 2616. See *White v. City of Chicago*, 369 Ill.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

App. 3d 765, 769 (Ill. App. Ct. 2006). None of the defendants to this matter carried out acts in any way resembling the "functions normally performed by a police officer." Instead they carried out an obstruction of justice conspiracy – a series of criminal acts and RICO Act predicates, forwarding to deny a broad swath of Leventhal's civil rights and those of his daughter – for money.

**16. Criminal Conspiracy to Obstruct Justice**

1. Plaintiff restates the fact allegations above and states further as follows:

2. Obstruction of Justice as described above is a criminal violation of section 31-4(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 31-4(a)). See *People v. Gerdes*, 173 Ill. App. 3d 1024, 1026 (Ill. App. Ct. 1988). Defendants' criminal acts complained of here are therefore sufficient predicates for treble damages recovery under RICO.

**17. Criminal Conspiracy to Unjustly Enrich**

1. Plaintiff restates the allegations above and states further as follows:

2. The doctrine of unjust enrichment underlies a number of legal and equitable actions and remedies. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 678 (1989). Unjust enrichment is not a separate cause of action that, standing alone, will justify an action for recovery. *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 631, 888 N.E.2d 1190, 1200 (2008); *Lewis v. Lead Industries Ass'n*, 342 Ill. App. 3d 95, 105, 793 N.E.2d 869, 877 (2003). "'Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or undue influence, and may be redressed by a cause of action based upon that improper conduct.'" *Alliance Acceptance Co. v. Yale Insurance Agency, Inc.*, 271 Ill. App. 3d 483, 492, 648 N.E.2d 971, 977 (1995), quoting *Charles Hester*



FILED DATE: 12/15/2020 4:11 AM 2020L062057

*Enterprises, Inc. v. Illinois Founders Insurance Co.*, 137 Ill. App. 3d 84, 90-91, 484 N.E.2d 349, 354 (1985). See: *Martis v. Grinnell Mutual Reinsurance*, 388 Ill. App. 3d 1017, 1024-25 (Ill. App. Ct. 2009).

3. Defendants' criminal acts to unjustly enrich themselves complained of here are sufficient predicates for treble damages recovery under RICO.

**18. Criminal Conspiracy to Commit Perjury**

1. Plaintiff restates the allegations above and states further as follows:

2. In *Sealfon v. United States*, 332 U.S. 575, 92 L.Ed. 180, 68 S.Ct. 237, which involved "the question whether an acquittal of conspiracy to defraud the United States precludes a subsequent prosecution for commission of the substantive offense, on the particular facts here involved." ( 332 U.S. 575, 576, 92 L.Ed. 180, 182, 68 S.Ct. 237, 238.) the Court stated: "It has long been recognized that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *The People v. Ricker*, 45 Ill. 2d 562, 567-68 (Ill. 1970). There are no less than six separate chargeable crimes related to Handeland's perjury in *U.S. v. Leventhal*: 1) The co-def/co-conspirators' subornation of perjury; 2) Co-def/co-conspirators' conspiracy to suborn perjury; 3) Handeland's actual perjury and that of Co-Def Michelle Espinosa; 4) Defendants' conspiracy to defraud the United States through perjury and subornation of perjury; 5) Defendants' obstruction of justice; and 6) Defendants' conspiracy to obstruct justice.

3. Perjury, subornation and obstruction of justice are all federal crimes subjecting offenders to protracted prison sentences. Paragon of virtue and husband to defendant Keller, U.S. District Court judge - honorless, hubris-infected, self-important jackass Brian M. Cogan entered the

FILED DATE: 12/15/2020 4:11 AM 2020L062057

following jury instruction in the record of *United States v. House*, No. 14-1275-cr (2d Cir. Jan. 26, 2016) in an obstruction of justice case: "... no matter the means or way by which the crime is alleged to have been committed . . . the act must have been committed corruptly" with "the improper motive or purpose of obstructing justice." *United States v. House*, No. 14-1275-cr, at *5-6 (2d Cir. Jan. 26, 2016). All of the defendants in this matter obstructed justice and suborned perjury for the corrupt purpose of driving payments of cash to themselves, rather than to serve the public interests in sentencing pursuant to a criminal proceeding.

4. The purposes of criminal sentencing under 18 U.S.C. § 3553 to: (1) deter the offender from further criminal conduct and to; (2) protect the public from further crimes. See *Pollard v. U.S. Parole Comm'n*, 15-cv-9131 (KBF), at *21 (S.D.N.Y. Aug. 11, 2016). Nowhere does § 3553 state that either a) destruction of a parent/child relationship; or b) increasing the obstructors' and perjurors' income and assets are proper purposes of sentencing. "Corrupt officials and bribed law enforcement officers operate as 'a silent conspiracy' in support of organized crime. (Organized crime) could not continue to operate without corrupt judges and prosecutors, or without the assistance of a handful of bribed police." 116 Cong.Rec. 601 (remarks of Sen. Hruska); see also Senate Judiciary Committee Report's discussion of Title VIII of the Act, the provisions aimed at syndicated gambling: "Finally, Congress finds that corruption and bribery of State and local officials responsible for enforcement of criminal laws facilitate illegal gambling enterprises." S.Rep. No. 617, 91st Cong., 1st Sess. 73 (1969). See *United States v. Angelilli*, 660 F.2d 23, 33 (2d Cir. 1981).

5. Defendants in this matter are not a particle or scintilla different from or misaligned with long-established and fabled organized crime figures. Each and every one of the defendants in his or her own way, has perverted the purposes and intents of lawful application of authority to the



FILED DATE: 12/15/2020 4:11 AM 2020L062057

severely manifest detriment of Howard and Amelia Leventhal, in order to fill their personal accounts with money and/or assets. To make matters worse, all of these people hide and have hidden behind "the color of law" to conceal their misconduct. They are cancers upon the United States and examples must be made of them.

6. Defendants' criminal acts to conspire to commit and suborn perjury complained of here are sufficient predicates for treble damages recovery under RICO.

**19. Tortious Interference with Familial Relations & Loss of Child Society**

1. As disquieting and stress-inducing though it is for the Plaintiff to express in writing, the effect upon Plaintiff of the Defendants' harmful acts in this matter are equivalent to and no less than the effects upon Plaintiff had his daughter's life been literally ended by the Defendants. Moreover the Defendants have been fully informed of this view by numerous public filings and Internet-posted statements on this topic by the Plaintiff over the last 5 years. The Defendants' response? They instituted no contact orders and arrest warrants in Wisconsin forbidding Leventhal's First Amendment-guaranteed right to free expression on the topic. see Exhibits C and P.

2. The roles children play in their parents' lives have evolved over the last few hundred years. (See Decof, *Damages in Actions for Wrongful Death of Children*, 47 Notre Dame Law. 197, 198 (1971); Belfance, *The Inadequacy of Pecuniary Loss as a Measure of Damages in Actions for the Wrongful Death of Children*, 6 Ohio N.U.L. Rev. 543, 545 (1969).) The Illinois Appellate Court expressed a similar view in *Cockrum v. Baumgartner* (1983), 95 Ill.2d 193, 198-202 (where it held that parents could not recover the expenses of rearing a child to the age of majority in a "wrongful birth" action), stating that the chief value of children to their parents is

FILED DATE: 12/15/2020 4:11 AM 2020L062057

the intangible benefits they provide in the form of comfort, counsel and society. See *Bullard v. Barnes*, 102 Ill. 2d 505, 516-17 (Ill. 1984). The Appellate court concluded that parents are entitled to a presumption of pecuniary injury in the loss of a child's society, based on the holding that the pecuniary injury for which parents may recover under the wrongful death statute includes this form of loss." *Bullard v. Barnes*, 102 Ill. 2d 505, 517 (Ill. 1984), referring to the benefits children provide in the form of comfort, counsel and society.

3. Leventhal did not enter into the arduous, lengthy, frightening, difficult, expensive and stressful process of rescuing an abandoned foundling halfway around the world out of a rural orphanage in a hostile foreign country, in order to present the child as a gift to these Defendants and walk away – as Leventhal has been forced to do by this obscenely miscreated herd of barnyard animal defendants. While Leventhal had no expectation that Amelia would work the fields for him, tend a store for him or prepare food for him, he most certainly had the most minimum expectations that his daughter like all other children, would spend time with him, send him birthday cards, invite him to her wedding and provide comfort to him in bad times (as the last 7 years most surely have been), along with counsel and society in general. These Defendants for money, have resolutely and arrogantly prevented this for the last five years as if they had some God-given right to do so, in the total absence of same.

4. The Illinois Appellate court acknowledged in *Cockrum*, as have several sister State courts in their decisions to permit recovery for loss of a child's society (see, e.g., *Wardlow v. City of Keokuk* (Iowa 1971), 190 N.W.2d 439, 446; *Fussner v. Andert* (1961), 261 Minn. 347, 352, 113 N.W.2d 355, 359; *Anderson v. Lale* (1974), 88 S.D. 111, 121, 216 N.W.2d 152, 158), the very substantial expenses associated with child-rearing. Moreover, many of the jurisdictions which have held that pecuniary loss encompasses loss of a child's society have also indicated that jurors



FILED DATE: 12/15/2020 4:11 AM 2020L062057

are to consider child-rearing expenses in arriving at a verdict. (See *Fuentes v. Tucker* (1947), 31 Cal.2d 1, 9, 187 P.2d 752, 757; *Haumersen v. Ford Motor Co.* (Iowa 1977), 257 N.W.2d 7, 17; *Sellnow v. Fahey* (1975), 305 Minn. 375, 382-83, 233 N.W.2d 563, 568; *Jones v. Carvell* (Utah 1982), 641 P.2d 105, 107; *Clark v. Icicle Irrigation District* (1967), 72 Wn.2d 201, 205-10, 432 P.2d 541, 544-47. See also, *The Value of a Child*, 25 Baylor L. Rev. 118, 125 (1973); The New North Carolina Wrongful Death Statute, 48 N.C.L. Rev. 594, 605 (1970); *Comment, Damages in Wrongful Death and Survival Actions*, 29 Ohio St. L.J. 420, 477 (1968). Compare *Jones v. Hildebrant* (1976), 191 Colo. 1, 3 n. 1, 550 P.2d 339, 341 n. 1, and *Sinn v. Burd* (1979), 486 Pa. 146, 151-52 n. 3, 404 A.2d 672, 675 n. 3. See *Bullard v. Barnes*, 102 Ill. 2d 505, 518 (Ill. 1984).

5. Juries must be instructed not only to assign a dollar value to the loss of the child's society, but also to arrive at a figure, based on the evidence presented to them, which represents expenditures a parent would have been likely to incur had the child lived, see: *Bullard v. Barnes*, 102 Ill. 2d 505, 518 (Ill. 1984). The court and jury in this matter, having the difficult job of trying to attach a monetary value to the loss of Amelia's society with Howard Leventhal, should be tasked with assigning a monetary value to the loss of their own children for comparison purposes. Most parents are likely to see this value as something approaching infinity, a cost that is nearly unmeasurable or unreducible to dollar sums. Nonetheless, given that no other remedy is available, a dollar figure must be determined and this can amount to nothing less than many, many, millions of dollars; in fact a ruinous sum of money sufficient to wreck the Defendants in every way and to the fullest extent that Howard and Amelia have been wrecked.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

## SECTION 4
### CONTINUING VIOLATIONS DOCTRINE TOLLING STATUTES OF LIMITATION

6. On December 3, 2020 the United States District Court for the Northern District of Illinois entered its order in *U.S. v. Leventhal*, Case No. 13-cr-844, terminating Leventhal's period of supervised release two years early, see Exhibit D attached hereto. This event tolled every relevant statute of limitation as to the claims in this matter.

7. A continuing violation is marked by continued unlawful acts and conduct, not by continual ill-effects from an initial violation. See *Bank of Ravenswood v. City of Chicago*, 307 Ill. App. 3d 161, 167-68 (1999) (city's construction of tunnel under plaintiff's property created a continual effect based on presence of subway below ground but not a continual violation). *Wayne Hummer Trust Co. v. Vill. of Elwood, an Ill. Home Rule Mun. Corp.*, 2019 Ill. App. 3d 170843, 7 (Ill. App. Ct. 2019). In this matter, all of the Defendants collaborated to keep Leventhal bound by terms and conditions of supervised release under which **they, the Defendants, held power to punish Leventhal and return him to federal prison, if Leventhal had acted to pursue this instant lawsuit**. It was not until the Northern Illinois District federal court acted on December 3, 2020 to terminate Leventhal's supervised release that this lawsuit could be filed in absence of oppression against it by all of the Defendants.

8. Continuing violations as set forth above have continued every day by the Defendants up to and including the date of filing this matter. This lawsuit is not mooted or barred by any statute of limitations as it was filed less than 30 days after the first date it could be filed in absence of retributory oppressive power over Leventhal by the Defendants. To the extent any relevant statutes of limitation exist, all exceed 30 days by many months.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

## SECTION 5
### DAMAGES CLAIMED

1. That things taken away may be priceless does not make them worthless. Urges and wants for money have been terribly destructive forces in this Plaintiff's existence. Howard Leventhal cares nothing at all about money at this point, except to the extent money is indispensable for minimally necessary food, shelter, medicine, education and occasional modest entertainment. Completely satisfactory to Leventhal in this matter would be nothing more than a court order to re-establish the *status quo* as it existed in March 2002, when Amelia entered the United States as an infant – an impossible remedy. However, given the nearly infinite and endless series of opportunities to make the faintest scintilla of correction of some kind to the nearly infinite and inconceivable harms they caused to both Howard Leventhal and Amelia Leventhal, each and every one of the Defendants in his or her own way, has merely looked just past the end of their noses, to their next baloney sandwich, their next bonus check or buying their next roll of toilet paper and stomped all over Howard Leventhal and Amelia Leventhal in pursuit of same. This cannot be allowed to stand in a society that deems itself to be civilized. These sub-humans - the Defendants - for anything approaching justice to be done, must be financially and spiritually crushed now in the resolution of this lawsuit, in the same way that Howard and Amelia have been. Unfortunately, burnings at the stake, public floggings and binding of people in stocks in the public square are no longer permissible remedies either, so disgorgement of cash, assets and property are the only societally-digestible remedies realizable pursuant to this matter.

2. Under *Sadacca v. Monhart*, 128 Ill. App. 3d 250, 255 (Ill. App. Ct. 1984): "A constructive trust is a device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs." (*Gravitt v. Jennings* (1979),

FILED DATE: 12/15/2020 4:11 AM 2020L062057

79 Ill. App.3d 286, 288, 398 N.E.2d 395, 397.) An implied or constructive trust "'arises by operation of law when the circumstances of a transaction are such that the court finds it inequitable for the legal owner to enjoy the beneficial interest.'" (*Price v. State of Illinois* (1979), 79 Ill. App.3d 143, 148, 398 N.E.2d 365, 370.) A constructive trust will be imposed to prevent a person holding title to property to profit from his wrong or be unjustly enriched by retaining the property. *Bozeman v. Sheriff* (1976), 42 Ill. App.3d 228, 355 N.E.2d 624. Plaintiff therefore seeks orders as follows:

a. **IMPOSITION OF CONSTRUCTIVE TRUST** on the real estate property commonly known as 2885 Farmington Dr., Lindenhurst, Illinois 60046, transferring title jointly to Howard Leventhal and Amelia Leventhal; and

b. **IMPOSITION OF CONSTRUCTIVE TRUSTS** upon the primary personal residence property of each and every defendant, jointly and severally for the benefit of Howard and Amelia Leventhal; and

c. **JUDGMENT OF INVALIDITY** of the Illinois marriage between Howard Leventhal and Mary Handeland; and

d. **ORDER VACATING MARITAL DISSOLUTION ORDER** in *Handeland v. Leventhal*, Case No. 05 D 808, in the 19th Judicial Circuit Court, Lake County Illinois; and

e. **FORFEITURE ORDER** requiring Handeland to disgorge and return every item of monetary value she received from Howard Leventhal, 1995 to the present, to the joint benefit of Howard Leventhal and Amelia Leventhal; and



FILED DATE: 12/15/2020 4:11 AM 2020L062057

f. **DECLARATORY ORDER** voiding all rights conferred upon Defendant Mary Handeland pursuant to the adoption of Amelia Handeland-Leventhal including rights of survivorship; and

g. **CRIMINAL REFERRALS** of all the Defendants to the United States Department of Justice, the Illinois Attorney General, the New York State Attorney General, the Wisconsin Attorney General and the U.K. Attorney General's Office (United Kingdom, in the case of Defendant Peter Goldsmith), including a recommendation that in the case of Co-Defendant Winston Paes, that his U.S. Naturalization Certificate is declared obtained by fraud and revoked; and

h. **FORFEITURE** of 100% of the compensation paid by Debevoise and Plimpton to Winston M. Paes since the first day of Paes' employment with the firm, paid to Howard and Amelia Leventhal; and

i. **FORFEITURE** of 100% of the salaries paid by their employers to Michelle Espinosa, Ronald Jacobs and Marcus Holmes, from the first day of their contact with Howard Leventhal – paid to Howard and Amelia Leventhal; and

j. **FORFEITURE** of 100% of the federal funds paid to Steve Zissou and Sally Butler, refunded to the United States Treasury, for "work" labelled as having been performed for Howard Leventhal's defense in *US v Leventhal*; and

k. **ACTUAL DAMAGES** judgment against each and every defendant, jointly and severally; and

l. **COMPENSATORY DAMAGES** judgment against each and every defendant, jointly and severally; and

FILED DATE: 12/15/2020 4:11 AM 2020L062057

m. **PUNITIVE DAMAGES** judgment against each and every defendant, jointly and severally; and

n. **AGGRAVATED DAMAGES** judgment against each and every defendant, jointly and severally; and

o. **TREBLE DAMAGES** judgment multiplying all above times three, against each and every defendant, jointly and severally, as set forth in the RICO ACT[46]; and

p. **DAMAGES FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** inflicted by the Defendants upon Howard Leventhal, judgment against each and every defendant, jointly and severally; and

q. **DAMAGES FOR INTENTIONAL PERSONAL TORTIOUS INJURY** of Howard Leventhal, in terms of the injuries suffered by Leventhal as a result of medical neglect by design and implementation of the Defendants - judgment against each and every defendant, jointly and severally; and

r. **SPECIAL DAMAGES** – an award of $1,000 per hour for each and every hour in which Howard Leventhal has not been in the direct residential personal company of Amelia, March 2002 to the present, jointly and severally against each and every defendant; and

s. **ANY AND ALL** other relief that this Honorable Court deems fit, proper and just under the instant facts, circumstances and law of this case.

---

[46] See: Judith A. Morse, *Treble Damages under RICO: Characterization and Computation*, 61 Notre Dame L. Rev. 526 (1986). Available at: http://scholarship.law.nd.edu/ndlr/vol61/iss3/9



FILED DATE: 12/15/2020 4:11 AM 2020L062057

## SECTION 6
## CONCLUSION AND PRAYER

1. At least thirteen of the defendants in this matter are lawyers, all of whom hallucinate at night that they are Clarence Darrow reincarnate. The real Clarence Darrow really said: "*As long as the world shall last there will be wrongs and if no man objected and if no man rebelled, those wrongs would last forever.*" The horrific, soul-crushing, amoral wrongs done by these people, crushing real human beings – the Plaintiff and his daughter - to dust for money must be ended now, once and for all.

2. Conversion of human beings to chattel property was outlawed in 1865 throughout the United States under the Thirteenth Amendment to the U.S. Constitution. In the United Kingdom, slavery was outlawed first in 1807 when Britain first passed the Abolition of the Slave Trade Act, outlawing British Atlantic slave trade. In 1833 Britain enacted the Abolition of Slavery Act, ordering gradual abolition of slavery in all British colonies. Yet somehow now two hundred years later, each and every one of the Defendants in this matter (including and most especially the first-named Defendant) has deemed themselves to again be living in the pre-Abolition period and have treated Howard and Amelia Leventhal as chattel property upon which to generate personal income, regardless of the cost and damage in terms of human suffering. The whole idea of this is so preposterous, outlandish and ludicrous as to seem impossible, yet that is exactly what has taken place.

3. There is no adequate remedy at law for the harms caused by these defendants. The *status quo* between Howard and Amelia Leventhal can never be reconstructed by any human effort or the order of any court. If all the money in the world was loaded into a truck and delivered to the Plaintiff, such an event would be inadequate and vacant of satisfaction. Yet nothing about this

FILED DATE: 12/15/2020 4:11 AM 2020L062057

matter can be allowed to stand unremedied. Doing nothing would provide a license to future individuals positioned as the Defendants, to inflict infinite harm upon actual human beings, under color of law and "just doing my job," as detestable miniature goblin monster Defendant Winston Pacs remarked several times to the Plaintiff - reminiscent of similarly hubris-infected claims barked out loud by Hitler's henchmen during the War Crimes trials at Nuremburg which took place after World War II.

4. Starting with Plaintiff's best good faith estimate of actual damages caused by the Defendants, the judgment in this matter if requested relief is granted, will exceed $500 million. No judgment less than this amount will be sufficient or newsworthy enough to discourage similar harms by similarly situated actors in the future.

**NOW THEREFORE** Plaintiff respectfully prays for judgment of this Honorable court particularizing and granting the remedies as set forth above under "DAMAGES CLAIMED."

Respectfully submitted,
**PLAINTIFF** (pro se)

Date: Dec 15, 2020

Howard Leventhal
1205 E. Prairie Brook Dr D1, Palatine, IL 60074
Ph +1-262-997-8570; Email: HLEV3@AOL.COM

**PLAINTIFF'S WAIVER AND REQUEST FOR ELECTRONIC SERVICE**

Plaintiff Howard Leventhal hereby waives physical service and requests electronic service under all circumstances, by email to: HLEV3@AOL.COM.

Howard Leventhal
Date: Dec 15, 2020



FILED DATE: 12/15/2020 4:11 AM 2020L062057

# Appendices

**1. Table of Authorities** (in order of appearance)

| Page | Authority |
|---|---|
| 4 | *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473 (1981) |
| 4 | *Claflin v. Houseman*, 93 U.S. 130 (1876) |
| 4 | *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502 (1962) |
| 5 | *Cont'l Grp., LLC v. All Access Int'l, Inc.*, 2017 Ill. App. 160389 (Ill. App. Ct. 2017) |
| 6 | 18 U.S.C. § 1964(c) |
| 6 | *Haroco v. American Nat. B. T. Co. of Chicago*, 747 F.2d 384 (7th Cir. 1984) |
| 6 | *Tafflin v. Levitt*, 493 U.S. 455 (1990) |
| 6 | 45 U.S.C. § 56 (1982) |
| 6 | *Burnett v. New York Cent. R.R.*, 380 U.S. 424 (1965) |
| 6 | 15 U.S.C. § 77v(a) (1982) |
| 6 | *Weiner v. Shearson, Hammill & Co.*, 521 F.2d 817 (9th Cir. 1975) |
| 6 | Labor Management Relations Act, § 301(a), 29 U.S.C. § 185(a) (1982) |
| 8 | Intercountry Adoption Act of 2000; 42 U.S.C. 14901 *et seq.* |
| 8 | *Mary Handeland vs. Marquette University School of Dentistry et al*, Wisc. |
| 9 | 18 USC § 1001 |
| 13 | *U.S. v. Leventhal*, Case No. 13-cr-695(BMC) in the United States Court for the Eastern District of New York |
| 13 | 18 U.S.C. § 1503 (Obstruction of Justice) |
| 13 | 18 U.S. Code § 1621 (Perjury) |
| 13 | 18 U.S. Code § 1622 (Subornation of Perjury) |
| 13 | *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) |
| 13 | 18 U.S.C. § 1961(5) |
| 13 | *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 236, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) |
| 14 | 13-cr-844, *U.S. v. Leventhal*, in the U.S. District Court, Northern District of Illinois |
| 15 | *Handeland v. Leventhal*, Case No. 05 D 808 in the Circuit Court of Lake County, IL |
| 15 | *Handeland v. Leventhal* in the Circuit Court of the State of Wisconsin, Ozaukee Cty |
| 15 | 18 U.S. Code § 1073 |
| 15 | Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A |
| 15 | *INTERSTATE CHILD CUSTODY, A Practitioner's Guide to the Parental Kidnapping Prevention Act* (PKPA), 28 U.S.C. § 1738A' |

FILED DATE: 12/15/2020 4:11 AM 2020L062057

| | |
|---|---|
| 17 | *Kelsay v. Motorola, Inc.* (1978), 74 Ill.2d 172, 186, 384 N.E.2d 353, 359 |
| 17 | *Cornell v. Langland*, 109 Ill. App. 3d 472, 475 (Ill. App. Ct. 1982). |
| 17 | First Amendment of the US Constitution |
| 17 | *New York Times Co. v. United States*, 403 U.S. 713 (1971) |
| 20 | Illinois law, (720 ILCS 5/16-1) (from Ch. 38, par. 16-1), Sec. 16-1. Theft. |
| 21 | 18 U.S.C. § 241, Conspiracy Against Rights |
| 21 | *Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009*, 18 U.S.C. § 249 |
| 22 | 14th Amendment to the US Constitution |
| 22 | 5th Amendment to the US Constitution |
| 22 | 6th Amendment to the US Constitution |
| 22 | 8th Amendment to the US Constitution |
| 22 | 18 U.S.C. § 245, Violent Interference with Federally Protected Rights |
| 24 | *Welsh*, 306 Ill. App.3d at 154, 713 N.E.2d at 683 |
| 24 | *McGrath v. Fahey*, 126 Ill.2d 78, 86, 533 N.E.2d 806, 809 (1988) |
| 24 | *Fahey*, 126 Ill.2d at 90, 533 N.E.2d at 811 |
| 24 | *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 89-90, 360 N.E.2d 765, 767 |
| 24 | *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 745 (Ill. App. Ct. 2001). |
| 29 | *West American Insurance Co. v. Sal E. Lobianco Son Co.* (1977), 69 Ill.2d 126, 130 |
| 29 | *Hermitage Corp. v. Contractors Adjustment Co.* (1995), 166 Ill.2d 72.) |
| 29 | *Bates v. Little Company of Mary Hospital* (1982), 108 Ill. App.3d 137, 139 |
| 29 | *Rozny v. Marnul* (1969), 43 Ill.2d 54, 72-73 |
| 29 | *Jackson Jordan, Inc. v. Leydig, Voit Mayer* (1994), 158 Ill.2d 240, 249 |
| 29 | *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 360-61 (Ill. 1995) |
| 30 | *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1 (1992) |
| 30 | *Mittleman v. Witous*, 135 Ill.2d 220, 233 (1989) |
| 30 | *Mitchell v. Peoria Journal-Star, Inc.*, 76 Ill. App.2d 154, 158-60 (1966) |
| 30 | *Bryson v. News America Publications*, 174 Ill. 2d 77, 103 (Ill. 1996) |
| 31 | Prosser, Torts § 93, at 593 (2d ed. 1955) |
| 31 | 53 C.J.S. Libel and Slander § 240 (1948) |
| 31 | *Valentine v. North American Co.* (1974), 60 Ill.2d 168, 170, 328 N.E.2d 265 |
| 31 | *Richardson v. Dunbar* (1981), 95 Ill. App.3d 254, 259, 419 N.E.2d 1205 |
| 31 | *Kirk v. Village of Hillcrest* (1975), 31 Ill. App.3d 1063, 1065, 335 N.E.2d 535 |
| 31 | *Whitby v. Associates Discount Corp.* (1965), 59 Ill. App.2d 337, 340-41, 207 N.E.2d 482 |
| 32 | *PSL Realty Co. v. Granite Investment Co.* (1981), 86 Ill.2d 291, 312, 427 N.E.2d 563 |



FILED DATE: 12/15/2020 4:11 AM 2020L062057

| | |
|---|---|
| 32 | *Moricoli v. P S Management Co.*, 104 Ill. App. 3d 234, 237-38 (Ill. App. Ct. 1982) |
| 33 | *Handeland v Leventhal*, Case No. 05 D 808, 19th Judicial Circuit Ct Lake Cty IL |
| 34 | *Redarowicz v. Ohlendorf* (1982), 92 Ill.2d 171, 185-86 |
| 34 | *Siegel v. Levy Org. Development Co.*, 153 Ill. 2d 534, 542-43 (Ill. 1992) |
| 35 | *United States v. United Mine Workers of America* (1947), 330 U.S. 258, 302-03, 91 L.Ed. 884, 917-18, 67 S.Ct. 677, 700-01 |
| 35 | *In re Marriage of Betts*, 200 Ill. App. 3d 26, 45 (Ill. App. Ct. 1990) |
| 39 | WI Stat § 946.10 |
| 39 | 18 U.S. Code § 201. Bribery of public officials and witnesses |
| 40 | *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) |
| 40 | 18 U.S.C. § 1961 |
| 40 | *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 236, 109 S. Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) |
| 40 | *Sedima*, 473 U.S. at 488 |
| 40 | *US v Leventhal*, 13-cr-695(BMC), US Dist Court Eastern Dist of NY |
| 43 | 18 U.S.C. § 1503 |
| 44 | *Gonzales v. American Express Credit Corp.*, 315 Ill. App. 3d 199, 206, 733 N.E.2d 345 (2000) |
| 44 | *Gallagher Corp. v. Russ*, 309 Ill. App. 3d 192, 199, 721 N.E.2d 605 (1999) |
| 44 | *W.W. Vincent Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759 (Ill. App. Ct. 2004) |
| 47 | 18 U.S.C. § 371 |
| 47 | *Hague Convention on the Protection of Children and Co-operation in Respect of Intercountry Adoption* |
| 48 | *Gonzalez*, 578 F.3d at 540 |
| 49 | *Wilson v. Layne*, 526 U.S. 603, 614–15, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) |
| 49 | *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) |
| 49 | *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) |
| 49 | *Soldal v. Cook County, Illinois*, 506 U.S. 56, 71–72, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) |
| 49 | *Marcus*, 394 F.3d at 824 |
| 49 | *Cochran v. Gilliam*, 656 F.3d 300, 309–11 (6th Cir.2011) |
| 49 | *Hensley*, 693 F.3d at 694 |
| 49 | *Menchaca*, 613 F.2d at 513 |
| 49 | *Murray v. Poani*, 980 N.E.2d 1275, 1283-84 (Ill. App. Ct. 2012) |

FILED DATE: 12/15/2020 4:11 AM 2020L062057

| | |
|---|---|
| 50 | *Imbler v. Pachtman*, 424 U.S. 409, 430, 47 L. Ed. 2d 128, 143, 96 S. Ct. 984, 995 (1976 |
| 50 | *Buckley*, 509 U.S. at 269, 125 L. Ed. 2d at 226, 113 S. Ct. at 2613 |
| 50 | *White v. City of Chicago*, 369 Ill. App. 3d 765, 769 (Ill. App. Ct. 2006). |
| 51 | Section 31-4(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 31-4(a) |
| 51 | *People v. Gerdes*, 173 Ill. App. 3d 1024, 1026 (Ill. App. Ct. 1988) |
| 51 | *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 678 (1989) |
| 51 | *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 631, 888 N.E.2d 1190, 1200 (2008) |
| 51 | *Lewis v. Lead Industries Ass'n*, 342 Ill. App. 3d 95, 105, 793 N.E.2d 869, 877 (2003) |
| 51 | *Alliance Acceptance Co. v. Yale Insurance Agency, Inc.*, 271 Ill. App. 3d 483, 492, 648 N.E.2d 971, 977 (1995) |
| 51 | *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 137 Ill. App. 3d 84, 90-91, 484 N.E.2d 349, 354 (1985) |
| 51 | *Martis v. Grinnell Mutual Reinsurance*, 388 Ill. App. 3d 1017, 1024-25 (Ill. App. Ct. 2009) |
| 52 | *Sealfon v. United States*, 332 U.S. 575, 92 L.Ed. 180, 68 S.Ct. 237 |
| 52 | *People v. Ricker*, 45 Ill. 2d 562, 567-68 (Ill. 1970) |
| 52 | *United States v. House*, No. 14-1275-cr (2d Cir. Jan. 26, 2016) |
| 53 | 18 U.S.C. § 3553 |
| 53 | *Pollard v. U.S. Parole Comm'n*, 15-cv-9131 (KBF), at *21 (S.D.N.Y. Aug. 11, 2016) |
| 53 | 116 Cong. Rec. 601 (remarks of Sen. Hruska) |
| 53 | S. Rep. No. 617, 91st Cong., 1st Sess. 73 (1969) |
| 53 | *United States v. Angelilli*, 660 F.2d 23, 33 (2d Cir. 1981) |
| 54 | Decof, *Damages in Actions for Wrongful Death of Children*, 47 Notre Dame Law. 197, 198 (1971) |
| 54 | Belfance, *The Inadequacy of Pecuniary Loss as a Measure of Damages in Actions for the Wrongful Death of Children*, 6 Ohio N.U.L. Rev. 543, 545 (1969).) |
| 54 | *Cockrum v. Baumgartner* (1983), 95 Ill.2d 193, 198-202 |
| 54 | *Bullard v. Barnes*, 102 Ill. 2d 505, 516-17 (Ill. 1984) |
| 55 | *Wardlow v. City of Keokuk* (Iowa 1971), 190 N.W.2d 439, 446 |
| 55 | *Fussner v. Andert* (1961), 261 Minn. 347, 352, 113 N.W.2d 355, 359 |
| 55 | *Anderson v. Lale* (1974), 88 S.D. 111, 121, 216 N.W.2d 152, 158) |
| 55 | *Fuentes v. Tucker* (1947), 31 Cal.2d 1, 9, 187 P.2d 752, 757 |
| 55 | *Haumersen v. Ford Motor Co.* (Iowa 1977), 257 N.W.2d 7, 17 |
| 55 | *Sellnow v. Fahey* (1975), 305 Minn. 375, 382-83, 233 N.W.2d 563, 568 |
| 55 | *Jones v. Carvell* (Utah 1982), 641 P.2d 105, 107 |



FILED DATE: 12/15/2020 4:11 AM 2020L062057

| | |
|---|---|
| 56 | *Clark v. Icicle Irrigation District* (1967), 72 Wn.2d 201, 205-10, 432 P.2d 541, 544-47 |
| 56 | *Jones v. Hildebrant* (1976), 191 Colo. 1, 3 n. 1, 550 P.2d 339, 341 n. 1 |
| 56 | *Sinn v. Burd* (1979), 486 Pa. 146, 151-52 n. 3, 404 A.2d 672, 675 n. 3 |
| 57 | *Bank of Ravenswood v. City of Chicago*, 307 Ill. App. 3d 161, 167-68 (1999) |
| 57 | *Wayne Hummer Trust Co. v. Vill. of Elwood, an Ill. Home Rule Mun. Corp.*, 2019 Ill. App. 3d 170843, 7 (Ill. App. Ct. 2019) |
| 58 | *Sadacca v. Monhart*, 128 Ill. App. 3d 250, 255 (Ill. App. Ct. 1984) |
| 58 | *Gravitt v. Jennings* (1979), 79 Ill. App.3d 286, 288, 398 N.E.2d 395, 397 |
| 58 | *Price v. State of Illinois* (1979), 79 Ill. App.3d 143, 148, 398 N.E.2d 365, 370 |
| 59 | *Bozeman v. Sheriff* (1976), 42 Ill. App.3d 228, 355 N.E.2d 624 |

**2. Index to Exhibits**

| ***Exhibit #*** | ***Description*** |
|---|---|
| A | Judith Leventhal, Obituary |
| B | Eernissee email |
| C | J of C Excerpt, prior restraint oppressing redress |
| D | Early termination order |
| E | Rea pubic record |
| F | Child custody order excerpts |
| G | Google maps record |
| H | "Sneaky Jew" article |
| J | Physician report |
| K | Psychologist report |
| L | Gov't admissions regarding gross excessiveness of Leventhal's sentence |
| M | Personal character reference letters, binder |
| N | Documentation signed by Handeland evidencing her position as an RPOC officer |
| P | Bought-and-Paid-For Wisconsin Judicial Orders |

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EXHIBIT A**






FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EXHIBIT B**



12/13/2020 Re: PLEASE FORWARD TO SERGEANT EERNISSE

From: neernisse@village.grafton.wi.us,
To: hlev3@aol.com,
Cc: jgabrish@village.grafton.wi.us,
Subject: Re: PLEASE FORWARD TO SERGEANT EERNISSE
Date: Sat, Jun 15, 2019 4:50 pm

Mr. Leventhal,

Mary Handeland and your daughter Amelia have both come to the Grafton Police Department requesting our assistance with what they deem to be harassing and unwanted communication from you. Both are adults and both have a lawful right to not communicate with you or receive communication from you. It is my understanding you have also been served with temporary restraining orders (TRO) issued through the Ozaukee County Wisconsin Courts and the message to stop communicating with Mary and Amelia should be understood. Any further contact or communication with them in violation of the TRO's will be referred to the Ozaukee County District Attorney's office for prosecution.

Further, any violations of law you wish to report to a law enforcement agency must be done so to the appropriate jurisdiction. I cannot investigate violations of federal law, nor anything else occurring outside of the Village of Grafton, WI. In the future, please refrain from communicating with me about anything that does not specifically and directly involve offenses occurring within the Village of Grafton WI corporate boundaries.

Sergeant Noah R. Eernisse
Grafton Police Department
1981 Washington Street
Grafton, WI 53024
p: (262) 375-5320
f: (262) 375-5338

From: Joseph Gabrish
Sent: Friday, June 14, 2019 5:44 PM
To: Noah Eernisse
Subject: Fwd: PLEASE FORWARD TO SERGEANT EERNISSE

Get Outlook for Android

From: Howard Leventhal <hlev3@aol.com>
Sent: Friday, June 14, 2019 6:18:37 AM
To: Charles Wentan; Joseph Gabrish
Cc: karen_kinta@usc.salvationarmy.org; richard_suterbaugh@usc.salvationarmy.org; ronald_jacobs@ilnp.uscourts.gov; aaron_elias@usc.salvationarmy.org
Subject: PLEASE FORWARD TO SERGEANT EERNISSE

**FURTHER TO MY PHONE MESSAGES FOR SERGEANT EERNISSE**
**RE: MARY HANDELAND**

Sergeant Eernisse:

My ex wife's attempt to improperly use your agency to evade criminal charges against her, to evade civil litigation, to suppress the imminent publication of my book and screenplay, which are largely about her, to avoid a six month jail sentence in Lake County Illinois for parental kidnapping and indirect civil contempt - are unsurprising. All of this behavior

https://mail.aol.com/webmail-std/en-us/PrintMessage 1/3

FILED DATE: 12/15/2020 4:11 AM 2020L062057



fits within Mary's lifelong pattern of sociopathy driven by drug abuse and her various chronic mental illnesses, including but not limited to severe depression and psychosis.

**I strongly caution you to take extreme care to avoid being used in this way.**

Forty three months in prison as a result of Mary's psychotic behavior is quite enough for anybody to depart prison and start suing everybody in sight involved in facilitating her never-ending attacks on me. Moreover, Mary violated a federal law, the Parental Kidnapping Prevention Act, by moving Amelie to Wisconsin while I was in prison, see this article: https://en.wikipedia.org/wiki/Parental_Kidnapping_Prevention_Act

Among Mary's objectives here, is to convert you into her co-conspirator in violation of the above-cited federal law. I strongly caution against falling into this trap. If pushed far enough, I will pursue federal charges and federal civil litigation against all involved, including your municipality.

**WHY HAVE I CONTACTED HER?**
I have attempted communication with Mary so as to avoid afflicting my daughter with the hurt of having yet another parent go to jail. I have attempted to give Mary an "out." Mary however is beyond help and I am left with no choice apparently to proceed legally as outlined below.

**MARY'S PSYCHIATRIC & DRUG HISTORY**
Mary was involved in a conspiracy to distribute illegal drugs with her first ex husband James Handeland, in one of the jurisdictions surrounding Milwaukee, during the 70s or 80s - according to Mary's statements to me. She defrauded her own parents and a bank, by taking funds from tenants to buy street drugs, rather than pay the mortgage her parents co-signed for (incident may be expunged, just ask her under oath). This is among the revelations in my book which Mary is soliciting your help to continue burying.

Today, if one carefully looks around Mary's home in Grafton, one is certain to find a wicker basket filled with various pharmaceuticals. The last time I saw the wicker basket (more than 10 years ago) it contained Prozac, an anti-depressant, Lithium, an anticonvulsant and Clozapine. Clozapine is a an anti-psychotic medication that works by helping to restore the balance of neurotransmitters in the brain.

With regard to "balance," one might casually glance at Mary's wrists during face-to-face conversation, to observe the cut marks. My fear that Mary will induce the very same mental illnesses into my daughter as Mary's mother induced into Mary - which culminated in at least one suicide attempt by Mary - this is one of two factors compelling me to seek alternatives to court action against Mary at this time. The other factor is that I love my daughter, my only child.

I dreamt about my daughter for 25 years before adopting her in China. Mary's numerous mental illnesses are not sufficient cause for me to give up and remain isolated from Amelie, in violation of standing Illinois court orders in every way possible to violate them - for the past four years and frankly, all the time since marital dissolution in 2006. That Amelie is an adult now does nothing to diminish all of the prior extreme unjustified harm and deep emotional wounds Mary has unduly inflicted upon me.

**OTHER FALSE CLAIMS & DEVIOUS NATURE**
Mary and her equally evil mother, Lorraine Marx Budiac Lodwig (Cedarburg?), have long histories of phony legal claims. Mary sued Roundy's after pulling a bunch of grapes off the shelf, throwing the grapes on the floor and pretending to slip and fall upon them. Mary sued her former employer Ralph Martin (the Fish Tie Company) for hostile environment - after overhearing a dirty joke. She extorted $14,000 out of them in that case. Mary and her mother have made a business out of suing dentists and settling for cash.

Mary's deceased father Stephen Budiac, a Milwaukee resident, authentic hero of World War II and the only meritorious individual in their family - was rejected, crushed and humiliated for many many years, similarly as I have been. Surprise surprise - as Steve neared death, Mary and Lorraine all of the sudden found a way to re-incorporate Steve into their lives. Not surprising was Steve's re-incorporation of Mary and Lorraine into his will, but only after Mary and Lorraine discovered all the money Steve had managed to save in their absence.

Mary threw herself into a wall in the basement of our home in Illinois and then filed an Order of Protection against me - which was subsequently dismissed. I am an internationally certified Taekwondo instructor, having taught violence avoidance to hundreds of seniors, women and children. I would shoot myself before harming a woman - even one so vile and toxic as Mary.

**IMMINENT PENDING CIVIL LITIGATION IN LAKE COUNTY ILLINOIS & AT FEDERAL LEVEL**
Since Mary has now left me with no other choice, I will be electronically filing a petition for indirect civil contempt against her in *Handeland v. Leventhal*, Case No 05 D 808, in the 19th Judicial Circuit Court, Waukegan, Illinois, this coming Monday June 17, 2019. In addition I plan to contact the Attorney General's office in DC to seek some method of having





FILED DATE: 12/15/2020 4:11 AM 2020L062057



Mary prosecuted for perjury and obstruction of justice in my federal criminal case - which was suborned by the (now former) prosecutor, who should also be prosecuted. My documentary evidence attachments are buried at the moment – including the court order Mary has been violating entirely for 4 years. As soon as I can unbury and scan them, I will copy you on my Lake County filings as soon as completed, before Monday morning.

**MY BOOK**
I had originally scheduled my book for publication on Amazon August 4, 2019. Now after hearing from you I have accelerated publication to this coming Monday, see Amazon listing here: https://www.amazon.com/dp/B07RJ16P6W

**MY SCREENPLAY**
My book is entirely factual, a non fiction accounting of my admitted criminal acts, driven by Mary's endless money harangue. My screenplay is the hyper-fictionalized version. The screenplay may be downloaded here: https://hcommons.org/deposits/item/hc:24579/

The screenplay manuscript is now being reviewed by a famous playwright of my acquaintance, who offers to help get it made into a feature length movie. Highly speculative but worth some effort. If one reads the screenplay, Mary and her mother will be recognized easily. They are obvious and named in my book - which goes a long way to explaining Mary's frivolous and improper approach to your agency, to employ Government by any deceptive means to deny and suppress my First Amendment rights.

---

**I strongly caution you to avoid falling into this trap, because I have passively taken quite enough and will accept no further such abuse without taking applicable defensive legal action.**

---

However ...

**ALTERNATIVE DISPUTE RESOLUTION**
I remain open to some form of alternative dispute resolution with regard to litigation against Mary, until the Lake County court date around mid-July. I am horrified at the thought of my daughter experiencing another parent spending time in jail - which is where the Lake County matter is headed. However I have been harmed far too badly, expensively, completely and to the Nth degree by Mary, to just let it go and walk away. My daughter is too important to me and no loving father should be expected to walk away from any situation of this nature. My daughter is in serious, imminent danger of being turned into the same emotional cripple that Mary's mother converted Mary into. So sorry, I am not walking away, no matter how many false reports Mary makes to any number of government agencies.

If the Village of Grafton would wish to provide some valuable service to one of its newest emerging young adults, a recent graduate from Grafton High, with a promising future that I have prepared for - your municipality would best serve Amelie by finding a team of psychiatrists and psychologists to intervene here, get Mary into ADR with me and assess my daughter for whatever psych pathology Mary may have already injected into her.

—

If you wish to interview me further on any topic, face-to-face in Illinois, please advise and I will request permission from my custodians, copied on this message.

Yours truly,

Howard Leventhal
hlev3@aol.com
ph 262.997.8670
Have a look at my new book on Amazon:
"Jail All The Lawyers (Before It's Too Late)"

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EXHIBIT C**



DEFENDANT: Howard Leventhal
CASE NUMBER: 13cr00695-BMC

## SPECIAL CONDITIONS OF SUPERVISION

I) The defendant shall comply with the restitution and forfeiture orders.

2) The defendant shall make full financial disclosure to the Probation Department.

3) The defendant shall not incur any new bank accounts or lines of credit, and shall not secure investments from individuals or businesses, without the permission of the Court or the Probation Department.

4) The defendant shall participate in a mental health treatment program as approved by the Probation Department. The defendant shall contribute to the cost of such services rendered and/or any psychotropic medications prescribed to the degree he is reasonably able, and shall cooperate in securing any applicable third-party payment. The defendant shall disclose all [illegible]

5. The defendant can not commence any civil litigation, nor seek to reopen any closed civil case, without the Court's permission, which will be granted if the Court determines that there is a colorable basis for the proposed claim.

6. The [illegible] contact in any form, whether in person, by mail, telephone, [illegible] means, with any victim of the [illegible] which the Probation Department will provide him, without prior permission of the Probation Department.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EXHIBIT D**



**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.3.3**
**Eastern Division**

UNITED STATES OF AMERICA
Plaintiff,
v.
Case No.: 1:13–cr–00844
Honorable Andrea R. Wood
Howard Leventhal
Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, December 3, 2020:

MINUTE entry before the Honorable Andrea R. Wood as to Howard Leventhal: Defendant's second motion for early termination of supervised release under 18 U.S.C. § 3583(e)(1) [35] is granted as unopposed. Consistent with 18 U.S.C. § 3583(e), the Court has considered the factors in 18 U.S.C. § 3553(a) and finds that his conduct and the interests of justice warrant early termination of Defendant Leventhal's supervised release. Accordingly, with no objections from the U.S. Attorney's Office or the U.S. Probation Department, the imposed term of supervised release as to Defendant Levanthal is hereby terminated and he is discharged. Status and motion hearing set for 12/4/2020 is stricken; parties need not appear. Mailed notice (dal, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

EXHIBIT E






FILED DATE: 12/15/2020 4:11 AM 2020L062057



FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EXHIBIT F**
Visitation/Custody Order Excerpts

against a party because such party, or the attorney or agent of such party, drafted the term or provision at issue. In the event that a Court should subsequently find any portion of this Marital Settlement Agreement to be ambiguous, no inference of any kind shall be taken against Mary because this Marital Settlement Agreement was primarily drafted by her attorney.

g. This Judgment shall be construed under the general laws of the State of Illinois, irrespective of the later domicile or residence of Howard or Mary.

h. All pending motions and petitions filed by either party are hereby dismissed.

IN WITNESS WHEREOF, the parties have set their hands and seals on the day and date set forth hereinabove:

MARY HANDELAND HOWARD LEVENTHAL

Law Offices of David S. Kerpel, LLC
Attorney #6256194
655 Deerfield Road - Suite 100
No. 408
Deerfield, Illinois 60015
Phone: (847) 374-8257
Fax: (847) 374-8258
Attorney for Mary Handeland

31



FILED DATE: 12/15/2020 4:11 AM 2020L062057

Plaintiff Leventhal notes: From the date of Leventhal's kidnapping in Sept 2015 forward, at the point Amelia was 14 years old and a minor, through her 18th birthday, through and including the filing date of this complaint, there is not a single right conveyed to Leventhal in the following instrument which has not been vaporized deliberately by the defendants. Forgetting about mere earthly litigation, every single one of these reprehensible bastards should live in Hell forever for this.

IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL CIRCUIT - LAKE COUNTY, ILLINOIS

IN RE THE MARRIAGE OF:
MARY HANDELAND,
Petitioner,
and
HOWARD LEVENTHAL
Respondent.

No. 05 D 808

**ORDER INCORPORATING**
**CHILD CUSTODY AND PARENTING AGREEMENT**

This cause coming to be heard on the agreement of the parties; and the Court being fully advised,

**THE COURT FINDS:**

A. This Court has jurisdiction over the subject matter and the parties.

B. Mary Handeland (hereinafter referred to as the "Mother" or "Mary") and Howard Leventhal (hereinafter referred to as "Howard" or the "Father") were lawfully married on October 2, 1999, and said marriage was registered in the State of Illinois.

C. Each of the parties currently reside in Lake County, Illinois.

D. One child was adopted by the parties as a result of the marriage, namely: Amelia Handeland-Leventhal, born November 17, 2000 (age 7).

E. The Joint Parenting Agreement entered on November 8, 2007 is hereby stricken and vacated in its entirety by this Child Custody and Parenting Agreement.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**IT IS THEREFORE AGREED AND ORDERED AS FOLLOWS:**

A. The parties agree that it is in the best interests of Amelia that Mary is granted sole legal care, custody and control of Amelia. Mary shall be the designated sole residential custodian of Amelia.

B. Residential Parenting Schedule. Howard shall have parenting time with Amelia every other weekend from Saturday at 9:30 am until Sunday at 7:00 pm. In addition, Howard shall have weekday parenting time with Amelia every Tuesday and Thursday from 4:30 pm to 7:00 pm. Overnight visitation between Howard and Amelia during the week is reserved.

C. Holiday Parenting Schedule. During the following holiday and special periods the

children shall reside with each parent as set forth below.

| HOLIDAY | EVEN NUMBERED YEARS | ODD NUMBERED YEARS |
|---|---|---|
| **Easter**: 7:00 pm Saturday evening before Easter until 7:00 pm Sunday evening | Mother | Mother |
| **Memorial Day** (Monday at 9:30 am until 7:00 pm, unless it is that parent's regular alternating weekend, in which case the time shall begin at Sunday evening at 7:00 pm) | Father | Mother |
| **Fourth of July** (from 9:30 am on July 4th until 9:00 a.m. July 5th) | Mother | Father |
| **Labor Day** (Monday at 9:30 am until 7:00 pm, unless it is that parent's regular alternating weekend, in which case the time shall begin at Sunday evening at 7:00 pm) | Mother | Father |
| **Halloween and Trick or Treat Activities**: 12:00 pm until 7:00 pm | Mother | Mother |
| **Thanksgiving Period** (Wednesday at 4:30 pm until Friday at 7:00 p.m.) | Father | Mother |



FILED DATE: 12/15/2020 4:11 AM 2020L062057

| | | |
|---|---|---|
| **Christmas Holiday** December 24th at 9:30 am until December 26th at 10:00 am | Mother | Mother |

**Passover**: Howard shall have the first or second night of Passover from 5:00 pm overnight until 5:00 pm the next day so long as he provides at least 14 days written notice to Mary of his requested night.

**Hanukkah**: Howard shall have parenting time with Amelia for two separate evenings during Hanukkah each year. A Hanukkah evening shall consist of 4:30 pm until 9:00 pm. Howard's choice of his two evenings of Hanukkah each year shall be provided by Howard with at least 14 days advance notice to Mary. Mary's Christmas Holiday and her half of Winter Vacation shall take precedent over Hanukkah should there be a conflict.

D. School Vacation Schedule: These shall be defined as extended school vacation periods such as summer vacation, spring break and winter break. Unless otherwise agreed in writing, the school vacation parenting schedule shall be as follows:

(i) Winter Vacation. The parties shall divide Amelia's Winter vacation equally, with Mary having the first uninterrupted half of Winter Vacation in all years and Howard having the second uninterrupted half of Winter vacation in all years. For purposes of this Agreement, Winter Vacation shall be defined as commencing after school on the last day of school at 4:30 pm, and concluding at 5:00 p.m. on the day before classes recommence.

(ii) Spring Vacation: The parents shall equally divide Amelia's Spring Vacation each year, with Mary having the first uninterrupted half each year, and Howard having the second uninterrupted half each year. For purposes of this Agreement, Spring Vacation shall be defined as commencing at 4:30 pm following the last day of

FILED DATE: 12/15/2020 4:11 AM 2020L062057

school, and ending at 5:00 p.m. on the day before classes recommence

(iii) Summer Vacation: Summer Vacation shall be defined as commencing the first weekday after the last day of school in June, and terminating on the last weekday before the first day of school in August or September. Each parent shall be entitled to one week of uninterrupted summer vacation time with Amelia. By mutual agreement of the parties, Summer Vacation parenting time may be divided and need not be taken in consecutive days. Howard's choice of his week shall take precedence in even numbered years and Mary's week shall take precedence in odd numbered years. The parent with first choice shall notify the other parent of his or her week by April 1st of each year, and the parent with second choice shall notify the other parent of his or her choice by May 1st of each year. Either parent may temporarily take the child to another state for vacation, as long as the location information of this agreement has been satisfied as set forth in paragraph K.

E. Special Periods. Special periods shall consist of Mother's Day, Father's Day, Mary's birthday, Howard's birthday, and Amelia's birthday (November 17th). Amelia shall reside with Mary on her birthday (October 4th) and Mother's Day, and with Howard on his birthday (November 4th) and Father's Day. For Amelia's birthday, the following parenting schedule will apply:

If Amelia's birthday falls on a Saturday or Sunday, or a weekday when there is no school: Howard's time shall be from 9:30 am until 12:30 pm, and Mary's time shall be from 12:30 pm until 3:30 pm.

If Amelia's birthday falls on a weekday, and there is school: Howard's parenting time shall be from 3:00 pm until 5:00 pm, and Mary's time shall be from 5:00 pm until 7:00 pm.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

F. Residential Precedence Requirements Special Periods shall take precedence over the Holiday Parenting Schedule, which shall take precedence over the School Vacation Schedule, which shall take precedence over the Residential Parenting Schedule.

G. Consistent alternating weekends: Regardless of when either parent's Holiday, School Vacation, or Special Periods occur, the regular alternating weekend parenting schedule shall not be changed unless by mutual written agreement.

H. Make Up Visitation: Unless by mutual written agreement, Howard shall not be entitled to make-up visitation with Amelia.

I. Location of Pick Up and Drop Off for Parenting Time Exchanges. The parties acknowledge that, in the immediate past, pick up and drop off of Amelia has occurred at the Starbucks, located at 7105 Grand Avenue #2J in Gurnee, Illinois. Howard recently moved to 2361 Old Hicks Road, in Lake Zurich, Illinois 60047. To accommodate Howard's farther distance caused by the move, the parties agree to have the new pick up and drop off location in the parking lot at the Libertyville Sports Complex, at Route 45 and Peterson Road in Libertyville. When arriving to pick up Amelia for his parenting time, Howard shall walk up to Mary's car, take Amelia out of the car and take her with him. When Howard drops Amelia off at the Libertyville Sports Complex at the end of his parenting time, Howard shall take Amelia out of his car, and bring her over to Mary's car, where the parties shall then separate. If Mary moves residences in the future, the parties shall attempt to agree on a new location for pick up and drop off. If the parties are unable to agree, Mary may petition the court to resolve the issue.

J. Restricted Communication and Contact.

i. Due to Howard's poor history of communicating with Mary, the following restrictions shall be in full force and effect regarding communication between the parties. Except as specifically set forth in paragraph J(ii) and paragraph L, Howard may only

FILED DATE: 12/15/2020 4:11 AM 2020L062057

communicate with Mary through Our Family Wizard, and shall only communicate with Mary regarding emergencies visitation and issues related to Amelia. Howard shall communicate appropriately with Mary while using Our Family Wizard. Howard is hereby restrained from doing any of the following when communicating with MARY through Our Family Wizard:

a. No use of profanities or vulgarities.
b. No insults or derogatory remarks.
c. No threats.
d. No harassment.
e. No verbal abuse.

ii. Howard shall only be allowed to contact Mary via telephone as follows: the day of Howard's scheduled visitation with Amelia, and only if he is running late for his scheduled parenting time, or if he feels that it is in the best interests of Amelia to return her to Mary prior to the end of his scheduled parenting time. If Howard is running late, he shall telephone Mary at least 30 minutes prior to his scheduled parenting time. Howard shall take all reasonable and necessary steps to ensure that he is not late for his parenting time with Amelia, and shall plan accordingly to prevent being late. The only exception to the restricted telephone contact between Howard and Mary is if an emergency exists related to Amelia's health, safety and welfare, in which case the parties shall telephone each other as soon as practical. If Howard arrives for his scheduled parenting time later than 30 minutes he shall forfeit his scheduled parenting time.

iii. A restraining order is hereby entered against Howard enjoining him and restraining him, and any third party on his behalf, from the following:

a. Contacting Mary's father (Stephen Budiac), mother (Lorraine Marx), brother (Michael Budiac) and sister-in-law (Geralyn Budiac), sister (Christine Klotz) and brother-in-law (Jack Klotz), or Mary's extended family, and Mary's therapist (Deborah A. Gust), and any other therapist Mary uses.
b. Contacting Mary's future place of employment.
c. Contacting Mary at any educational institution she may attend.
d. All forms of physical and verbal abuse, intimidation, harassment, and/or



FILED DATE: 12/15/2020 4:11 AM 2020L062057

stalking.

iv. Howard shall stay at least 500 feet away from Mary, Mary's home, and Mary's future place of employment. The only exception to this 500-feet restriction is for the pickup and drop off procedure set forth in paragraph I of this Agreement.

K. Basic Information and Travel. Each party shall keep the other informed as to the exact place where he or she resides, and each party shall provide the other party with their respective cellular and home telephone numbers. If either party travels out of town for any period of more than three (3) days, then such person shall take their cell phone with them so they can be reached in case of an emergency. In the event Amelia is to travel out of town with a parent overnight, a complete itinerary shall be provided to the other parent listing travel arrangements, flight schedules, hotel or other out of town accommodations, phone numbers where Amelia will be staying, and all other information necessary to ensure that the other parent is able to communicate with Amelia regularly while they are out of town. In the case of domestic travel, said itinerary shall be provided by the parent traveling with Amelia at least fourteen (14) days in advance of the trip. In the case of international travel, said itinerary shall be provided by the parent traveling with the children at least twenty-one (21) days in advance of the trip. While Amelia is a minor, neither parent shall travel with her to any country that is the subject of a then-current United States State Department Travel Warning, without the voluntary written consent of the other parent. Amelia's passport shall remain in Mary's possession except when Howard requires it for travel with Amelia as set forth in this Agreement. After Howard returns from a trip that involves using Amelia's passport, Howard shall return the passport to Mary within the next 24 hours of his return from his trip.

L. Right of First Refusal. In the event that a parent is unable to supervise Amelia overnight on a night assigned to that parent, the other parent may have a right of first refusal to have Amelia overnight with him or her, as the case may be, rather than having Amelia be with a babysitter or another family member. If a parent declines to exercise his or her right of first

FILED DATE: 12/15/2020 4:11 AM 2020L062057

refusal, then the parent scheduled to be with Amelia at that time shall be responsible for providing Amelia with appropriate supervision and any costs associated therewith. If Mary's right-of-first-refusal option is triggered while Amelia is with Howard, Howard may call Mary to request and/or arrange for her right-of-first refusal.

M. Child's Records and School Activities. Mary shall list Howard as Amelia's father at Amelia's school. Both parents shall participate, encourage, and support Amelia's homework and school project assignments by assisting her with assignments during each party's parenting time. Pursuant to 750 ILCS 5/602.1, Howard shall have access to all school and medical records related to Amelia.

N. Removal: The parties agree that neither parent shall permanently remove the residence of Amelia from the State of Illinois without court order. The only exception to this is if Mary wishes to move with Amelia to Wisconsin on a permanent basis, she may be allowed to do so. If Mary decides to move with Amelia to Wisconsin on a permanent basis, she shall be restricted to moving to 100 miles into the State of Wisconsin from her present address of 2885 Farmington Drive, Lindenhurst, Illinois. Further, either party may travel with Amelia out of the country for their vacation time one (1) time in a 12-month period (or more as mutually agreed to in writing between the parties) provided they comply with the itinerary and information disclosure requirements set forth in paragraph K of this Agreement.

O. Medical Issues: In regards to Amelia's health care, the parties agree that (a) each shall promptly inform the other of any serious illness or condition of Amelia which requires medical attention; (b) each party shall inform the other of any medical or health-related problems of Amelia while that child has been in that parent's custody; (c) Mary shall provide Howard with any medications which Amelia is taking at the time of a physical transfer of custody, and Howard shall ensure that Amelia takes said medication during his parenting time.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

P. General Rules of Parental Conduct:

1. Each party shall, at all times, conduct himself or herself in a manner which promotes a beneficial effect upon Amelia.

2. Neither parent shall make disparaging remarks about the other parent, or any other family member, to Amelia; and each parent shall only speak of the other parent in positive terms.

3. Neither parent shall denigrate the love and affection that the other parent has for Amelia.

4. Neither parent nor other family member shall question or interrogate Amelia about the other parent, or family member.

5. In the event of the remarriage of either party, the party so remarrying shall have an affirmative obligation to make known to his or her new spouse the terms and provisions of this Agreement and to instruct the new spouse to comply with the intent of this Parenting Agreement.

6. Neither party shall allow any 3rd party, or any future spouse to engage in corporal punishment of Amelia.

7. Both parties shall insure that Amelia is properly secured in a booster seat or car seat in the back of the vehicle she is traveling in. Amelia shall not be allowed to ride in the front seat of any vehicle.

Q. Child's surname: Howard shall use the name Amelia Handeland-Leventhal, and not Amelia Leventhal, or any other surname or hyphenated name, in all private, public, school, medical, or any other records, appointments or reservations. Only Mary shall be referred to or referenced by Howard as Amelia's Mother. Only Howard shall be referred to or referenced by Mary as Amelia's Father.

**EXHIBIT G**







Skokie Public Library

Website Directions Save

Call

4.7 164 Google reviews

Public library in Skokie, Illinois

**Address:** 5215 Oakton St, Skokie, IL 60077

You visited in February

*Visible only to you*

**Sep 26** 2019 **Jan 10** 2020 **Feb 17** 2020

View in timeline Remove

**Hours:** Closed · Opens 9AM · More hours

**Phone:** (847) 673-7774





**EXHIBIT H**

"Sneaky Jew" Articl



## Sneaky Jew Tricks People Into Investing in Star Trek Tricorder That Doesn't Exist in Real Life

**Daily Stormer**
January 3, 2013

*"Jim, I'm a Jew, not a legitimate business man! How do you expect me to make this work?!" Leventhal to the judge, who's name is not actually Jim*

*"Jim, I'm a Jew, not a legitimate business man! How do you expect me to make this work?!" Leventhal to the judge, who's name is not actually Jim*

Jews are often very funny. This Jew couldn't come up with his own idea for a scam product that didn't exist to defraud people with, so he just said a device from Star Trek was real.

From the National Post

> An Illinois man could spend the rest of his life in jail for impersonating whole sections of Health Canada as part of a $25-million scam to bilk investors into funding a bogus Star Trek-inspired medical device.

> On Monday, **Howard Leventhal**, 56, pleaded guilty to a suite of U.S. fraud charges, including stealing the identity of former Health Canada deputy minister Glenda Yeates.

> All told, the Long Grove, Illinois man could be facing up to 22 years in prison, as well as a $2-million fine.

> "In Leventhal's world, the truth was cloaked by his web of lies and impersonation," said Loretta Lynch, United States Attorney for the Eastern District of New York, in a Monday statement.

> **"Within this alternate reality, Leventhal marketed non-existent technology, fabricated an on-line presence, and impersonated a government official, all to defraud investors out of very real**

Demographic Countdown

22 : 294 : 10 : 11 :
33

59.41681658% WHITE
40.58318342% NON-WHITE

WHITE POPULATION OF THE UNITED STATES OVER TIME

11.6%

WHITE PERCENTAGE OF GLOBAL POPULATION

Sources:

shekels plz goyim

This is a reader funded site. It is the most censored publication in

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EXHIBIT J**



NCH MyChart - Test Details

Name: Howard Leventhal | DOB: 11/4/1955 | MRN: 1750881 | PCP: Evelyn Strzyz White, MD

## CT Enterography With Contrast - Details

**Study Result**

History: Status post colectomy for ulcerative colitis.

TECHNIQUE: Axial, helical CT of the abdomen and pelvis with intravenous contrast and with neutral contrast following the CT enterography protocol. Sagittal and coronal 3-D reformatted images were also acquired.

FINDINGS: Comparison is made to a CT of 2/13/2015.

Limited images through the lung bases are unremarkable.

There are a few simple hepatic cysts. No solid liver lesions are present. There is no biliary ductal dilatation. There are few cysts within the spleen. The pancreas, adrenal glands and kidneys are normal. The gallbladder is unremarkable.

No mesenteric or retroperitoneal lymphadenopathy. No abdominal free fluid or free air.

The bladder is moderately distended and normal. The prostate gland is not enlarged.

There has been previous colectomy.

There is mucosal hyperenhancement and mural stratification involving the distal most 10 cm of ileum extending to the ileorectal anastomosis. There are no sinus tracts or fistulas. The small bowel is not dilated proximally. There are no additional small bowel mucosal abnormalities.

There are degenerative changes of the lumbar spine.

IMPRESSION:

Findings consistent with inflammatory bowel disease involving the distal most 10 cm of ileum extending to the ileorectal anastomosis. These findings are consistent with backwash ileitis.

Signed by

| Signed | Date/Time | |
|---|---|---|
| ZIVIN, STEPHEN B | 9/14/2020 | 10:41 |

MyChart® [illegible] Corporation © 1999 - 2020





FILED DATE: 12/15/2020 4:11 AM 2020L062057



NCH MyChart - Test Details

Name: Howard Leventhal | DOB: 11/4/1955 | MRN: 1750881 | PCP: Evelyn Strzyz White, MD

## Pathology, Tissue exam - Details

Resulted: 10/02/20 1014, Result status: Final result

**Pathology, tissue exam (771148[illegible])**

Ordering provider: VanCura, Benjamin G., MD 09/28/20 0758

Resulting lab: NCH HOSPITAL LABORATORY

**Specimen Information**

| Type | Source | Collected On |
|---|---|---|
| Tissue | Terminal ileum, biopsy | 09/28/20 0748 |
| Tissue | Terminal ileum, biopsy | 09/28/20 0751 |

**Components**

| Component | Value | Reference Range | Flag |
|---|---|---|---|
| Case Report | — | — | — |

Result:

Surgical Pathology Report Case: S20-14993

Authorizing Provider: VanCura, Benjamin G., MD Collected: 09/28/2020 07:48 AM

Ordering Location: GI Center 850 AH Received: 09/29/2020 08:53 AM

Pathologist: Milano, Mary J., MD

Specimens: A) - Terminal ileum, biopsy, R/O crohn's.

B) - Terminal ileum, biopsy, Pouch ileo, R/O crohn's.

Final Diagnosis — — —

A. Terminal ileum, biopsy:

- Chronic ileitis with focal cryptitis, crypt abscess and granulation consistent with ulceration. No evidence of granulomas or dysplasia. See comment.

B. Terminal ileum, biopsy:

- Marked chronic ileitis with focal cryptitis and granulation consistent with ulceration. No evidence of granulomas or dysplasia. See comment.

Electronically signed by Milano, Mary J., MD on 10/2/2020 at 10:14 AM

Comment — —

Histologic features of Crohn's disease are not identified. This case underwent intrade[illegible] assurance review.

Quality Assurance review performed.

Gross Description —

Result:

Specimen A:

SOURCE/FIXATIVE: Terminal ileum, biopsy R/O crohn's. formalin.

TISSUE DESCRIPTION: 4 fragments of tan tissue, 0.1-0.3 cm in greatest dimension. All submitted in one cassette.

Specimen B:

SOURCE/FIXATIVE: Terminal ileum, biopsy Pouch ileo, R/O crohn's. formalin.

TISSUE DESCRIPTION: 4 fragments of tan tissue, 0.2-0.4 cm in greatest dimension. All submitted in one cassette.

Embedded Images

Testing Performed By

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EXHIBIT K**
Psychologist Report

ASCENT

**Linda Hochfeld, MA.LCPC**
**320 Grand Ave**
**Waukegan, Il 60085**
**224-730-2725**

**Howard Leventhal** **DOB: 11/14/1956**

**Sessions:** 7/31/2020, 8/4/2020, 8/11/2020, 08/19/2020, 8/26/2020, 9/2/2020, 9/11/2020, 9/17/2020, 9/24/2020, 9/30/2020
**Missed sessions:** None
**Cancellations:** None

**Name of Examiner:** Linda Hochfeld, MA.LCPC
**Illinois License 180008285**
**Wisconsin License 567125**

**PURPOSE OF EVALUATION**

The client initially presented to this therapist with symptoms of depression and anxiety related to his daughter's alienation. Mr. Leventhal was convicted of wire fraud, which led to incarceration from 9/ 2015 until 4/2019. The client's daughter was a minor at the time of his imprisonment, and a restraining order was placed on him, which forbade contact with his daughter. The client is presently on probation, and the restraining order is currently in place. The client engaged in one-hour sessions utilizing telehealth except 9/30/2020, which was at this writer's office.\

**BEHAVIORAL OBSERVATIONS**

The client is a 63-year-old Caucasian male who was born and raised in Illinois. He is polite and well-spoken and possesses an apparent high level of intelligence. The client is respectful and pleasant and consistently engages in sessions with this writer.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

**MENTAL HEALTH ASSESSMENT**

The client was pleasant and cooperative during the social history and clinical interview. The client engaged in positive eye contact and appeared comfortable utilizing telehealth services. Thought processes and speech were coherent and appropriate. The client was oriented to time and place. The client denies hallucinations, delusions, or cognitive issues. The client was open and honest with this therapist and provided information regarding his incarceration. The client has a high school education and has participated in college-level courses. The client is currently enrolled in college and is pursuing a degree in architecture and hopes to complete his Bachelor of Science degree. Mr. Leventhal is presently living with his mother for whom he is the caretaker. The client presents with mild symptoms of depression and anxiety. This finding is consistent with a previous mental health report provided to this writer by the client.

**PRESENTING CONCERNS**

The client appears to function well in most areas of his life. He experiences a pervading sense of sadness concerning the alienation from his daughter. The client is prohibited from contacting her under the terms of his probation. Mr. Leventhal informed this writer that he always wanted to be a father from the time he was 18 years old. The client hoped to start a family with his first wife; however, she was diagnosed with Muscular Sclerosis, which precluded having children. The client divorced his first wife but continued to provide her with financial support for her life. The client later married his second wife. The two went to China to adopt their daughter.

Mr. Leventhal states that his daughter became a pawn in their marriage. He denies ever physically hurting his daughter and reports that he extensively traveled with her when she was younger. The client appears to be a victim of "Parental Alienation Syndrome," as evidenced by his report that the child should not have known about the struggles in that marriage. He feels that his ex-wife unfairly influenced his daughter. He believes his daughter was encouraged to 'take sides' and choose a 'preferred parent.'

The client has not been able to contact his daughter for five years ( as per the court) and would relish the opportunity to re-engage with his estranged daughter. He reports that he

FILED DATE: 12/15/2020 4:11 AM 2020L062057

thinks about her daily and has 'deep love and concern for her ' Mr. Leventhal takes full responsibility for the events that led to his incarceration but believes that the greatest travesty in his present situation was not the loss of time and imprisonment but rather the breakdown of his relationship with his beloved daughter.

**EMOTIONAL FUNCTIONING**

The client reports symptoms of anxiety and depression. The client has returned to college to pursue a degree. The client attempts to distract himself from the sadness and stress of not being present in his daughter's life by walking and putting forth great effort into his education and economic pursuits.

The client appears to have "psychological resiliency," which suggests that he is mentally equipped to overcome hardship constructively. The client is impacted by the loss of his daughter in his life, which appears to be the single most impacting variable in his mental health condition. The wellbeing of the client's mother is a concern; however, Mr. Leventhal seems to manage the stress of his caretaking role in a favorable manner.

**CONSIDERATIONS AND RECOMMENDATIONS:**

- This writer's recommendation that the Honorable Judge considers that the client is granted an "early release" from probation. This writer believes that the client's mental health would vastly improve if he were to be released.
- The client does not pose a threat to society, and there is no evidence that he is inclined to hurt anyone or himself.
- The client has a significant responsibility as it pertains the care of his 95-year-old mother. His mental wellbeing must be supported, given the stressful nature of his commitment.
- The client accepts full responsibility for the actions that brought him into the legal system.
- The client would benefit from the opportunity of attempting to re-engage with his daughter without restriction. Mr. Leventhal's mental health condition would vastly improve by being allowed to repair the damage that has occurred in this most valuable relationship.



FILED DATE: 12/15/2020 4:11 AM 2020L062057

- The client would like to attempt to support his daughter as she pursues college.
- The client is pursuing continued education. Release from probation would reduce stress regarding his academics.
- The client's economic pursuits may necessitate traveling. Release from parole would allow him to pursue his interests unencumbered and without legal restrictions.
- The client appears to recognize his mental health needs and would like to continue with counseling irrespective of the court mandate.

It is the hope of this writer that the Honorable Judge considers the recommendations addressed in this report.

Respectfully submitted,

Linda G Hochfeld MA LCPC

Linda Hochfeld, MA.LCPC 10/12/20



FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EXHIBIT 1**

any order compelling him to do so, for among other reasons, he has no confidence in the Government to competently, properly or correctly distribute such funds.

22. As to satisfying the principles set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a) regarding the need to avoid sentencing disparities[6] and the principle of sentencing "not greater than necessary," two closely and directly comparable cases which produced sentences orders of magnitude less harsh than that imposed in this case. The first, in the same district and court where Leventhal was sentenced is Case No. 11-CR-255, United States District Court Eastern District Of New York *in United States v. Klein*. The second is *U.S. v. Matassa*, Case No. 17 CR 373 before Judge Matthew Kennelly of this court.

23. Matassa's PSR writer penned the following statement about Matassa: "Defendant is a Chicago native who had a seemingly normal upbringing[7]," when in fact Matassa and his family according to decades of published newspaper reports, were publicly identified innumerable times as being high ranking members of a Chicago Organized Crime family. See Chicago Tribune article June 22, 2019: *"Reputed 'made' member of Chicago Outfit given 6 months in prison for embezzling from union"*[8].

24. Neither Howard Leventhal nor any known member of his family going back to their immigration into the United States in the late 1800s, had ever once entered a criminal court, aside from traffic, claims Leventhal. Matassa stole irreplaceable labor union retirement and

[6] 18 U.S.C. Section 3553(a)(6) requires sentencing judges in federal court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."
[7] 1:17-cr-00373 Document #: 67 Page 10 of 16 PageID #:774
[8] https://www.chicagotribune.com/news/criminal-justice/ct-reputed-chicago-mob-figure-sentencing-20190722-kahyuutmzvc7jpnu6uqvx6oiz4-story.html



FILED DATE: 12/15/2020 4:11 AM 2020L062057

medical funds for his personal consumption. Leventhal claims that he committed his admittedly criminal acts to fund an authentic technology development company under desperate circumstances in the aftermath of the 2008 stock market crash, while supporting three families including one with a dying (earlier) ex-spouse who needed otherwise unobtainable 24/7/365 care. He also claims that he took extraordinary care to make certain that his victims could withstand and recover from the losses he produced; not that any of this excuses the criminal conduct to which the defendant admitted.

25. John "Pudgy" Matassa's age at the time of sentencing was within a few years of Leventhal's age at sentencing. Both had serious medical issues yet the prosecutor in Matassa's case did not waste more than a year of Matassa's life trying to invalidate the presence of these issues, as the prosecutor did in Leventhal's case, producing manifest physical harm in the present day to Leventhal. Decades of published reports show that Mr. Matassa was a lifelong professional criminal from a family of lifelong professional criminals. Matassa was sentenced to 6 months versus the 60-month sentence for Leventhal. Matassa's parent-child relationship was not deliberately destroyed by the Government and Probation as a *quid pro quo* for a confidential informant's perjury, as Leventhal's was. This comparison establishes a **gross and unwarranted sentencing disparity of 1,000%** when measured in simple numbers. It is exceedingly difficult however in practical terms, to precisely enumerate the harm caused to Leventhal and his daughter, by the deliberate destruction of his relationship with his daughter not suffered by Matassa. The Matassa comparison however pales in comparison to Klein



FILED DATE: 12/15/2020 4:11 AM 2020L062057

26. Philip Klein was in the same age range at sentencing as Matassa and Leventhal, also with serious medical conditions[9]. Klein embezzled funds allocated for the support of children and federal Head Start Program monies. To the extent monies obtained illegally by Leventhal were not used for bona fide business expenses, the remainder was used (according to Leventhal) to support an ex-spouse afflicted with Multiple Sclerosis dying in agony and the humiliation of the loss of body function control; as well as Leventhal's aged parents, his daughter adopted as an abandoned foundling in China; and Leventhal's stepchildren. Klein was sentenced to one day of imprisonment – an **unwarranted sentencing disparity of 1,825 times or 182,500% versus Leventhal.**

27. What explains these disparities? Mr. Leventhal expresses an unsupported misconduct conspiracy theory, however the sentencing disparities speak for themselves to establish that the sentence in Leventhal's case was far greater than necessary, particular in light of the deliberate destruction of relationship between the Defendant and his only child, which the Government has not denied was planned and executed by EDNY Prosecution and Probation, among others. It is unsurprising from Leventhal's viewpoint, that he is repulsed by the thought of any ongoing contact whatsoever with Probation personnel going forward.

28. Lastly, the public interest is best served by terminating Leventhal's supervised release because this will allow the Probation Department to invest the public's limited resources on those who are truly in need of supervision. Due to the current Coronavirus Crisis especially, Probation staffers are quoted on public record[10] stating that an above normal rate of early releases of vulnerable prisoners have placed them (probation officers) under an excess, unmanageable burden. There is no benefit to be derived by maintaining supervision at public expense over someone like Leventhal who has shown himself to be beyond the need for

[9] See "Amended Statement of Reasons" in Klein case, dated December 27, 2011

[10] See for example: https://www.themarshallproject.org/2020/04/03/probation-and-parole-officers-are-rethinking-their-rules-as-coronavirus-spreads





FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EXHIBIT M**

Reference letters, binder

FILED DATE: 12/15/2020 4:11 AM 2020L062057

## SWORN AFFIDAVIT OF DR. GREGGORY A. YOUSTRA

I, Greggory A. Youstra do hereby solemnly swear and affirm as follows: I am a father, grandfather, 65 years of age and a resident of Cook County for more than thirty eight years. I was a public school teacher for 38 years and hold a doctorate in education. I am a 8th degree black belt master instructor in TaeKwon-Do and have taught self defense and violence avoidance to thousands of children.

My family and I have known Howard E. Leventhal for more than thirty years. Howard was a student of mine at Niles Township North High School in Skokie, Illinois and one of my earliest students to achieve black belt rank. My first independent teaching assignment for Howard was to instruct the early childhood class in Morton Grove's Park District.

Howard has always been a person who can be trusted to do what he says he'll do. I am very impressed by the way he has continued to support his ex-wife who is stricken with multiple sclerosis. His compassion in this case is noteworthy.

Howard and his wife went to China to adopt a beautiful baby girl named Amelia Wenying Handeland-Leventhal. Howard has shown much love and financial support for this child. He is a capable and committed father.

Howard is hard working and has always provided for those in his family. He helps support his mother and father who are elderly.

I have never heard or witnessed Howard intoxicated on alcohol or drugs. He has not taken illegal drugs, associated with criminals, or had any disputes with associates, neighbors, or law enforcement personnel.

In my opinion, Howard is an exemplary human being in every aspect of is life.

AFFIANT FURTHER SAYETH NOT.

Greggory A. Youstra Date: 12-07-2005

Subscribed and sworn before me this 7th day of December, 2005.

Mary L. Zinkel
[Notary Public]

OFFICIAL SEAL
MARY L ZINKEL
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 12-18-08

C000323

FILED DATE: 12/15/2020 4:11 AM 2020L062057

## /ORN AFFIDAVIT OF LINDA SINC

I, Linda Singer, do hereby solemnly swear and affirm as follows: I am a mother, 47 years of age and a resident of Cook County for 47 years. I have had principal roles in the raising of 2 children.

My family and I have personally known Howard E. Leventhal for more than 20 years. During this period I have witnessed Howard care for his ex-wife Judith, a totally disabled sufferer of chronic-progressive multiple sclerosis, along with others, in an utterly unselfish manner without regard to the burden upon himself. I am also aware that he is very close with a wheelchair bound disabled cousin and always available to help him.

Howard is very caring and will give 200% of himself to those who are special to him including his daughter, family and friends. Howard is the type of friend who is always available to help no matter how busy he is in his private and business life. Howard is an individual you can rely on. It will only profit Amelia to spend as much time as possible with her Dad. He possesses unconditional love for her and she is a huge part of his life.

Howard is a hard working, creative individual with an unparalleled work ethic. To my personal knowledge over more than two decades, he has never been arrested, taken an illegal drug, suffered from a substance abuse affliction or associated with criminals or otherwise unsavory characters.

AFFIANT FURTHER SAYETH NOT.

Linda C Singer Date: Nov 21, 2005

Subscribed and sworn before me this 21st day of 2005. [Notary Public]

C000328

FILED DATE: 12/15/2020 4:11 AM 2020L062057

Law Offices of Caroline Kaplan
5 south County Street | Waukegan, Illinois 60085
ph 847-899-3159 | Email: carolinekaplan@comcast.net

November 8, 2013

Steven Yurowitz, Esq.
Newman & Greenberg
950 Third Ave., 32nd Floor
New York, NY 10022

RE: Howard Leventhal

Dear Mr. Yurowitz:

This letter is intended to provide a reference for your client Howard Leventhal, whom I have known personally since 2005 and represented since 2007 in family law matters in my capacity as an attorney licensed in Illinois.

Enclosed is a selection of other personal reference letters which were filed in Mr. Leventhal's divorce case long ago, in the 2005-2007 timeframe. In my view the statements made in these letters are an accurate portrayal. Also enclosed is a selection of news articles regarding real, legitimate computer and electronics products created and developed by Howard. I personally have seen operating demonstrations of the Voyager Mobile Internet TV created by Howard at USTelematics, as well as the VIVEE talking email software and service conceived and developed by Howard also at USTelematics.

My own personal observation of Howard is that he is lovingly devoted to his family, including his 88 year old mother who Howard supports, his first ex-wife Judith who Howard has financially supported for 25 years and his deceased father who Howard supported for 30 years after a business failure. Most particularly Howard is a magnificent father to his now 13 year old daughter who Howard adopted from a Chinese orphanage in 2002. I have requested a copy of the adoption agency home study which addresses Howard's fitness as a father among other things and will forward as it becomes available.

Howard is also extraordinarily supportive to his first cousin Neal Golden, a paralyzed quadriplegic of 30 years duration. He frequently visits Neal at his home to repair and maintain Neal's computers and electronics, has repaired Neal's wheelchair and adaptive equipment on numerous occasions and provides continuous emotional support to Neal's parents, Fern and Jerry Golden. Mr & Mrs Golden are elderly, lost their daughter at an early age to cancer and have taken care of Neal at home for all of the time since his crippling motorcycle accident. Howard calls them frequently, visits them with this daughter frequently and makes his aunt, who now can never be a grandmother, feel like a cherished grandmother none the less.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

Howard is also a blackbelt in Taekwon-do and simultaneously a gentle and nurturing person. He has taught self defense to hundreds of children in addition to women and men, almost entirely on a volunteer basis. One of Howard's earliest students was Senior Master Earl Weiss who is now an 8th degree blackbelt and one of the highest ranking Taekwon-do masters in the world. To my knowledge Howard has also begun to teach martial arts to his daughter for personal defense purposes and character-building. Just this year he spent parts of the summer with her at Judo camp in South Carolina and Taekwon-do camp in Fox Lake, Illinois.

When my son Tommy, who was born prematurely and suffers from severe and permanent disabilities and was permanently admitted to the Misericordia Home in Chicago, a group care facility, Howard accompanied me, comforted me and emotionally supported me on what was arguably the worst day of my life. Around the same time Howard attended a Misericordia fund raiser and donated enough money to purchase an entire table of seating for my friends, family and guests.

Howard's inventions and product developments have been in the hands of millions of people and he is an important and productive contributor and teacher to the people and community around him. Many people rely upon him both emotionally and financially.

Very truly yours,

Caroline Kaplan

Caroline Kaplan

FILED DATE: 12/15/2020 4:11 AM 2020L062057

ALBERT L. WYSOCKI
A Professional Corporation
ATTORNEYS AT LAW
325 WASHINGTON STREET
SUITE 600
WAUKEGAN, ILLINOIS 60085-5520

ALBERT L. WYSOCKI
BAILEE D. MYERS

PHONE 847.244.3030
FAX 847.244.3003

December 12, 2013

The Honorable, Sentencing Judge
United States District Court
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge:

I am writing this letter in connection with the sentencing of Howard Leventhal. Of course, I am aware of the fact that he will very soon be entering a plea of guilty. The purpose of my correspondence is to tell you what I know about Howard, not only as a friend but as a practicing attorney for over thirty-five years, which included a period of time on the Nineteenth Judicial Circuit bench as a judge in Lake County, Illinois. I've been a police officer, then the Chief Deputy Sheriff of Lake County, and I've held prosecutorial positions throughout my career as well.

I first met Howard inadvertently due to my active participation at Prince of Peace Catholic Church in Lake Villa where my family and I have been long time, active members. Howard enrolled his lovely daughter, Amelia, at our parochial Catholic School at Prince of Peace. Our paths crossed when I participated with Howard in many of the support activities for the parish and its school. Howard always demonstrated kindness, charity, hard work and active participation in supporting the parish school where his daughter attends.

At first we became acquaintances and then friends. I came to learn, after many personal and private discussions with Howard, about his tremendous charity and responsibility that he demonstrates on behalf of his family. As you may come to know, Howard is greatly valued, loved and appreciated in the community which I know him, that being Prince of Peace Catholic Church and School.

I know that Howard supports his deathly ill first wife extraordinarily beyond what anyone could possibly imagine as well as he continues to support his second ex-wife. He is committed to a personal, loving and kind relationship to his daughter, Amelia, and his quite elderly and financially distressed mother as well. I have never heard him use profanity or express any negative comments or recriminations about anyone.

FILED DATE: 12/15/2020 4:11 AM 2020L062057



I am a seasoned, long time practicing criminal defense attorney and former judge. As a consequence of my professional experiences, I believe I have developed a very accurate perception of the people whom I come in contact with. I can represent to you, Your Honor, that my observations, experiences, and interactions with Howard for over the last eight years confirms my belief in his kindness, goodness, and charity with which he conducts his relationships with the people whom he knows, interacts with and loves. I am confident that my recommendations to you of Howard's character and goodness are accurate. If in your determination as to the appropriate sentence for Howard that he receive a rehabilitative sentence as opposed to a punitive one, I would certainly offer my skill and professional standing in a supplementary or supervisory role of any probationary disposition you might order.

I am a life long resident of Lake County, Illinois and I know Howard has lived here for many, many years. I am familiar with and conversant with all of the County and State agencies of the Lake County Court System and its personnel from top to bottom. I would be more than willing, indeed it would be an honor, if you felt you could rely on me in supervising any probationary sentence.

Howard Leventhal is a good man. It is my considered opinion that a removal of Howard from the interaction that he currently has with his two ex-wives, his daughter and his elderly mother would literally cause a much greater hardship on these women to their detriment with Howard's absence. I ask you to extend your discretion and consider this plea for mercy and rehabilitative community based sentencing alternatives for Howard here in Lake County, Illinois.

Very truly yours,

Albert L. Wysocki
ALW:dd

FILED DATE: 12/15/2020 4:11 AM 2020L062057

Fern Dawn Golden
1700 Paddock Lane
Lake Forest, IL 60045
847-525-6505

November 5, 2013

Mr. Steven Yurowitz
syurowitz@newmangreenberg.com
Newman and Greenberg
950 Third Ave
New York, NY 10022

SUBJECT: Howard Leventhal

Mr. Yurowitz:

I am a lifelong resident of the Chicago area and have known Howard Leventhal for 55 years. My husband and I operated a financial services business for 35 years serving the needs of lower income factory workers in the City of Chicago.

Howard is a relative but not a blood relative. In one sentence the way I would describe Howard would be that he is among the most kind, kindly, kindhearted, big-hearted, good-natured, good, benign, compassionate, caring, altruistic and humanitarian individuals I have ever had the pleasure of knowing. He lives to help others and while he surely enjoys life, the most joy I have seen him derive from life has been during those times of greatest service to others.

When Howard was admitted to 1st grade he had a reading comprehension equivalent of a 6th grader. While in 1st grade he could quote large portions of the World Book Encyclopedia, which he had been reading since age 4. When Howard was about 9 years old and his family invited us over for a summer barbeque, Howard relieved his father as the cook and from that day forward until today he has taken great pleasure as a quite alpha male in being the chef and serving the meal at countless family dinners.

My brother Sheldon took an early interest in Howard and mentored him to develop their lifelong mutual interest in flying and electronics. When Howard was 10 years old he sat alongside full grown men at the federal building in Chicago, demonstrated fluency in reading and sending morse code and advanced electronics theory and passed the government administered test for his amateur radio license at the FCC.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

Howard's bar mitzvah speech at age 13, which he authored entirely himself and on his own initiative, was about the virtues of not following the crowd, not breaking the law, not taking drugs and serving others before himself. This has been the theme which has pervaded his life, not only in words but in deeds. I have never once heard Howard even joke about taking illegal drugs himself, and Howard tends to joke and reminisce about everything he does.

At age 15 Howard was elected to the board of directors of a non-profit public service corporation, and he was elected by a group of arms-length adults who were not his relatives. In working with this group Howard provided communications support for Project LEAP, a poll-watching group and personally safeguarded an underprivileged precinct during elections on the south side of Chicago. Also with this group he provided health, safety and welfare communications during MS Walks and other charity events and during fires and natural disasters around the Chicago area. On a volunteer basis at age 16 while in the Civil Defense Explorers, Howard re-stocked fallout shelters throughout the northern suburbs with food, water and other supplies.

Howard began martial arts training at 15, attaining his black belt and significant proficiency in Tae Kwon Do. He placed well in several college-level tournaments while he was still in high school. At 5' 6" he is the only one of his instructor's thousands of students ever to have bested his own 8th degree master instructor Dr. Greg Youstra, a man of 6' 4", in a consensual sparring match that ended with Dr Youstra's hospitalization. At the same time I have never seen or heard of Howard applying his formidable skills in any offensive way nor misapplying his skills in the slightest way. Beginning at age 19 Howard taught self-defense to children ages 5-10 at the Morton Grove Illinois Park District for a number of seasons.

Howardbegan college at Southern Illinois University in Carbondale, Illinois but did not stay long because he could not bear to be away from his first girlfriend in Chicago. The next year he enrolled at the University of Illinois at Chicago and was unable to continue as his father began to fail in business.

In 1982 after Howard's father had some sort of breakdown arising from his business failure, Howard saw that his mother and father needed financial support and started his first company, Suncom, Inc. At Suncom Howard dissected the flimsy joystick controller for the newly popular Atari game and developed a highly durable replacement. The "SlikStik" and "StarFighter" were sold all over the world including at places like Target

FILED DATE: 12/15/2020 4:11 AM 2020L062057

and Toys R Us. Howard once related that while in Singapore on business he walked down the street and passed a peddler's pushcart selling joysticks from Howard's company.

For almost the entire 7 year duration of Suncom's existence before it was sold, Howard gave from one third to one half of his salary and bonuses to his mother. He also gave some money to his Great Aunt Molly who had cared for him as a baby. When the company was sold, the first thing Howard did was drive to the homes of his parents and his Aunt Molly to hand them bundles of cash. Not because they were investors in his company, and not because they were owed any money on any legal basis, but because they were investors in Howard's life and he was delivering upon his own personal code of conduct which demanded that he do it.

When Howard was in his early 20s my dear son Neal, Howard's first cousin, was devastatingly injured in a motorcycle crash. Neal was near death and in a coma for an extended period of time. Today Neal is nearly 100% paralyzed and my husband and I have cared for him at home for more than 30 years. I have attached digital video of a recent TV news story about Neal which provides a glimpse into his condition.

Howard's first reaction after Neal's long term outlook became known was to try fashioning some adaptive devices to ease Neal's challenges. Through the years Howard has gladly set up and repaired some of Neal's computers and electronics, and whenever called been at our door for this purpose at the soonest possible moment.

As shown on the TV news clip, Neal has made the most of his life by among other things attending as many Chicago Bulls basketball games as possible. Not long ago when Neal was re-admitted to the Rehabilitation Institute of Chicago, the upcoming game was blacked-out on local TV and Neal was quite unhappy. Upon learning of this during a visit to Neal, Howard went home and returned on the 60 mile round trip the next day with a fully functioning setup to play the Bulls game for Neal via a temporary streaming video feed over the Internet.

By far the greatest good thing Howard has achieved in his life was to travel to China for 16 days in 2002 and adopt his daughter Amelia Wen Ying Handeland-Leventhal.

Amelia had been abandoned in the womens' restroom of a train station near in a rural area of Hunan Province in Central China. She lived in an orphanage from her recovery by the police until Howard and his ex-wife Mary traveled there to retrieve her. Shortly

FILED DATE: 12/15/2020 4:11 AM 2020L062057

after Howard enabled Amelia to become an American citizen at the U.S. Embassy in Guangzhou, they came home to a welcoming party in my home. When it came time to say the prayers and do the blessings, Howard gave a speech to the assembled group of people who normally will not stop talking or fidgeting for a moment to save their own lives. In a very short time this group of people sat in rapt motionless silence.

Howard explained the thinking behind Amelia's name, which comes from two distinctly different sources. Firstly, Amelia is a westernization of the Aramaic "Al Maliya", meaning "Born by God" which could not be a better name for this adopted daughter who is so dearly loved by Howard. Secondly Amelia was named after aviator Amelia Earhart, and not only because of Howard's love for flying. Amelia Earhart was a symbol of the accomplishments of women and Howard said this name was chosen "because Amelia is an American now and in America … a woman can be anything she decides to be".

My daughter Laura passed away at a very young age and I will never be a grandmother. Howard has tried at every opportunity to bring Amelia into my life and keep Amelia in my life so that I can have some of the experience of being a grandmother. I need this to continue.

Further remarkable about Howard is the way in which he has provided financial and emotional support for his first wife Judi, who is also a quadriplegic. To his own great merit, detriment and sacrifice, Howard has supported Judi for 25 years and provided her with whatever she has needed including a round-the-clock caregiver. This support followed the earlier many years of support Howard provided his parents, overlapped it and continues to this day, when Howard still cares for his 88 year old mother, my sister-in-law Lila Leventhal.

Through my experiences with Neal I have met and know many people with disabled relatives. For the most part, after a certain time, the only way they can survive has been to institutionalize the individual. But Howard has so empathized with Judi that he has been unable to take this step and he has stood beside her and with her regardless of his subsequent marriages. There are few people on earth who would even consider this let alone actually do it for a quarter of a century.

Howard is an excellent father and is needed by his daughter who is now 13 years old. Regardless of the outcome of these current matters, the person who stands to be hurt the most is Amelia, and she has already recovered from a devastating abandonment, quite well, directly because of Howard's efforts and for no other reason that I am aware of.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

When Amelia was still a young child and her mother (Howard's 2nd wife Mary) was too overwhelmed with motherhood, Howard would take Amelia wherever he went, even on business trips. When Mary and her lawyer made things very difficult for Howard by using Amelia as a hostage to be exchanged for material things – Howard signed over his interest in the house he had paid for entirely with his own money, without hesitation, so that he could have the time with Amelia that Amelia needs and deserves. Most people would go to endless war over an issue such as this, but not Howard. When it came time to relinquish a material thing gained at great cost, Howard gave it up willingly in exchange for nothing more than the freedom to enjoy an ice cream with Amelia at will.

Howard recently volunteered to coach Amelia's school robotics team. He has taken her flying in the airplane he rents at the inexpensive, non-profit flying club he has belonged to for many years. Last summer Howard ignited an interest in martial arts for Amelia by taking her to a Judo camp in the Carolinas and a Tae Kwon Do camp in Illinois. He coaches her privately and she already can break boards and deflect attacks even while being slight and weighing 70 pounds. Because Amelia is slight, she takes growth hormone injections which Howard administers to her whenever she is in his care.

In all the time I have known Howard, although he has been in plenty of mischief, it has been innocent mischief and he has never hurt anyone. At 5 years old, while I was watching him in my home, he disappeared and walked to his home, several miles away. He found a way into the locked house and when I arrived there after great upset to look for him, he was eating potato chips, watching TV and dreading the coming moment that I would find him.

Howard has never committed a crime or been accused of a crime as far as I am aware. When at our house he will not even take a can of soda without first asking permission. Howard knows that my husband and I are not as young as we used to be, and much of the time he visits with Amelia he brings food for everybody with special consideration for food that Neal can tolerate. When my daughter was near the end of her life, Howard also brought food, knowing that she could not eat it and hoping she could get some enjoyment from just smelling it or touching it to her lips. When Howard recently moved into a new home, the first thing he told me about it was that his criteria for enabling access for my son's wheelchair was satisfied, and that he had gone out immediately searching for wheelchair ramps suitable for Neal to pass over his threshold.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

Howard is a productive member of society and he has much to offer. The video game and computer products he developed have served the needs and entertainment of many hundreds of thousands of people, all over the world. He once developed a computer graphics tablet called Animation Station and donated several to the Museum of Science and Industry in Chicago. For a number of years the public information graphic monitors on display all over the museum used the computer tablets that Howard created first with pencil on blank paper alone in his own lab.

Howard is an accomplished and noteworthy problem solver. When he thinks about solving problems, normally it is in the interest of the public good. For example he developed a product and service called VIVEE to reduce distracted driving by using a computer generated character to read aloud the email and text messages of drivers while driving. He wrote a book called "Are We There Yet, Road Trips in the 21st Century", which is still available on Amazon and proudly on display in my bookcase. The object of this book was to help parents everywhere solve the problem of keeping kids under control, entertained and intellectually stimulated while on long road trips. He developed a product called ICONtroller to solve the problem inherent in early laptop computers of needing to carry around an accessory mouse. As a pattern and practice in his life, he uses his intellect, which is formidable, to help not just those he loves or are close to him, but to help society at large.

Howard is not a consumer of luxuries or material items for himself generally speaking. He wears jeans and old clothes and drives a leased Chevrolet. Up until recently he drove a 10 year old car with 150,000 miles on it. It is obvious from the effusive support he has provided for his parents, ex-wife and daughter that this is where his lifetime income has gone. I understand that Howard is accused of fraud and is likely to plead guilty. Regardless there can be no productive purpose for depriving him of liberty under any guise or expressed cause, my feelings and emotions acknowledged and set aside.

Yours truly,

Fern Dawn Golden

Fern Dawn Golden

FILED DATE: 12/15/2020 4:11 AM 2020L062057

Lorraine B. Marx
N17 W5195 Garfield Circle
Cedarburg, WI 53012

To Whom It May Concern
United States District Court
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

December 5, 2013

To Whom It May Concern.

My name is Lorraine B. Marx and I reside in the State of Wisconsin. I am retired from Kraft Foods. This reference letter is on behalf of Howard Leventhal who. I understand, plans to plead guilty to fraud in your Court.

I have known Howard Leventhal for the last twenty-eight years. I first met Howard in 1985 when he was the President of SunCom, Inc., in Chicago, Illinois and my daughter worked for his company. My daughter, Mary Handeland and Howard were married in October, 1999.

In 2002, Howard and Mary adopted my granddaughter Amelia who, as a baby, was abandoned in a remote area of the People's Republic of China. Howard's extremely proud of his daughter and always recognizes the importance of spending time with her or calling her on the phone.

Although we may have had differences of opinion in the past, ultimately I have known Howard to be conscientious, hardworking, generous and considerate person who has worked hard to

FILED DATE: 12/15/2020 4:11 AM 2020L062057

support his family and parents. Over the years, Howard developed many successful technology products. He is a talented man with many positive attributes that, if given the opportunity, could benefit the community.

I truly believe that Howard has already suffered extensively for his actions. He has lost credibility with his business associates and has expressed sadness by what he has put his family through. A prison sentence would cause irreparable harm to his young daughter. Therefore, I ask the court to take into consideration the importance of this critical relationship when considering his sentence as his absence in her life would be akin to yet abandonment for her.

Sincerely,

Lorraine B. Marx

ITING
MILIES
NDATION

DITED

Ave.
60046
356-1452

FILED DATE: 12/15/2020 4:11 AM 2020L062057

September 26, 2000

**Home Study for International Adoption**

**Family:** [redacted] Howard E. & Handeland, Mary Ann
2885 Farmington Drive
Lindenhurst, IL 60046
Home Telephone: (847) 245-3066
Husband Work: (847) 948-8200
Wife Work: (847) 356-0781
I-600 Petition Filing Date: March 7, 2000
I-600 Fingerprint Clearance Date: June 26, 2000

**Interview Dates and Support Information:**

This International Home Study was conducted by Uniting Families Foundation caseworker, Lynn L. Wetterberg. Interview dates of 2/4/00, 4/9/00, 4/14/00, and 5/21/00 include home and office contacts. As part of the overall Home Study, character references, medical reports, financial statements and income tax returns are reviewed and the family's home is inspected. This couple stated that they have never been rejected as prospective adoptive parents nor have they been the subject of an unfavorable Home Study. They stated that they have no history of substance abuse, sexual abuse, child abuse or domestic violence even if it did not result in an arrest. They also stated that they have never been arrested, indicted or convicted of any crime.

**Adoption Expectations:**

Howard and Mary Ann, a childless couple, would like to adopt a Chinese infant of either sex, as young as possible, and under 15 months old. Although they would like a child who is as healthy as possible, they are willing to accept a child with a correctable condition. They would not accept a child with a diagnosis of Fetal Alcohol Syndrome. Both Howard and Mary Ann have been diagnosed and treated extensively for infertility conditions. This is a second marriage for Howard and a third for Mary Ann. Both say that their prior marriages suffered from the stress of infertility and they have chosen to create their family through adoption with relief and conviction. They are attracted to international adoption because they like the idea of providing a home for a child who would otherwise not have one. They appreciate the relative predictability of international adoption. Howard and Mary Ann believe a Chinese child will fit into their family system and their community with no difficulty. They stated that they have the enthusiastic support of friends and family.

Through extensive training the Leventhals have been made aware of the issues involved with adopting children from an institutional setting. Training included a discussion of the processing, expenses, difficulties and delays associated with international adoptions. They are also aware that the child they adopt might develop a previously undiagnosed medical or psychological condition following placement. The say that they accept this possibility and are willing to take this risk. Howard and Mary Ann state that they will assume full responsibility for the medical and financial needs of their adopted child upon placement and that they will fully cooperate with the Agency in its provision of post-placem

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**Recommendation:**

I find Howard and Mary Ann Leventhal to be a mature, responsible and loving couple who have the emotional and financial ability to provide a nurturing home for a child. I highly recommend that the Leventhal's be allowed to adopt one healthy Chinese infant of either sex under fifteen months and as young as possible from China.

Uniting Families Foundation is licensed as a Child Welfare Agency by the State of Illinois and is authorized to place children for adoption under License #304862-02 which is in effect until April 17, 2001

Lynn L. Wetterberg [signature]
Lynn L. Wetterberg, MS
Caseworker
Licensing Personnel ID #506969

9/26/00
Date

Judith Tanter [signature]
Judith Tanter, LCSW, MS
Casework Supervisor
Licensing Personnel ID #506721

9/26/00
Date

Signed and sworn before me this 26th day of September, 2000.

Sharon G. Thompson [signature]
Notary Public

OFFICIAL SEAL
SHARON G. THOMPSON
Notary Public, State of Illinois
My Commission Expires 04/04/01

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EMSI**
THE PAY-FOR-PERFORMANCE PUBLIC RELATIONS FIRM

November 25, 2013

Sentencing Judge
United States District Court
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Sir/Madam:

I am writing in connection with the sentencing of Howard Leventhal, who I understand is entering a guilty plea with regard to his case. I have known Howard for at least 15 years, and from my working relationship with him, I have knowledge of his character and responsibility.

I am the CEO of EMSI Public Relations, a national PR firm, which I founded more than 23 years ago. I have managed publicity campaigns for Howard for the promotion of 3 of his products.

In all my dealings with Howard, I found him to be an honorable businessman, who kept his word in every agreement he made with me and my company, including meeting his financial obligations, i.e. he paid us fully and when expected. And just as important is the fact that the products he promoted were real and of value to consumers.

We got media for Howard to promote these three products:

A. 1998: We arranged TV interviews for Howard who was promoting Quicksite CD ROM Software (cutting-edge software that made it easy and economic for small business to develop a website, when previously such was cost prohibitive).

B. 2005: We arranged talk radio interviews around the country for Howard who was promoting his book, *Are We There Yet? Road Trips in the 21st Century.*

C. 2007: We arranged TV, radio and print coverage when he was promoting VIVEE, a voice interactive email for use in cars (at that time considered cutting-edge technology which promoted safety through hands-free use of digital devices while driving).

3748 Turman Loop, Suite 101 • Wesley Chapel, FL 33544 • Tel. (727) 443-7115
info@emsincorporated.com • www.emsincorporated.com

FILED DATE: 12/15/2020 4:11 AM 2020L062057

I hope this information is helpful in putting into context the type of person that Howard has been throughout the time I have known him - an honorable businessman who has promoted real products that have been beneficial to consumers.

Sincerely,

Marsha Friedman
CEO

FILED DATE: 12/15/2020 4:11 AM 2020L062057

November 20, 2013

To Whom It May Concern,

I am writing this letter on behalf of my friend of almost two decades, Howard Leventhal. I understand he will shortly be entering a guilty plea in court proceedings against him. I met Howard in 1995. I was working with a graphics arts company, who, at that time was one of the early pioneers of digital printing. Howard was working on some packaging projects and found digital printing to be helpful. Our shared sense of humor made us quick acquaintances and it wasn't long before we became friends. We had many lunches and eventually dinners including our wives. It wasn't long before I realized his kindness and generosity. We were invited to his cousin's house. His cousin is wheelchair bound and severely disabled from and accident years ago. There were several family members there, but it always seemed like it was Howard constantly looking after his cousin. I also had the pleasure of meeting Howard's parents. His father, too, had a great sense of humor, and over the years we have shared several laughs . Howard was very close to his dad and was there constantly until his dad passed. He has since been there in every way to make his mother's last years as comfortable as possible.

I later found out Howard is taking care of his first wife both compassionately and financially. She is suffering from a debilitating disease that requires both time and money. Just Howard doing what comes naturally . I also feel blessed to have been the very first person to greet Howard at the airport when he brought his beautiful new daughter Amelia home from China. He has been a loving, giving father ever since. Ho beams around her. I will regularly get texts on my phone with pictures / videos of things Amelia is involved with. Dancing, martial arts, and sometimes dad just bragging about how big and beautiful she has grown. Recently, Howard called and asked if could stop by our home with Amelia. We were very glad to see both of them. The reason for his visit? He wanted me, as a guitar player, to show Amelia how a professional could make her new guitar sound. Here's the unusual part. Howard BUILT the guitar by hand. I asked "why build one"? He said "I thought it would be a little more special this way" "perhaps she will be a bit more motivated to spend the time to learn, knowing I didn't just run out to the store and buy one".

I know several people who participate in the Big Brother program. They cannot stress enough, the importance of a male influence in a child's life. We have all seen the implications of children growing up without dads. It would be doubly sad if Amelia were rescued from China, only to spend her time here, in her new country, fatherless.

It is difficult to share all of the great things I have witnessed Howard doing. I hope this sheds a bit of light on the kind of person I proudly call my friend.

Sincerely

Michael A Gianokopolous

President/co-owner M & M Fasteners Inc. Crystal Lake Illinois 60014 est. 1999

Home address :35672 N. Sheridan Dr. Fox Lake IL. 60020 1999 to present

FILED DATE: 12/15/2020 4:11 AM 2020L062057

Spectrum

November 30, 2005

To Whom It May Concern:

My name is Dan Bleil. I am currently president of a credit union service organization providing financial services to businesses and professionals throughout the country, a proud father of two adult women, and a dear friend of Howard Leventhal. I have known Howard Leventhal both professionally and personally for more than 15 years. I have known Howard to be a caring and responsible man. He has demonstrated great patience and care with both his elderly parents and his ex-wife Judith, a disabled sufferer of multiple sclerosis. I also witnessed Howard's actions, attitudes and commitment throughout the arduous and burdensome process of adopting his daughter, Amelia Wenying Handeland-Leventhal. During this process, I observed Howard's loving and caring attempt to manage the process with the utmost care and attention to both his wife and their prospective adopted child. The process required an exceptional amount of time and resources in a foreign country in order to conform to the requirements of the child's country of origin. I was impressed with the way in which Howard handled this process with care and attention to the special and sensitive conditions of Amelia's origins.

Since the successful adoption of Amelia, many of our shared conversations revolve around his love and affection for his daughter. I have had the opportunity to spend many shared moments with Howard and Amelia as they play and interact with one another. It is obvious to anyone that knows Howard even casually, that his relationship with his daughter is the most important thing in his life. Furthermore, and more critical, Amelia's need for her father's love, care, and nurturing is indisputable.

I am compelled to assist Howard in his efforts to be afforded as much time as possible with his daughter as a result of my own experience with the judicial system in Illinois and its adverse impact on father's and their children. Too often the child's needs are deferred to the mother with little regard or attention to the relationship the child had, and needs to maintain, with their father. I would elaborate, but am confident that the plethora of written material supporting this most intuitively obvious situation requires little more supporting evidence than the look in the eyes of the father's child.

Howard is a hard working, creative individual with an unparalleled work ethic. In my opinion as father of two beautiful adult women, Amelia will be best served by a custody arrangement whereby Howard is afforded the greatest conceivable amount of time exclusively with Howard. Please feel free to contact me if I can provide any further support in my efforts to provide whatever is necessary to assist Howard and Amelia in maintaining the relationship they both need.

Most sincerely,

Daniel S. Bleil

C000324

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**Stuart W. Volkow**
Box 5755 Santa Monica CA 90409
SKYPE: svolkow svolkow@gmail.com
www.linkedin.com/in/svolkow

November 11, 13

Steven Yurowitz
Newman and Greenberg
950 Third Ave

IN SUPPORT OF HOWARD LEVENTHAL
New York, NY 10022
via email: syurowitz@newmangreenberg.com

Mr. Yurowitz:

I am a California resident and have known Howard Leventhal for over 45 years since approximately the 5th grade. This letter is in support of his defense and liberty.

Mr. Yurowitz:

I am a lifelong friend of Howard Leventhal , residing most of my life, full or part time in the Chicago area.

Howard is a loyal friend and family man who has worked diligently and had many business successes. I have been at all three of his weddings and have seen first hand his unwavering support of his aging parents, daughter Amelia, and disabled first wife Judy. All of this support has been with great personal sacrifice. This is especially true of his continued quarter century support of his completely disabled first wife Judy, keeping her from institutionalization. I witnessed first hand the depth of his commitment to family as he cared for his father in his final years. I have witnessed numerous times how he helps support his quadriplegic cousin Neal. For certain, Howard is, and has been pivotal in the support of numerous people in his family circle both financially, logistically and emotionally.

Howard has a unique combination of talent and ability combining technical skill in electronics and design with marketing savvy. I have seen first hand his ability to articulate and design complex products and bring them to market. I have worked with

FILED DATE: 12/15/2020 4:11 AM 2020L062057

him many times as a consultant on several of his businesses including Quicksite, Stealth Media Labs, U.S. Telematics, and Heltheo. As an expert in mobile Internet technology I can attest that to the feasibility of the eNurse Companion mobile home health monitoring product, brand named The McCoy. It integrates readily available off-the-shelf technologies.

As boys of 14 or 15 we trained together in an Explorer Post in Skokie Il. where we learned first aid and ran emergency communications operations. Howard always performed at an excellent level.

Around that same time Howard began training in Tae Kwon Do about a year after myself. I trained and competed with Mr. Leventhal through my college years when we both attended Southern IL. Univ. He always conducted himself honorably and has always displayed excellent self-discipline as a practitioner.

Howard is an excellent father and is needed by his adopted daughter Amelia, who is now 13 years old. Regardless of the outcome of these current matters, the person who stands to be hurt the most is of course Amelia, as well as his ex wife Judy and aging mother Lyla.

Sincerely,

Stuart W. Volkow

FILED DATE: 12/15/2020 4:11 AM 2020L062057

IN THE UNITED STATES DISTRICT COURT - EASTERN DISTRICT OF NEW YORK

UNITED STATES v HOWARD LEVENTHAL — CASE 13 CR. 695 BMC

DECLARATION OF S.D. KRAMER

I SAMUEL D. KRAMER DECLARE AS FOLLOWS:

I AM AN INMATE AT BROOKLYN MDC, BROOKLYN NY THE SAME AS THE DEFENDANT

I HAVE ONLY KNOWN HOWARD LEVENTHAL A VERY SHORT PERIOD OF TIME. HOWEVER, IN THAT PERIOD, I CAN SAY THAT ON TWO DIFFERENT OCCASIONS IF NOT FOR HIM I MAY NOT BE ALIVE AT THIS MOMENT. IN LATE JANUARY 2016, I WAS FEELING ILL AND HAD REQUESTED MEDICAL ASSISTANCE. AFTER HOURS OF NEGLECT I ADVISED HOWARD OF MY CONDITION. HE PROCEEDED TO TAKE MY PULSE AT WHICH TIME HE NOTICED AN ARRYTHMIA, HE THEN PROCEEDED TO ASSIST ME TO MY CELL AND REMAINED CONTINOUSLY CHECKING MY PULSE WHILE INSTRUCTING ME TO RECLINE AND RAISE MY FEET OF THE GROUND. HE THEN VIGOROUSLY PROTESTED THE LACK OF CONCERN OF THE MEDICAL STAFF VIA A VERY FRIGHTENED CORRECTION OFFICER. I WAS TAKEN TO A LOCAL MEDICAL CENTER SHORTLY THERE AFTER. ON ANOTHER OCCASION HE WATCHED OVER ME FOR HOURS WHILE AWAITING MEDICAL STAFF. HE IS ALSO INSTRUMENTAL IN TEACHING G.E.D CLASSES, COMPUTER TRAINING COURSES, JUST TO NAME A FEW. I HAVE WATCHED MR LEVENTHAL BRAVO ALL DAY EVERDAY IN ENDLESS SELF FLAGELLATION, OBVIOUSLY FOR WHATEVER CRIME HE COMMITTED.

WHILE I HAVE NO IDEA IF THIS LETTER/AFFIDAVIT WILL MEAN SOMETHING TO THE COURT, I CAN SAY HOWARD HAS MADE A DIFFERENCE IN THE LIVES OF THOSE AROUND HIM IN THE SHORT TIME WE HAVE BEEN TOGETHER, IN MY EXPERIENCE BOTH IN AND OUT OF PRISON, AND THAT MAKES HIM A VERY RARE PERSON

[signature] 2-14-16

Earl Weiss
10024 Skokie Blvd. #240
Skokie, IL 60077

847 679 5580

May 7, 2015

Honorable Judge
Brian M. Cogan
United States District Court
Eastern Div. of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE: *U.S. v. Leventhal*

Your Honor:

This letter is in support of Mr. Howard Leventhal, Defendant in the above captioned matter, whom I have known personally since 1973. I am an attorney licensed in the State of Illinois, admitted to the Illinois bar in 1980 and a graduate of De Paul University School of Law. I humbly submit the following:

I am an 8th degree black belt in Taekwon-Do, one of a handful in the USA to achieve this rank. My instructors along the way have included the Founder of Taekwon-Do, the late South Korean Army General, Choi Hong Hi. Howard was my senior early on, a black belt before me, an assistant instructor for our *Sabumnin* (instructor) and among my earliest teachers. In the course of my martial arts career, I have taught many of students directly and indirectly through classes and seminars, some of whom also became instructors.

Howard's dedication and work ethic, at least in some small way, is embedded in the students that followed his example.

Martial art instruction is transmitted partly through inspiration. A good teacher mixes instruction and repetition with demonstrations that appear almost superhuman to students, inspiring them to eventually perform the same feats. I was inspired in this way by, Howard, who was the only one to kick a suspended heavy bag once and make it hit the ceiling three times in response.

Howard was of a teacher, who led by example with focus and energy. He provided students with a window into their potential.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

FILED DATE: 12/15/2020 4:11 AM 2020L062057

He was a fierce, fighter who competed in the open heavyweight division at tournaments. Our instructor Dr. Greggory Youstra, VI Dan, assigned him to teach the youngest K-3rd grade students at our Morton Grove Park District classes. It is not easy for an intense martial artist to dial it back and present lessons gently for the mentality and physicality of children. Dr. Youstra could see that Howard is adaptable and suited for the challenge.

While many years have passed since then, I am certain that regardless of whatever misfortune has brought Howard before the Court, qualities which lit a fire under me as a young person can and should still be harnessed. I strongly encourage the Court to give serious consideration to sentencing in this matter which is focused upon community service, productivity and enriching the lives of people

The United States does not need yet another prison inmate. The corrections system as it presently exists in the United States does little to rehabilitate the incarcerated or benefit society. No higher or better agenda could be served than by allowing Howard to pay his debt to society in a very real and tangible way by being just such a soldier in this war.

Yours truly,

Earl Weiss

FILED DATE: 12/15/2020 4:11 AM 2020L062057



Keton Adjara
Reg: 78893-053
Metropolitan Detention Center
P.O Box 329002
Brooklyn NY 11232

September 15 2016

Judge Brian M. Cogan
United States District Court
225 Cadman Plaza East
Brooklyn NY 11232

Judge Cogan:

I have just had a very bad experience with defendant Howard Leventhal in a case before you and I want you to know about it.

Assistant United States Attorney Winston Paes contacted my defense attorney to tell her that Mr. Leventhal signed my name to something. This charge is false!

A couple month ago Howard and I watched as correction office here left a man who might have had a very bad injury just lay on the concrete floor for an hour before putting him on a stretcher and bringing him downstairs.

EXHIBIT 14-1

FILED DATE: 12/15/2020 4:11 AM 2020L062057

Howard offered to help as he always does and he was told to back off. He and I started writing notes about this event including [illegible] getting this man out of here. Then Howard typed the not into an email to the Warden. Printed it out, ask me to Co. Sign it which I did.

In my Country in Africa we would not poison a lion by feeding it any Person who would accuse anybody else Falsely. I Signed the letter exactly as it show. My Lawyer said to me That this Prosecutor must hate your friend very much to do a thing like this.

I have sat at Same table with Howard and taken almost every meal with him almost every day since he came to MDC. He does not hide with the white people. he sits with a table only Africans. Today I was Sentenced in my case to the lowest possible Santance and because of Howard's help and Stratgy, instead of



FILED DATE: 12/15/2020 4:11 AM 2020L062057

being isolated from my family for another four year I will be Probably One on a treaty transfer to my family in England before next year is finished. My Lawyer knows nothing about this and Howard gave me Perfect direction. how to do

He also help another of my Country-men named Kinsley Koloko, Kinsley to Claim asylum because he had been attacked in Nigeria for reason having to do with his Per sonal Preferences. Howard wrote justification for not deporting Mr. Kinsley back to Nigeria Way and today Mr. Kinsley is working in New York in a medical occupation under no further threat of deportation.

FILED DATE: 12/15/2020 4:11 AM 2020L062067

Howard is suffering here for not having good contact with his daughter. He talks to me about almost nothing else almost every day. I wish you Sir will please allow him to also be home with his daughter because he deserves it and she deserves to have his kind of father.

Sincerely

Peter Hagyora

FILED DATE: 12/15/2020 4:11 AM 2020L062057

Clifford M. Gross, Ph.D.
11930 North Bayshore Drive
North Miami, Florida 33181 Tel 313-393-0756

To Whom It May Concern
United States District Court
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

November 20th, 2013

Dear Honorable Sir or Madame,

I am providing this character reference on behalf of Howard Leventhal and I understand that he has or will enter a guilty plea in the matter before you.

I've known Howard for more than 12 years. I was introduced to Howard by Schneider Securities, an investment bank I had engaged to complete a public offering in 2000. I have been a professor (NYU, NYIT and USF) and department chairman; I've founded and taken public two companies, one on the NASDAQ and one on the American Stock Exchange. Combined, I served as the CEO and Chairman of the Board of Directors for a total of approximately 20 years. I have also served as CEO and President of a Canadian government, provincial venture capital fund. Currently, I am CEO of a technology company based in Oxford, England. I hold a Ph.D. from New York University and an M.B.A. from Oxford University. Additionally, I serve on the Board of Directors of the State University of New York at Empire State College and the Board of Directors of the Technology Transfer Society. I am a listed inventor on 19 issued patents and an author/co-author of four published books.

I think Howard is a good and decent man who works extraordinarily hard in the emerging technology space. Soon after I was first introduced to him, although he was highly engaged in growing a new company, he took the time to travel to China to adopt a mal-nourished child and bring her back to the U.S. Through my interactions with Howard over the years, Howard always seemed to be a caring and attentive father.

Howard is a skilled aircraft pilot. On one of his flights, which was recounted to me because his passenger was a technologist I had introduced to him, the electrical system of plane failed. Through his steadfast action and resolve Howard was able to safely land the plane saving not only his own life, but also the life of his passenger. In the Talmud, Sanhedrin 37a states:

> "FOR THIS REASON WAS MAN CREATED ALONE, TO TEACH THEE THAT WHOSOEVER DESTROYS A SINGLE SOUL... SCRIPTURE IMPUTES [GUILT] TO HIM AS THOUGH HE HAD DESTROYED A COMPLETE WORLD; AND WHOSOEVER PRESERVES A SINGLE SOUL..., SCRIPTURE ASCRIBES [MERIT] TO HIM AS THOUGH HE HAD PRESERVED A COMPLETE WORLD."

In my business dealings with Howard, an investment company I was running had made an investment in an early start-up he founded. The investment did not work out as often happens with new technology investments. However, Howard proceeded to do something remarkable and unexpected. When he started a new company, he issued a pro-rata amount of shares to our firm, to equal the amount we had lost in the previous investment. This was done without requirement, mention or request from us. Over the past 25 years I have invested in more than 75 early-stage companies. Most don't succeed, as is characteristic of the early-stage investment class, a few thankfully have worked. None of our other investments that haven't worked have ever endeavored to repay our initial investment. Howard's action really stood out in my mind as an indication of good character and dedication; partly perhaps because it was so unexpected.

Irrespective of any mistakes Howard has made, I believe him to be a good man and a good father. I firmly believe that a person's past and future should not be described by a few actions, but the assessment of an individual should ideally reflect the totality of choices made and actions taken.

I plead before the court that you show compassion to Howard Leventhal. I understand that he has done wrong there is a price to paid, but I also remain enthusiastic and hopeful as to the additional good Howard can and will do in his remaining years, should he have the opportunity to do so.

Sincerely,

Clifford M. Gross, Ph.D.

FILED DATE: 12/15/2020 4:11 AM 2020L062057

REPLY TO
POUGHKEEPSIE OFFICE

RUDOLPH P. RUSSO
Attorney and Counselor
35 Market Street
Poughkeepsie, New York 12601
Telephone: (845)452-9010
Fax: (845)473-8122

BRANCH OFFICE
P.O. Box 189
Hopewell Junction, NY 12533
Telephone: (845)226-7002
Fax: (845)226-0080

December 2, 2013

Sentencing Judge
US District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11207

Re: People v. Howard Leventhal

Your Honor:

I am Graduate of The Columbia Law School and have practiced law in the State of New York since 1957. Since that time, in addition to my law practice, I have served as, among others, a Town Justice, a member of the Dutchess County Legislature, Chairman of the Dutchess County Legislature, a member of the Board of Trustees of The Dutchess Community College, attorney for the Dutchess County Legislature and attorney for the Dutchess Community College.

I have personally known the defendant, Howard Leventhal, since approximately 1997. I met Mr. Leventhal through my brother-in-law who, at the time, was in the investment banking business. Since 1997, I have personally invested in a number of Mr. Leventhal's enterprises. Although all of these endeavors were not commercially successful, in almost every instance Howard did, in fact, develop and/or bring to market the intended product.

Among these products was "QuickSite", a CD-ROM software which enabled small businesses to create their own e-commerce websites. This product was distributed nationally and in July of 1999, PC Computing Magazine gave it a 4-star rating with the comment that "QuickSite Gold is the friendliest of the bunch..." and "...the easiest way to set-up shop". To my knowledge, this product was totally and solely developed by Howard.

FILED DATE: 12/15/2020 4:11 AM 2020L062057



In 2002, Howard, together with 2 researchers at the University of Miami developed THE STEALTH CHANNEL DIGITAL WATERMARK, which was subsequently awarded U.S. Patent #7,079,633. Although this product did not reach commercial success, it was a ground-breaking development in the prevention of piracy of digital goods such as music, movies and TV programming.

In 2006, Howard, along with two others, co-authored a book entitled, "Are We There Yet? Road Trips in the 21st Century. This book, which is still available today, educates parents about using electronic methods of entertaining children on long car trips.

In 2007, Howard introduced the Vivee voice interactive messaging for retrieving email in automobiles. The purpose of this product was to allow drivers to retrieve email without distraction.

In 2008, Howard, together with consulting engineers, developed the Voyager Mobile Television, which allowed the reception of live TV in moving automobiles. Voyager was demonstrated at the January 2008 Consumer Electronics show in Las Vegas.

I have been advised that Howard attended the Southern Illinois University and the University of Illinois, but did not graduate. Obviously, he is a self-taught engineer and an accomplished inventor, despite his lack of formal education. A number of years ago, Howard's father told me that when Howard was 12 years old, the local police agency sought his assistance in establishing their radio communication system.

Throughout the years that I have known Howard, I have never known him to be anything but honest and straightforward and as far as I can ascertain, he has absolutely no prior criminal history.

In the instant case, Howard, apparently under intense pressure to finance his latest undertaking, exercised extremely poor judgment for which he must atone. However, it would appear to me that no useful purpose whatsoever would be served by sentencing Howard Leventhal to any term of imprisonment.

Very truly yours,

RUDOLPH P. RUSSO
RPR:sb

FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EXHIBIT N**

Handeland signature as RPOC Officer



The Republican Party of Ozaukee County
N62 W278 Suite 6, Washington Ave., Cedarburg, WI 53012
PAID FOR BY THE REPUBLICAN PARTY OF OZAUKEE COUNTY
Phil Georges, Chairman and [illegible], Treasurer

*Village of Thiensville,*
*Amy Langlois, Clerk*
*President Van Mobley*
*250 Elm St*
*Thiensville, WI 53092*

November 15, 2019

Dear Municipal Official and Clerk,

Pursuant to Wisconsin Statute § 7.30(4), the Republican Party of Ozaukee County (RPOC) may submit a certified list of Election Inspector (EI), and Special Voting Deputy (SVD) where applicable, nominees to each municipal governing body in Ozaukee County. As the RPOC Chair, I submit the attached list of the following individuals, who have agreed to be designated Republican First-Choice nominees, to serve as election workers for the Village of Thiensville for the 2020 and 2021 calendar year elections. All of the persons listed must be invited to participate as Election Inspectors and SVDs prior to inviting any other persons who may wish to serve as a Republican representatives for your polling place for any given election.

The RPOC has worked diligently to comply with the Wisconsin State Statutes related to this responsibility as a Republican Party county organization. By providing this list of qualified election inspectors, we are proud of helping ensure that Wisconsin's elections remain open, fair, and transparent.

If you have questions, please feel free to contact me

Sincerely,

*Philip S. Georges*
*Chair, RPOC*
*414-758-9192*

*Mary Handeland*
*Secretary, RPOC*
*262-665-2900*

1 of 2



FILED DATE: 12/15/2020 4:11 AM 2020L062057

**EXHIBIT P**

# Bought-and-Paid-For Wisconsin "Court" Orders

FILED DATE: 12/15/2020 4:11 AM 2020L062057

*(Below is one excerpt of the subject orders. There are no less than 9 "judicial" orders in Wisconsin harming Leventhal which are all products of bribery and graft by the Defendants and corrupt, improper exercises of governmental authority - as set forth in this compliant. Supplements to the record are forthcoming)*



## Ozaukee County Case Number 2019CV000221 Amelia Handeland vs. Howard Leventhal

**Case summary**

| Filing date | Case type | Case status |
|---|---|---|
| 06-12-2019 | Civil | Closed |

| Class code description | Responsible official | Branch ID |
|---|---|---|
| Harassment Restraining Order | Volland, Joseph W. | 2 |

**Party summary**

| Party type | Party name | Party status |
|---|---|---|
| Petitioner | Handeland, Amelia | |
| Respondent | Leventhal, Howard | |

**Parties**

**Petitioner: Handeland, Amelia**

| Date of birth | Sex | Race |
|---|---|---|
| 11-2000 | | |

**Address**

**Attorneys**

| Attorney name | Guardian ad litem | Entered |
|---|---|---|
| Olmr, Robert P | No | 06-21-2019 |

**Respondent: Leventhal, Howard**

| Date of birth | Sex | Race |
|---|---|---|
| 11-1966 | | |

**Address (last updated 06-13-2019)**
825 N Christiana Ave, Chicago, IL 60651

**Court record**

| Date | Event | Court official | Court reporter | Amount |
|---|---|---|---|---|
| 06-01-2019 | Notes | | | |





FILED DATE: 12/15/2020 4:11 AM 2020L062057



| Date | Event | Court official | Court reporter | Amount |
|---|---|---|---|---|
| | Additional text: Howard Leventhal | | | |
| 06-26-2019 | Certificate of non-service. Additional text: Howard Leventhal | | | |
| 06-21-2019 | Injunction granted | Storck, John R. | | |
| 06-21-2019 | Injunction w/out firearm restriction for Leventhal, Howard. Additional text: forwarded to Dispatch. Emailed to Cook County Sheriff's. | Storck, John R. | | |
| 06-21-2019 | Injunction hearing. Additional text: 11:36 AM Cases 19CV220 and 19CV221 called together. Petitioners Mary Handeland and Amelia Handeland in court with Attorney Robert Olmr. Respondent Howard Leventhal appeared by phone means. Atty Olmr advises Petitioners are each requesting injunction and makes record to additional conditions being requested. Respondent opposes injunctions. Mary Handeland sworn and testifies. Court goes off the record for noon break. Parties to reconvene at 12:30 pm. Court back on the record with same appearances at 12:30 pm: Mary Handeland continues testimony. Parties as to ex parte filings of Respondent. Atty Olmr acknowledges receipt of the filings and has no objection to the court reviewing the documents. Respondent requests the court review the documents. Court goes off the record to review the filings. Court back on the record with same appearances at 01:18 pm: Mary Handeland continues testimony. Amelia Handeland sworn and testifies. Court goes off the record for break. Court back on the record with same appearances at 02:52 pm: Howard Leventhal sworn and testifies. Closing argument by Atty Olmr. Closing argument by Respondent. Court examines Atty Olmr as to requested conditions as it relates to jurisdiction. Court makes findings and grants injunction to each petitioner for a period of four years, without firearms restrictions. Copies provided to present parties in court. | Storck, John R. | Klein, Anjanette | |
| 06-18-2019 | Notes. Additional text: Judge Storck grant's respondent's request to appear by phone. Clerk contacted petitioner via phone informing of same. Clerk e-mailed Respondent the call in number. | | | |
| 06-17-2019 | Letters/correspondence. Additional text: Email response to Howard Leventhal email inquires. | | | |
| 06-17-2019 | Letters/correspondence | | | |